THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROCHESTER GAS AND ELECTRIC CORPORATION, ) ) ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 00-CV-6369 |
| ) | |
| v. ) | |
| ) | |
| FIRSTENERGY CORP., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF ROCHESTER GAS AND ELECTRIC CORPORATION'S
PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Rochester Gas and Electric Corporation ("RG&E"), by its attorneys

Dickstein Shapiro LLP, submits the following Proposed Post-Trial Findings of Fact and

Conclusions of Law:

**PROPOSED POST-TRIAL FINDINGS OF FACT**

**I.        THE PARTIES**

1.  Plaintiff RG&E is a corporation organized under the laws of the State of New

York, with its principal place of business at 89 East Avenue, Rochester, New York.  Plaintiff's

Third Amended Complaint ("Complaint") ¶ 6; Defendant's Answer to Plaintiff's Third Amended

Complaint ("Answer") ¶ 6.

2.  Defendant FirstEnergy is a corporation organized under the laws of the State of

Ohio, with its principal place of business at 76 South Main Street, Akron, Ohio.  Complaint ¶ 7;

Answer ¶ 7.

II.      __THE SITES__

3.  RG&E is and has been an owner and operator of the sites of the former East Station and West Station manufactured gas plants ("MGPs"), located along the Genesee River in Rochester, New York.  Tr. Day 3 at 15; Joint Ex. 110 at RGE 26914.

4.  The former East Station MGP Site is a facility located between Suntru Street and the Bausch (formerly Smith) Street Bridge.  The East Station MGP was constructed in approximately 1872, and operated as an MGP from that time until the mid-1950's.  Joint Ex. 110 at RGE 26914-15.

5.  The former West Station MGP Site is a facility located at 254 Mill Street.  The West Station MGP operated as an MGP from 1917 until 1952.  Tr. Day 3 at 182; Joint Ex. 92 at RGE 01298; *see also* Joint Ex. 107 at 3.

6.  During their periods of operation, the East and West Station MGPs both used coal carbonization and carbureted water gas technologies to manufacture gas.  Tr. Day 3 at 16-17.

7.  When the gas cooled, tar formed.  Tr. Day 4 at 82.  Tar is an important byproduct of the gas manufacturing process.  *Id.*  Tar created as a byproduct of gas manufacturing could be, and was, reused or sold.  Tr. Day 6 at 7-8.

8.  RG&E recovered for reuse and for sale essentially all of the known tar that it generated.  Tr. Day 6 at 17.

9.  During the operation of the MGPs, tar leaked from underground bases of tar-handling equipment and pipes, as well as from inadvertent spills.  Tr. Day 6 at 12-13.

10.  Tar was not released by activities when the plants were demolished or "decommissioned."  Tr. Day 4 at 4.

11.  There is no evidence of intentional disposal of tar at the East or West Station MGP Sites.  Tr. Day 4 at 4.

DSMDB.2346210.04

12.  There is no evidence in the record that operational and disposal practices at the East and West Station MGP Sites differed between the periods of AGECO's ownership and operation of the MGPs and RG&E's ownership and operation of the MGPs.

### III.        AGECO'S CONTROL OVER RG&E

13.  RG&E was incorporated in 1904 as the Rochester Railway and Light Company, which was renamed Rochester Gas and Electric Corporation in 1919.  *See* Stipulation ("Stip.") (dated Oct. 21, 2007) ¶¶ 5, 7.

14.  In 1906, Associated Gas & Electric Company ("AGECO") was incorporated as a holding company for operating utility companies.  Defendant's Ex. 631 at 6674, 6676.

15.  In 1929, AGECO acquired Rochester Central Power Corporation.  Through this acquisition, AGECO gained ownership of RG&E's voting stock.  Joint Ex. 27 at RGE 11365-66; Plaintiff's Ex. 536 at C384-92.

16.  From May 1929 to July 15, 1932, AGECO treated RG&E the same as other operating companies in the AGECO empire.  Plaintiff's Ex. 505 at 610; Tr. Day 1 at 103-05.

17.  From May 1929 to July 15, 1932, AGECO controlled all facets of the management and operations of RG&E.  Tr. Day 1 at 153-54; Plaintiff's Ex. 538 at C490.

18.  AGECO installed its key employees and associates in positions of authority at RG&E, including officer and director positions.  Joint Ex. 49 at RGEC 64848-49; Plaintiff's Ex. 507 at G1424; Plaintiff's Ex. 562; Plaintiff's Ex. 563.

19.  Director meetings were held at AGECO's New York offices, not at RG&E's Rochester offices.  Joint Ex. 2 at RGEC 64870.

20.  RG&E's financial functions were controlled from AGECO's New York offices.  Joint Ex. 7 at RGE 17776.

DSMDB.2346210.04

21.  RG&E's minutes and books of account were irregularly maintained; entries were placed on RG&E's books at the whim of AGECO.  Plaintiff's Ex. 538 at C489-90.

22.  The most important mechanism which AGECO used to control RG&E was through the use of "service company" contracts with AGECO affiliates.  Through the implementation of the service company contracts, AGECO exerted control over RG&E by providing management, auditing, consulting, engineering, corporate, security and tax services using AGECO-controlled companies.  These contracts outsourced all pertinent operations to AGECO service companies, including J.G. White Management Corporation (later known as Utility Management Corporation), W.S. Barstow & Co. (later known as E.M. Gilbert Engineering Corporation), Utilities Accountants and Tax Consultants, and Utilities Purchasing and Supply Corporation.  None of these contracts were negotiated at arms-length.  Tr. Day 1 at 125-26; Joint Ex. 2 at RGEC 64870, 64872; Joint Ex. 3 at RGEC 64892-93.  The payments by RG&E to these service companies ultimately were funneled upstream to AGECO.  Plaintiff's Ex. 537 at 847.

23.  AGECO siphoned money from RG&E for its own uses through service contracts with AGECO-controlled companies, some of which provided no services, such as Mid-State Fuel Corporation, and through fronting companies or individuals, such as E.J. Cheney.  Plaintiff's Ex. 535 at 715-17; Plaintiff's Ex. 537 at 869.  RG&E's payments were passed upstream to AGECO.  Plaintiff's Ex. 537 at 869.

24.  AGECO also siphoned money from RG&E by using accounts such as the "Surplus Appropriated for Common Stockholders" account by which all net income of RG&E in excess of the amount of preferred dividends paid was set aside for the use of the common shareholders -- AGECO.  Joint Ex. 50 at 175-76.  Although RG&E's accounting records indicate that these funds remained with RG&E, financial statements are simply snapshots of a company's

4

finances.  AGECO had the ability to and did make transfers of funds which were not recorded in RG&E's accounting records.  Tr. Day 1 at 162-64; Tr. Day 7 at 144-45; Plaintiff's Ex. 535 at 715-17.

25.  AGECO also guaranteed payment of RG&E's debts.  Joint Ex. 27 at RGE 11366; Plaintiff's Ex. 535 at C290.

26.  Because of the depressed national economy and as a result of AGECO's actions, RG&E's credit was impaired.  These financial difficulties threatened to force RG&E into receivership in 1932, unless AGECO could produce $9.7 million to pay off RG&E's notes due on July 15, 1932.  AGECO's credit also was so impaired that bankers refused to loan AGECO money to pay the RG&E notes unless AGECO agreed to a voting trust agreement.  AGECO begrudgingly agreed, and on July 15, 1932, RG&E's stock became subject to a ten-year voting trust as a condition of receiving financing.  Joint Ex. 9 at RGE 11468-95; Joint Ex. 27 at RGE 11366; Tr. Day 2 at 29-30.

27.  Without these loans, RG&E would have gone into bankruptcy.  Tr. Day 7 at 141-42.

28.  The Voting Trust Agreement alone, however, did not end AGECO's control over RG&E.  Plaintiff's Ex. 505 at 605; Tr. Day 2 at 35, 59-60.

29.  The Voting Trust Agreement forbade the voting trustees from making any changes in the structure, financing or organization of RG&E without the consent of AGECO. Article Eight of the Voting Trust Agreement provided that:

> The Voting Trustees shall not, and will not, however, during the continuance of this Agreement, vote in respect of the shares of stock of the Company deposited hereunder, to authorize:
>
> (a)      Any increase or decrease in the authorized number of shares of any class of stock of the Company authorized prior to July, 1932; or

DSMDB.2346210.04

(b)     The creation of any new class or series of stock of the Company other than Preferred Stock with no greater voting rights than are now possessed by the Preferred Stock, Class D, of the Company as at present constituted, which Preferred Stock shall be redeemable at not more than $105 per share and accrued dividends; or

(c)     Any change in the preferential or voting rights or restrictions of any class of stock of the Company; or

(d)     The making or execution of any new mortgage upon any of the property of the Company, other than a purchase money mortgage; or

(e)     The sale, conveyance, assignment, transfer or lease of any fixed property of the Company in excess of $100,000, for cash or otherwise; or

(f)     The purchase or acquisition of any plant or system of a value in excess of $100,000 for cash or otherwise; or

(g)     The winding up or dissolution of the Company; or

(h)     The merger or consolidation of the Company with or into any other corporation or corporations; or

(i)     The increase or reduction in the number of the directors of the Company; or

(j)     The alteration, modification or repeal of any by-law of the Company which limits the power of the Company or its Board of Directors or officers to do any act or take any proceeding which, by the provision of this Agreement, is not to be done or taken by the Company;

except with the consent of the holders of Voting Trust Certificates representing not less than a majority in number of shares of the Common Stock of the Company then deposited hereunder, evidenced either by a vote in person or by proxy at a meeting called by the Voting Trustees for that purpose, or by a written instrument duly signed by such holders.

Joint Ex. 9 at RGE 11480-81.

30.  Although only one of the voting trustees were supposed to be affiliated with

AGECO, government investigators found that two were.  Tr. Day 2 at 37; Plaintiff's Ex. 505 at

605.

31.  AGECO still held all of RG&E's voting stock through its subholding companies.

Plaintiff's Ex. 505 at 605.

6

32.  AGECO affiliated persons continued to hold RG&E's officer positions, exercising day-to-day control over RG&E.  Tr. Day 2 at 37-38; Plaintiff's Ex. 564.

33.  The service contracts between AGECO service companies and RG&E continued after the institution of the Voting Trust Agreement.  Plaintiff's Ex. 505 at 605.  Notwithstanding discussions among RG&E's Board of Directors, the service contracts providing management, engineering, and supplies between RG&E and E.M. Gilbert Engineering Corporation, Utility Management Corporation, and Utilities Purchasing and Supply Corporation continued unchanged until September 19, 1934 when those contracts were cancelled.  Tr. Day 2 at 47-51; Joint Ex. 326 at 55-56; Joint Ex. 12 at RGEC 65749.

## IV.  FIRSTENERGY'S LIABILITY AS A SUCCESSOR TO AGECO

34.  AGECO and its wholly owned and controlled subsidiary, Associated Gas & Electric Corporation ("AGECORP"), filed for bankruptcy on January 10, 1940 under Chapter X of the Bankruptcy Act.  Stip., ¶ 8; Defendant's Ex. 631 at 6673.

35.  In January 1946, AGECORP was merged with and consolidated into AGECO. The consolidated surviving company that emerged from bankruptcy proceedings was AGECO, renamed General Public Utilities Corporation, which later changed its name to GPU, Inc.  Joint Ex. 295 at G5739-41; Tr. Day 6 at 167-68; Tr. Day 7 at 9, 18-21.

36.  General Public Utilities Corporation received the stock of operating subsidiaries, such as RG&E, as a result of the bankruptcy proceedings.  Tr. Day 7 at 27-29.

37.  The Board of Directors of General Public Utilities Corporation represented that it was the successor-in-interest to AGECO and AGECORP.  Tr. Day 7 at 22-25; Joint Ex. 65 at 5184.

DSMDB.2346210.04

38.  The Final Decree ending the bankruptcy proceedings only barred claims that could have been brought against AGECO, renamed General Public Utilities Corporation, before August 12, 1946.  Joint Exhibit 24; Tr. Day 7 at 25-26.

39.  The statute under which RG&E's claims in the instant action arise, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. § 9601, *et seq.*, was enacted in 1980.  Tr. Day 7 at 26.

40.  General Public Utilities Corporation was a registered holding company for operating utilities after the end of bankruptcy proceedings.  Tr. Day 7 at 28-29.

41.  General Public Utilities Corporation sold the stock of operating companies, such as RG&E, to comply with the mandates of the Public Utility Holding Company Act, but retained the stock of its operating companies that were located in Pennsylvania, where it was located.  Tr. Day 7 at 28-31.

42.  General Public Utilities Corporation shortened its name to GPU, Inc. during the 1990's.  Tr. Day 5 at 171.

43.  GPU, Inc. remained a holding company for operating utility companies until it merged with FirstEnergy in 2001.  Stip. ¶ 9; Tr. Day 7 at 33.

**V.      REMEDIAL ACTIVITIES AND STATE INVOLVEMENT AT EAST AND WEST STATIONS**

44.  There have been releases of hazardous substances, including but not limited to coal tar, at the East and West Station MGP sites during their periods of operation.  Tr. Day 6 at 53; *see* 42 U.S.C.A. § 9601(14) (defining "hazardous substance" under CERCLA); 42 U.S.C.A § 9601(22) (defining "release" under CERCLA).  *See also* Joint Ex. 110 at RGE 26919; Joint Ex. 107 at RGE 01356; Joint Ex. 96 at RGE 04930.

45.  East and West Stations are "facilities" as defined by CERCLA.  Tr. Day 6 at 53. *See* 42 U.S.C.A. § 9601(9).

8

46.  RG&E has incurred costs responding to the releases at East and West Stations, as required by CERCLA.  Tr. Day 6 at 53-54.

47.  Coal tar is present at the East and West Station MGP sites as a result of the production of gas at the sites.  Tr. Day 3 at 20-21.

48.  Coal tar is the principal hazardous substance that has been and continues to be remediated at East and West Stations.  *See* Joint Ex. 110 at RGE 26919, RGE 26944; Joint Exhibit 43 at RGE 351042-351051.

49.  A response by a private party under a U.S. Environmental Protection Agency ("EPA") consent order complies with the National Contingency Plan, 40 C.F.R. § 300 ("NCP"), which governs standards for private party cleanups under CERCLA.  Tr. Day 5 at 56.

50.  Approved state agencies can substitute for the EPA.  The New York State Department of Environmental Conservation ("NYSDEC") is an approved state agency.  Tr. Day 8 at 55-56; Tr. Day 5 at 56-57.

51.  NYSDEC can determine whether there is a CERCLA-quality cleanup that is consistent with the NCP.  Tr. Day 6 at 57.

52.  NYSDEC has created a Voluntary Cleanup Program ("VCP") as a means for Potentially Responsible Parties ("PRP's") to address sites requiring environmental remediation in a systematic and consistent matter.  Tr. Day 4 at 41.

53.  The VCP is somewhat flexible, but generally requires the same overall process as the NCP.  Tr. Day 6 at 60-61.  A cleanup compliant with the Voluntary Cleanup Program presumptively meets the NCP.  Tr. Day 6 at 61.

54.  RG&E entered into a standardized Voluntary Cleanup Agreement ("VCA") with NYSDEC on April 10, 2003, under the Voluntary Cleanup Program.  Tr. Day 4 at 22.  The VCA included East and West Stations, as well as six other former MGP sites.  Joint Ex. 40 at RGE

9

28463-28483.  The New York State Department of Environmental Conservation has supervised and directed RG&E's investigations and cleanup at each of the sites.

56. As a result of its participation in the Voluntary Cleanup Program, and under the direction and demands of NYSDEC, RG&E has incurred costs in investigating and remediating releases of hazardous wastes at East Station and West Stations, as well as necessary state oversight costs.  *See generally* Joint Ex. 82 at RGE 361283-361308.

## B.   REMEDIATION ACTIVITIES AT THE EAST STATION MGP

56. RG&E incurred costs in the amount of $375,319.75 in preparing a Focused Remedial Investigation at East Station, which was a preliminary remedial evaluation created by a professional consultant, Ish, Inc., and META Environmental in April 2000.  *See* Joint Ex. 82A at RGE 361285-361287; *see also* Joint Ex. 36; Joint Ex. 103.

57. RG&E has incurred costs in the amount of $11,923.25 for a Focused Feasibility Study performed by Ish, Inc. in June 2001.  *See* Joint Ex. 82B at RGE361288; *see also* Joint Ex. 37.

58. RG&E incurred costs in the amount of $8,829.27 for an Executive Summary prepared by Ish, Inc. and META Environmental, at the demand of NYSDEC, in October 2003. *See* Joint Ex. 82 at RGE 361289; *see also* Joint Ex. 110.

## C.   HISTORY OF THE TAR WELL

59. One of the gas holders at the East Station MGP was converted to use as a tar well to store tar in the 1880s.  Tr. Day 4 at 65.

60. The East Station MGP recovered tar until the end of its operations in the mid-1950s.  Tr. Day 6 at 135.

61. The East Station sold or reused all of the tar that it produced, with the exception of unknown tar that leaked through underground piping or equipment, and tar that spilled.  Tr.

DSMDB.2346210.04

Day 6 at 48.  The East Station MGP never dumped or disposed of its tar.  Tr. Day 6 at 48-49.

The East Station would have needed to store tar prior to its sale or use.  There was no significant

tar storage vessel at East Station other than the tar well.  Tr. Day 6 at 134.  The only other

potential tar storage vessels at East Station were small tanks.  Tr. Day 6 at 135.

     62.  Sanborn maps were maps that were used for fire insurance purposes, and show

structures on a site.  Tr. Day 4 at 65-66.

     63.  Sanborn maps of East Station beginning in 1911 do not show the tar well.  Tr.

Day 6 at 133.  Sanborn maps, however, do not show underground structures like tar wells.  Tr.

Day 6 at 134, Tr. Day 4 at 66-67.

     64.  Tar from East Station could not have been stored at West Station before West

Station was built in 1917.  The tar well would have been used to store East Station tar before

1917.  Tr. Day 6 at 136.

     65.  Piping diagrams and an engineering diagram (Defendant's Exhibits 645 and 646,

respectively) show that tar was pumped from East Station to West Station beginning in 1928.

There is no evidence of such activity before 1928.  Tr. Day 6 at 137.  The tar well would have

been used to store East Station tar before 1928.  Even after 1928, tar was processed at East

Station  before being pumped to West Station.  Tr. Day 6 at 148.

     66.  Even after 1928, some tar could have been piped to the East Station tar well.  Tr.

Day 6 at 136.

     67.  Joint Exhibit 226E is a photograph from between 1947 and 1949.  It shows the

East Station tar well accessible between the operating equipment at East Station that produced

tar.  Tr. Day 4 at 69; Joint Ex. 226E.

     68.  When the tar well removal action was conducted, demolition debris was removed

from the tar well.  Tr. Day 6 at 137.  There is no evidence of demolition activity at East Station

DSMDB.2346210.04

before the 1950s, and most demolition took place around 1975.  Tr. Day 6 at 137, 138-39.

Therefore, the tar well was not buried, but was accessible throughout the East Station's MGP

operations.

69.  There is no evidence that the tar well was retired during plant operations.  *See,
e.g,* Joint Ex. 309 at 17-18 (listing major decommissioning activities at the East Station MGP).

70.  Thus, it is more likely than not that the tar well was used to store some tar at East

Station until the end of plant operations in the mid 1950s.

### D.    THE TAR WELL REMOVAL

71.  "Interim remedial measures" as used in New York State, are synonymous with

"removal actions" described in the NCP.  Tr. Day 6 at 63.

72.  NYSDEC demanded that RG&E remediate the tar well before it performed other

cleanup activities at East Station.  Tr. Day 3 at 57.  Although RG&E did not view the tar well as

an imminent threat, NYSDEC wanted the tar well removed first.  Tr. Day 3 at 62–63.

73.  RG&E's initial plan was only to do an *in situ* stabilization ("ISS") with the tar in

the tar well.  Tr. Day 3 at 48–49.

74.  NYSDEC has a policy requiring removal of tar and tar wells as a source material

for contaminants, in order to protect human health and the environment.  Tr. Day 3 at 57-58.

75.  NYSDEC's policy of conducting removal actions to remove vessels that contain

tar, even if there is no imminent hazard, is consistent with the USEPA's policy.  Tr. Day 3 at 57–
58.

76.  Other than RG&E, no utility in New York has left a tar well or tar-handling

structure in the ground.  Tr. Day 6 at 94.

77.  If the tar well had not been removed as an interim remedial measure, it would

have been removed later as part of the site-wide remediation.  Tr. Day 6 at 95.

DSMDB.2346210.04

78.  NYSDEC insisted that RG&E remove the tar well structure and all surrounding soils and pipes, potentially down to the river.  *See* Joint Ex. 126 at RGE 344202.  RG&E persuaded NYSDEC to accept a compromise area where a 20-foot radius surrounding the tar well was excavated.  *See* Joint Ex. 135.

79.  Preparation of a work plan and removal of the tar well at East Station were performed between June 2004 and June 2005, and a final engineering report was prepared and submitted to NYSDEC and approved in March 2006.  *See* Joint Ex. 185, at RGE 347427 - 347456.

80.  During the tar well removal, NYSDEC was constantly on the site and approved work plans.  Tr. Day 3 at 79.

81.  Even absent NYSDEC involvement, RG&E complied with each aspect of the NCP applicable to removal actions, as follows:

   a.  RG&E developed and implemented a worker health and safety plan for the tar well removal.  Tr. Day 3 at 71.

   b.  RG&E documented its work on the tar well through daily construction logs and other means.  Tr. Day. 3 at 72.

   c.  RG&E met all permit requirements in the tar well removal by conducting the removal under the Voluntary Cleanup Agreement.  Tr. Day 3 at 72.

   d.  RG&E identified and complied with all applicable or relevant and appropriate requirements ("ARARs"),  Tr. Day 3 at 72-73.

   e.  RG&E met reporting requirements to the EPA for East and West Stations, to the extent applicable.  Tr. Day 3 at 73–74; Joint Ex. 229.

   f.  RG&E conducted a removal site evaluation for the removal of the tar well, in the form of the Focused Feasibility Study, as a means to evaluate whether the tar well should be removed.  Tr. Day 3 at 74.  The Focused Feasibility Study was the equivalent of an engineering evaluation/cost analysis as contemplated by the NCP, and considered cost-effectiveness.  *See* 40 C.F.R. § 300.415(b)(4)(i); Joint Ex. 37 at RGE 04814-04815.

13

g. Prior to the removal of the tar well, NYSDEC distributed fact sheets to notify the public regarding the tar well removal. Tr. Day 3 at 74. NYSDEC's involvement also meets the public participation requirement of the NCP.

82. The tar well contamination posed a potential threat of exposure to nearby humans, animals, or the food chain; involved hazardous substances in a container; held the threat of migration due to infiltrating rainwater; and otherwise posed a threat to the public or the environment. Tr. Day 3 at 74–77.

83. As a result, the tar well removal was appropriate as a removal action under the NCP or under New York's guidance document, TAGM 4048, even without an imminent threat to human health and the environment. Tr. Day 4 at 37–40.

84. The NCP has specific provisions for non-emergency removal actions, like the tar well removal, that take at least 6 months to plan. 40 C.F.R. § 300.415(b)(4); Joint Ex. 90 at 60. EPA guidance documents also specifically contemplate non-time-critical removal actions. Joint Ex. 234. RG&E satisfied these provisions.

85. When the tar well itself was removed, RG&E encountered unexpected groundwater infiltration problems, even though RG&E tested the tar well area extensively just before excavating the tar well, using piezometers and test pits. Joint Ex. 142 at RGE 348517, 348522; Tr. Day 7 at 168.

86. It is not uncommon to run into unanticipated problems when remediation activities take place in a subsurface. Tr. Day 3 at 83.

87. RG&E installed a slurry wall to resolve the groundwater infiltration issue. RG&E would have had to install that wall even if it had known about the extent of the problem before excavation. If RG&E had been able to proceed with its initial plans, the groundwater problem would not have resulted. Tr. Day 3 at 83–84.

DSMDB.2346210.04

88.   State regulations require that cost-effectiveness be considered with respect to environmental remediation, and the Focused Feasibility Study included cost-effectiveness considerations.  Tr. Day 6 at 112.

89.   The tar well removal included not just the tar well excavation, but also exterior soil removal from within 20 feet outside of the tar well.  Tr. Day 6 at 130.  Tar migrated to this area primarily from sources other than the tar well.  *Id.*

90.   Most of the tar outside the tar well that was remediated came from multiple sources of tar contamination, other than the tar well.  Tr. Day 6 at 131.  All of these sources operated until the mid-1950s.  Tr. Day 6 at 132.  These sources leaked tar that was remediated through the 1940s and 1950s.  Tr. Day 6 at 132-33.

91.  Costs related to the tar well can be identified as either incurred in the removal of the tar well itself or, alternatively, incurred to excavate surrounding soils that were contaminated by the tar well and other MGP operations at East Station that continued into the 1950's.

92.   The actual excavation of the tar well, tar well contents, and surrounding soils occurred over the period of January 3, 2005 to May 13, 2005.  *See* Joint Ex. 143, RGE 347563-347677.  According to waste shipping logs prepared as part of the final engineering report for the tar well, 19,987 tons of waste material were removed.  Joint Ex. 143 at RGE 347519.  Consultant daily log reports indicate the approximate location of work on a given day (i.e. inside the tar well versus outside of the tar well).  *See* Joint Ex. 143 at RGE347563-347677.  The solid waste shipping log in the final engineering report indicates the amount of waste removed each day.  *See* Joint Ex. 185 at RGE 347506-347519.

93.   Based upon construction reports and shipping logs, approximately 13,000 tons of soil were removed from outside the tar well itself.  *See* Joint Ex. 143 at RGE 347563-347677; Joint Ex. 185 at RGE 347506-347519.  This number is equivalent to approximately 65% of the

15

total, 19,987 tons, of removed soil.  The remaining 7,000 tons of waste removed, or

approximately 35% of the total, was constituted by the structure of tar well itself and the soils

within it.  It therefore is possible to divide costs between those incurred to remove the tar well

itself and costs incurred to remove soils surrounding the tar well.

94.   The percentages set forth in the previous paragraph apply to costs for activities

undertaken prior to removal, actual excavation, and costs to remove contaminated groundwater

encountered in the course of excavation.  *See generally* Joint Exhibit 82D (itemizing individual

invoices that have been filed with the Court in hardcopy format).  Tar well removal costs totaled

$4,396,028.  Joint Ex. 82D at RGE 361301.  As set forth above, costs to remove soils outside the

tar well constituted 65% of these costs, and therefore totaled approximately $2.9 million.  Costs

to remove the tar well and its contents constituted 35% of these costs, and therefore totaled

approximately $1.5 million.

95.   Even if the Court holds that the tar well did not operate after 1928, and that

RG&E is not entitled to recover from AGECO costs of removing the tar well, RG&E nonetheless

is entitled to recover the $2.9 million incurred to remove soils outside the tar well (as well as all

other claimed costs), as the tar in these soils was generated by MGP operations that continued

through the 1929 – 1934 period.

E.   FUTURE CLEANUP AT EAST STATION

96.   Following its investigation and remedy selection, and with NYSDEC oversight,

RG&E is preparing to implement an *in-situ* stabilization ("ISS") remediation along the riverbank

at East Station to minimize seeps of tar into the Genesee River.  Tr. Day 3 at 85–86; *see* Joint Ex.

213.  RG&E has incurred and will continue to incur costs in connection with the ISS

remediation.

DSMDB.2346210.04

97.  The ISS work is being done under the direction of NYSDEC and pursuant to the Voluntary Cleanup Agreement.  Although the work has not yet been conducted, it will be substantially compliant with the NCP.  Tr. Day 3 at 87-88.

98.  To date, RG&E has expended a total of $189,491 in recoverable costs for the ISS.  Joint Ex. 82E at RGE 361302-361304.

99.  RG&E expects to incur millions of dollars at East Station in additional response costs in connection with necessary future investigation and remediation activities.  Tr. Day 3 at 91–92.

F.    WEST STATION ACTIVITIES

100.  In November 2003, RG&E incurred costs in the amount of $2,897.53 in preparing a survey of seeps of tar (the "seep survey") into the Genesee River from West Station. *See* Joint Ex. 82 at RGE 361283–361308; *see also* Joint Ex. 360 at RGE 28390-28403.

101.  There is no dispute that this initial seep survey was done in compliance with the NCP, and its cost is recoverable under the NCP.  Tr. Day 6 at 119.

102.  The New York State Department of Environmental Conservation requested the seep survey, and approved its work plan.  Tr. Day 3 at 97.

103.  After receiving the seep survey, NYSDEC demanded that RG&E investigate the tar/oil separator located on West Station to determine whether it was a source of contamination that needed to be remediated as an Interim Remedial Measure.  In response to NYSDEC's demand, RG&E undertook an investigation of the tar/oil separator.  Tr. Day 3 at 97–99; *see* Joint Ex. 43 at RGE 351042-351468.

104.  RG&E was able to demonstrate to NYSDEC that an IRM for the tar/oil separator was not warranted.  Tr. Day 3 at 99–100.

17

105.  RG&E has expended more than $159,274.60 to investigate tar/oil separator at West Station.  *See* Joint Ex. 82 at RGE 361284.

106.  RG&E expects to incur millions of dollars at West Station in additional response costs in connection with necessary future investigation and remediation activities.  Tr. Day 3 at 101–102.

G.    DAMAGES

107.  In total, RG&E has incurred $5,143,764 in costs responding to releases and threatened releases of hazardous substances at East and West Stations.  *See* Joint Ex. 82 at RGE 361283-361284.

108.  Releases of tar occurred during the operations of the plants, from the 1870's through the mid-1950's.  Tr. Day 4 at 62.

109.  The tar releases were in proportion to the amount of gas manufactured.  Tr. Day 4 at 62-63.

110.  More gas was produced in certain months, such as during winter, than in other months, such as during summer.  Tr. Day 6 at 45.  Plaintiff's Exhibit 571 is the only analysis of gas produced from May 1, 1929, when AGECO acquired RG&E, through July 14, 1932, when the Voting Trust was enacted.  Eight percent of all gas that was produced at East and West Station was produced during this period.  *See* Plaintiff's Ex. 571.

111.  The same analysis shows that 18% of all of the gas that was produced at East and West Station was produced during the 90-month period from July 15, 1932 through January 10, 1940.  *Id.*

112.  AGECO's control over RG&E ended in September 1934, when the most oppressive service contracts were canceled, and replaced by at-cost contracts.  On a *pro rata*

18

basis, approximately five percent of all gas was produced from July 15, 1932 to September 1, 1934.  *See* Plaintiff's Ex. 571.

113.  RG&E has spent $5,143,764 investigating and remediating the projects at issue in this action at the East and West Station MGPs.  *See* Joint Ex. 82.  RG&E's damages from FirstEnergy are 13% of that total, or $668,689, plus accrued interest of $82,926 (based upon prevailing Superfund interest rates established by the U.S. Environmental Protection Agency, accrued as of the completion date of the respective activities at East and West Stations).  In total, FirstEnergy is liable to RG&E in the amount of $751,615, in addition to future costs.

## CONCLUSIONS OF LAW

1.  Private parties may recover response costs incurred in cleaning up a site from other potentially responsible parties under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.A. § 9601, *et. seq*.

2.  East and West Stations are "facilities" as defined by CERCLA.  Tr. Day 6 at 53.  *See* 42 U.S.C.A. § 9601(9).

3.  There have been releases of hazardous substances, including coal tar, at the East and West Station MGP sites during their periods of operation.  Tr. Day 6 at 53; *see* 42 U.S.C.A. § 9601(14) (defining "hazardous substance" under CERCLA; 42 U.S.C.A § 9601(22) (defining "release"); *see also* Joint Ex. 110 at RGE 26919; Joint Ex. 107 at RGE 01356; Joint Ex. 96 at RGE 04930.

4.  RG&E has incurred costs responding to the releases.  Tr. Day 6 at 53-54.

5.  Under CERCLA, a "person who at the time of disposal owned or operated any facility at which…hazardous substances were disposed of" is liable as a responsible party for the remediation of contamination.  42 U.S.C.A. § 9607(a)(2); 42 U.S.C.A. § 9601, *et. seq*.

DSMDB.2346210.04

6.  The requirements placed upon private parties seeking cost recovery are set forth in the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. § 300.700.

7.  The Environmental Protection Agency amended the NCP in 1990 to require that a private party merely be in "substantial compliance" to satisfy the NCP.  Tr. Day 6 at 54-55; 40 C.F.R. §300.700(c)(3)(i).

8.  Upon piercing of the corporate veil, a parent corporation is liable under CERCLA as an owner and an operator for the pollution-causing acts of its subsidiary.  *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 64 (1998).  *See also* Decision and Order ("Order") (dated Mar. 31, 2004) at 3.

9.  To pierce the corporate veil and reach the assets of AGECO, RG&E must demonstrate that "(1) AGECO exercised complete domination over RG&E with respect to the transaction at issue; and (2) that such domination was used to commit a fraud or wrong that injured RG&E."  Order at 4;  *Morris v. New York State Dept. of Taxation and Finance*, 603 N.Y.S.2d 807, 810-11 (Ct. App. 1993); *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (applying New York law).

10.  With respect to the first prong of the test, whether a parent corporation completely dominates a subsidiary depends on ten factors of which "no one of these factors is either necessary or sufficient to disregard corporate separateness," Order at 7-8; *Pfohl Brothers Landfill Site Steering Comm. v. Allied Waste Sys., Inc.*, 255 F.Supp.2d 134, 180 (W.D.N.Y. 2003) (Foschio, J.).  The ten factors include:

> (1) the absence of corporate formalities and paraphernalia that are part and parcel of the corporate existence (i.e., issuance of stock, election of directors, keeping of corporate records);

> (2) inadequate capitalization;

DSMDB.2346210.04

(3) use of corporate funds for personal rather than corporate purposes;

(4) overlap in ownership, officers, directors, and other personnel;

(5) common office space, address and telephone numbers of corporate entities;

(6) the amount of business discretion maintained by the allegedly dominated corporation;

(7) whether related corporations dealt with the dominated corporation at arms length;

(8) whether the corporations are each treated as independent profit centers;

(9) the payment or guarantee of debts of the dominated corporation by the other corporations in the group; and

(10) whether the corporation in question [had] property that was used by other of the corporations as if it were its own.

Order at 7-8 (citing *William Passalacqua Builders, Inc. v. Resnick Developments South Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

11.  For the period May 1929 to July 15, 1932, the only factors that arguably were not met is the absence of corporate formalities and capitalization.  Because AGECO controlled RG&E's board, the corporate formalities were a sham.   Plaintiff's Ex. 505 at 605; Plaintiff's Ex. 538 at C489-90.  Because RG&E's assets were hard assets, its capitalization was misleading. Without the loans received pursuant to the Voting Trust Agreement, RG&E would have been bankrupt. Tr. Day 7 at 141-42.  Capitalization is also based on a snapshot of the company's financial records, and does not account for AGECO's ability to siphon funds from RG&E at will.

12.  With respect to the other eight factors, from May 1929 to July 15, 1932, AGECO used RG&E's funds for its own use; RG&E's officers and directors were the same individuals that AGECO used to run its other companies; RG&E's board of director s meetings and accounting functions took place in AGECO's New York offices; through outsourcing its management and AGECO's control over its officers and directors, RG&E had no business

DSMDB.2346210.04

discretion; AGECO's overlapping officers and directors prevented arm's length transactions, particularly with respect to the service contracts; RG&E was not an independent profit center; AGECO paid RG&E's obligations; and AGECO freely used RG&E's property as if its were AGECO's.  Joint Ex. 49 at RGEC 64848-49; Plaintiff's Ex. 507 at G1424; Plaintiff's Ex. 562; Plaintiff's Ex. 563; Joint Ex. 2 at RGEC 64870; Joint Ex. 7 at RGE 17776; Joint Ex. 50 at 175-76; Joint Ex. 27 at RGE 11366; Plaintiff's Ex. 535 at C290.

13.  For the period July 15, 1932 to September 19, 1934, although the Voting Trust Agreement loosened AGECO's control over RG&E, AGECO still maintained control over RG&E.  At least five of the factors were still met: AGECO continued to siphon money from RG&E through the service contracts and thus use RG&E's funds as its own; a majority of RG&E's officers were the same individuals that AGECO used to run its other companies; because of the continued service contracts, RG&E had no business discretion: the contracts were not negotiated at arm's length; and AGECO continued to siphon funds from RG&E, rather than treat RG&E as an independent profit center.  Plaintiff's Ex. 505 at 605; Tr. Day 2 at 37-38; Plaintiff's Ex. 564;  Tr. Day 2 at 47-51; Joint Ex. 326 at 55-56; Joint Ex. 12 at RGEC 65749.

14.  RG&E further demonstrated that  "such domination was used to commit a fraud or wrong that injured RG&E"  because "AGECO's control over the corporate operations of RG&E contributed to the environmental damage and liabilities alleged in the complaint."  Order at 6.  AGECO's control also cost RG&E millions of dollars that AGECO wrongly siphoned from RG&E.

15.  Under New York law, RG&E is allowed pierce its own veil, for its own benefit and for the benefit of its ratepayers.  *E.g., State of New York v. Easton*, 647 N.Y.S.2d 904, 908 (1995); *Sweeney, Cohn, Stahl & Vaccaro v. Kane*, 6 A.D.3d 72, 75-76 (N.Y. App. Div. 2004);

DSMDB.2346210.04

*Corcoran v. Frank B. Hall & Co., Inc.*,149 A.D.2d 165, 174-175 (N.Y. App. Div. 1989); *Matter of Guptill Holding Corp. v. State of New York*, 33 A.D. 2d 362, 365 (N.Y. App. Div. 1970).

16.  Because AGECO exercised domination over RG&E, and this domination was used to commit a fraud or wrong that injured RG&E, the corporate veil is pierced during the period May 1929 to September 13, 1934 for purposes of owner and operator liability under CERCLA.  *Morris v. New York State Dept. of Taxation and Finance*, 603 N.Y.S.2d 807, 810-11 (Ct. App. 1993); *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (applying New York law);  *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

17.  General Public Utilities Corporation, renamed GPU, Inc., is the successor to AGECO and "is liable for the debts of its predecessor where there is a merger or consolidation of the two firms."  *Beck v. Roper Whitney*, 190 F. Supp. 2d 524, 533 (W.D.N.Y. 2001).  FirstEnergy is the successor to GPU, Inc. and AGECO through its 2001 merger with GPU, Inc.  *Id.*

18.  RG&E's claims against AGECO under CERCLA, which was enacted in 1980, were not discharged in AGECO's 1946 bankruptcy  because "[c]laims against a reorganized debtor that arose from a statute that was enacted after entry of the debtor's final bankruptcy plan of reorganization were not pre-petition 'claims' that had been discharged."  *In re Chateaugay*, 53 F.3d 478, 497 (2d Cir. 1995); *In re Duplan Corp.*, 209 B.R. 324, 332-33 (S.D.N.Y. 1997); *Chesapeake Utilities Corp. v. GPU, Inc.*, No. 96-338-JJF, slip op. at 9-10 (D. Del., Dec. 30, 1997); *Chesapeake Utilities Corp. v. GPU, Inc.*, C.A. No. 96-338/ 97-468-JJF, slip op. at 12 (D. Del., Apr. 5, 1999); *see also In re Duplan Corp.*, 212 F.3d 144, 151 (2d Cir. 2000); *In re Penn Central Trans. Co.*, 944 F.2d 164, 168-69 (3d Cir. 1991).

DSMDB.2346210.04

19.  AGECO's liabilities under CERCLA still passed to its successors even though AGECO was required to divest subsidiaries, including RG&E, under the Public Utilities Holding Company Act.  *North Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642 (7th Cir. 1998).

20.  As a matter of law, constituent elements of coal-tar are hazardous substances for CERCLA purposes, and their presence at the site of a former manufactured gas plant may constitute a "release" or "disposal" for purposes of CERCLA liability.  *See HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F. Supp. 318 (D. Md. 1993).

21.  At East and West Stations, there have been "releases" and threatened releases of "hazardous substances," as those terms are defined under CERCLA.  *See* 42 U.S.C.A. § 9601(14) (defining "hazardous substance"); 42 U.S.C.A §9601(22) (defining "release").

22.  Under CERCLA, the owner of a facility is liable for necessary costs of response incurred by other persons consistent with the National Contingency Plan.  42 U.S.C.A. § 9607(a)(4)(B); National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. § 300 (1990).

23.  The response costs incurred by RG&E at East and West Stations were necessary and consistent with the National Contingency Plan.  *See General Electric Co. v. Litton Indus. Auto. Sys.*, 920 F.2d 1415, 1421 (8th Cir. 1990); *see also Town of New Windsor v. Tesa Tuck, Inc.*, 919 F. Supp. 662, 673-74 (S.D.N.Y. 1996).

24.  RG&E may recover its investigative costs incurred at East and West Station MGP Sites even if those costs were not incurred in substantial compliance with the NCP.  *Nashua Corp. v. Norton Co.*, 116 F. Supp. 330, 353 (N.D.N.Y. 2000).

25.  A private party proceeding under an EPA Consent Order is compliant with the National Contingency Plan.  Both regulations and case law have established an "irrebutable presumption" that "[a]ny response action carried out in compliance with the terms of an order

DSMDB.2346210.04

issued by EPA … will be considered 'consistent with the NCP.'" *Morrison Enterprises v. McShares, Inc.*, 302 F.3d 1127, 1136 – 37 (10th Cir. 2002), quoting 40 C.F.R. § 300.700(c)(3)(ii).  Tr. Day 5 at 56.

26.  An approved state agency can substitute for the EPA, and there is no dispute here that the New York State Department of Environmental Conservation ("NYSDEC") is such an approved state agency.  Tr. Day 8 at 55-56 (Closing Argument of John F. Stoviak on behalf of Defendant FirstEnergy); Tr. Day 5 at 56-57.

27.  The involvement of "a state environmental agency charged with approving cleanup plans and monitoring the remediation process" satisfies RG&E's "burden of establishing that the costs and response actions conform to the NCP."  *Chitayat v. Vanderbilt Assoc.*, 2007 U.S. Dist. LEXIS 72207 (E.D.N.Y.).  *See also Pfohl Bros. Landfill Site Steering Committee v. Browning-Ferris Indus.*, 2004 U.S. Dist. LEXIS 28367 at *73 (W.D.N.Y.) (Foschio, J.).

28.  Even in the absence of a consent order, a party's design and implementation of a clean-up plan with a state agency's approval and under its supervision is sufficient to meet the requirement for NCP compliance where the party continued remediating until the state agency advised the party that it could stop.  *NutraSweet Co. v. X-L Engineering Co.*, 227 F. 3d 776, 780 & 791 (7th Cir. 2000).

29.  Where a party cooperates with a state agency in conducting a clean-up, its "immaterial and insubstantial deviations from the technical NCP requirements" should not bar its ability to recover costs.  *Franklin County Conv. Facilities Auth. v. American Premier Underwriters, Inc.*, 240 F.3d 534, 543-45 (6th Cir. 2001).

30.  The response costs incurred by RG&E at East and West Stations substantially complied with the National Contingency Plan.  *See Nashua Corp. v. Norton Co.*, 116 F. Supp. 330, 353 (N.D.N.Y. 2000); *see also B.F. Goodrich v. Betkoski*, 99 F.3d 505, 526 (2d Cir. 1996)

DSMDB.2346210.04

("a CERCLA plaintiff is not required to prove its case with scientific certainty; a preponderance of the evidence is enough" [citations omitted]).

31.  Even without the involvement by the NYSDEC, RG&E's clean-up of East and West Stations as a private party was consistent with the NCP because, when evaluated as a whole, that cleanup was in "substantial compliance with the applicable requirements in paragraphs (5) and (6) of [40 C.F.R. § 300.700(c)], and will result in a CERCLA-quality cleanup."  40 C.F.R. § 300.700(c)(3)(i).

32.  RG&E has incurred $5,143,764 in costs responding to releases and threatened releases of hazardous substances at East and West Stations.  *See* Joint Ex. 82 at RGE 361283–361284.

33.  In making an allocation of costs, "CERCLA places both the selection and weighing of equitable factors in the sound discretion of the district court."  *Beazer East, Inc. v. The Mead Corp.*, 412 F.3d 429, 449 (3rd Cir. 2005).  This Court "has broad discretion to 'allocate response costs among liable parties using such equitable factors as the court determines are appropriate.'"  *American Cyanamid Co. v. Capuano*, 381 F.3d 6, 19 (1st Cir. 2004), quoting 42 U.S.C.A. § 9613(f)(1).

34.  Consideration of the potentially applicable "Gore factors" does not reduce the allocation of response costs to Defendant FirstEnergy for cleaning up East and West Stations. *Seneca Meadows, Inc. v. ECI Liquidating*, 427 F. Supp. 2d 279, 292-93 (W.D.N.Y. 2006) (Larimer, J.).

35.  Following a finding of a defendant's liability, the burden of proof as to the divisibility of the harm (and resulting liability) falls upon the defendant.  *See, e.g., United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 270 n.29 (1992) ("However, we believe that this inquiry … is best resolved at the initial liability phase and not at the contribution phase since it involves

26

precisely relative degrees of liability.  Thus, if the defendant can prove that the harm is divisible and that it only caused some portion of the injury, it should only be held liable for that amount.")

36.  Declaratory relief serves to let parties know "their share of costs before they are incurred…. Declaratory relief allocating future costs is therefore consistent with the broader purposes of CERCLA."  *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191 (9th Cir. 2000).  *See generally United States v. E.I. DuPont De Nemours & Co.*, 341 F. Supp.2d 215, 255 (W.D.N.Y. 2004) (Skretny, J.) (granting "declaratory judgment for all costs of future response actions").

37.  The "chief factor" typically used by a district court to allocate costs is its "determination [of] the volume of waste disposed … that could be attributed to each [party] based on the evidence."  *United States v. Davis*, 261 F.3d 1, 30 (1st Cir. 2001).

38.  Where a party such as AGECO had "profited for several years from the ownership and operation of the waste-producing enterprise," that party "should bear primary responsibility for the hazardous byproducts of its activity."  *Se*e *New York v. Westwood-Squibb Pharmaceutical Co., Inc.*, 2004 U.S. Dist. LEXIS 13841 (W.D.N.Y. 2004) (Curtin, J.).

39.  AGECO owned and operated East and West Stations during the period May 1, 1929 – September 13, 1934, during which time 13% of gas production occurred on the Sites. Defendant's Ex. 654.  That same percentage of gas production can used to approximately the same percentage of coal tar contaminants that were released on the Sites during the same.  Tr. Day 6 at 16.

40.  RG&E's damages from FirstEnergy are 13%, or $668,689, plus accrued interest of $82,926.  In total, Defendant FirstEnergy is liable to RG&E for costs in the amount of $751,615.[1]

---

[1] Excluding costs to excavate the tar well itself (*see* Proposed Finding of Fact ¶ 95, *supra*, RG&E has incurred $3,643,764 in total recoverable costs.  FirstEnergy's allocation of 13% equals $473,689, with accrued interest of $60,442, and FirstEnergy is liable to RG&E for $534,131.

DSMDB.2346210.04

41.  Defendant FirstEnergy Corp. furthermore is liable for 13% of RG&E's future costs of investigation and remediation of MGP contamination at the East and West Stations conducted under the direction of NYSDEC and pursuant to the Voluntary Cleanup Agreement.

Dated: November 7, 2007                    Respectfully submitted,


                                           By /s/ Keisha A. Gary /s/
                                             David L. Elkind
                                             Andrew C. Cooper
                                             Keisha A. Gary
                                             Jennifer Mullen St. Hilaire
                                             Geoffrey M. Long
                                             DICKSTEIN SHAPIRO LLP
                                             1825 Eye Street NW
                                             Washington, D.C.  20006
                                             (202) 420-2200

                                             Attorneys for Plaintiff Rochester Gas and
                                             Electric Corporation

DSMDB.2346210.04