UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____
                                        :
ROCHESTER GAS AND ELECTRIC              :
CORPORATION,                            :
                                        :
                     Plaintiff,         :
v.                                      :
                                        :
GPU, INC.,                              :              Civil Action No.
                                        :              00 CV 6369
                                        :
                     Defendant.         :
_____:

**DEFENDANT FIRSTENERGY CORP.'S (F/K/A GPU, INC.) POST-TRIAL BRIEF**

John F. Stoviak, Esq.
Jane Kozinski, Esq.
Melissa Hill, Esq.
Christine M. Pickel, Esq.
Saul Ewing LLP
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA  19102
(215) 972-1095

Paul F. Keneally, Esq.
Underberg & Kessler, LLP
300 Bausch & Lomb Place
Rochester, NY 14604
(585) 258-2800
*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     **NOTHING IN RG&E'S CORPORATE HISTORY FORMS A BASIS FOR LIABILITY OF FIRSTENERGY TO RG&E** . . . . . . . . . . . . . . . . . . . . . . . . . . .2

     A.     <u>**RG&E Failed To Satisfy its Burden of Proving that FirstEnergy is the Successor to AGECO for Purposes of Imposing CERCLA Liability Based OnActivities That Allegedly Occurred Pre-AGECO Bankruptcy, More Than 70 Years Ago.**</u> . . . . . . . . . . . . . . . . . . . . . . . . . . .2

          1.     <u>**FirstEnergy and GPUC Are Not Successors to Liabilities of AGECO.**</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

          2.     <u>**Where CERCLA and PUHCA Intersect, Liability Does Not Attach.**</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          3.     <u>**The Bankruptcy Bar was Intended to Protect Any Remaining AGECO Assets from Future Claims.**</u> . . . . . . . . . . . . . . . . . . . . . . . 8

     B.     <u>**AGECO Cannot be Held Derivatively Liable Under CERCLA as an Owner or Operator of the Sites.**</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          1.     <u>**Piercing the Corporate Veil is Only Appropriate in the Most Exceptional Circumstances, None of Which Exist Here.**</u> . . . . . . . 10

          2.     <u>**RG&E has Failed to Satisfy the Elements of a Veil-Piercing Argument.**</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          3.     <u>**The 1932 Voting Trust Eliminated Any *Potential* Ability of AGECO to Control RG&E.**</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

          4.     <u>**RG&E Cannot Pierce the Corporate Veil of its Parent Corporation.**</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     C.     <u>**AGECO Cannot be Held Directly Liable Under CERCLA as an Operator of the Sites.**</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

III.     **RG&E IS NOT ENTITLED TO ANY RECOVERABLE DAMAGES  UNDER CERCLA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     A.     <u>**RG&E has Not Incurred and Will Not Incur Any Damages Because It has Fully Recovered Its Cleanup Costs Through Its Rate Base.**</u> . . . . . . . 18

B.     **RG&E's Response Costs are Not "Necessary" Costs of Response Pursuant to CERCLA.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

C.     **RG&E Costs were Not Incurred in a Manner Substantially Consistent with the National Contingency Plan.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

     1.    **The Tar Well.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     2.    **The ISS Remedy.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

     3.    **Experimental Methods.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

     4.    **West Station.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.     **RG&E is Not Entitled to Recover Oversight Costs Incurred Pursuant to the Voluntary Cleanup Agreement.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

E.     **Even if FirstEnergy is Held Liable, FirstEnergy has a Viable Counterclaim Against RG&E and FirstEnergy's Equitable Share of Response Costs Must be De Minimis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

     1.    **Costs Not Subject to Allocation.** . . . . . . . . . . . . . . . . . . . . . . . . 29

     2.    **The Ability of the Parties to Demonstrate that Their Contribution to a Release of Hazardous Substances Can Be Distinguished: Volume of Gas Produced.** . . . . . . . . . . . . . . . . . . . 30

     3.    **Any Share of Liability Attributed to FirstEnergy Should be Reduced to Reflect Other Equitable Allocation Factors.** . . . . . . . 32

IV.    **A DECLARATORY JUDGMENT AS TO FUTURE COSTS IS PREMATURE WHEN IT IS UNKNOWN WHETHER ANY FUTURE CLAIMS FOR RELIEF WILL BE MADE, AND, IF SUCH CLAIMS ARE MADE, WHETHER THE FUTURE COSTS WILL BE RELATED TO ACTIVITIES THAT OCCURRED DURING A TIME PERIOD FOR WHICH FIRSTENERGY IS LIABLE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

V.    **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130 (2d Cir. 1997). . . . . . . . . . .11

Bedford Affiliates v. Sills, 156 F.3d 416 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . .11, 32

Chesapeake Utilities Corp. v. General Public Utilities, Corp., No.96-338 (JJF) (D.Del.). . . .4

Coast Mfg Co. v. Keylon, 600 F. Supp. 696 (S.D.N.Y. 1985). . . . . . . . . . . . . . . . . . . . . . 15

Consol. Edison Co. v. UGI Utilities, Inc., 310 F. Supp. 2d 592 (S.D.N.Y. 2004). . . . . . . . . 14

Freeman v. Complex Computing Co., 119 F.3d 1044 (2d Cir. 1997). . . . . . . . . . . . . . . . . .10

Foster v. United States, 922 F. Supp. 642 (D.D.C. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 19

Electronic Switching Ind., Inc. v. Faradyne Electronics Corp., 833 F.2d 418 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Malowney v. Federal Collection Deposit Group, 193 F.3d 1342 (11th Cir. 1999). . . . . . . .33

McCormick ex rel McCormick v. School Dist. of Mamaroneck, 370 F.3d 275 (2d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

New York v. Nat'l Servs. Indus. Inc., 352 F.3d 682 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . 7

New York State Gas & Elec. v. FirstEnergy Corp., 3:03-CV-0438 (N.D.N.Y.). . . . . . . . . . .4

North Shore Gas Co. v. Salomon Inc., 152 F.3d 642 (7th Cir. 1998) . . . . . . . . . . . . . . . . . .7

In the Matter of Penn Central Transportation Co., 944 F.2d 164 (3d Cir. 1991). . . . . . . . . . 9

In re Chateaugay, 53 F.3d 478 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

In re RCS Engineered Products Co., Inc., 102 F.3d 223 (6th Cir. 1996). . . . . . . . . . . . . . . 15

Interstate Power Co. v. Kansas City Power & Light, 909 F. Supp. 1241 (N.D. Iowa1993). 5-7

Seneca Meadows v. ECI Liquidating, 427 F.Supp.2d 279 (W.D.N.Y. 2006). . . . . . . . . .28, 32

State of New York v. Westwood-Squibb Pharmaceutical Co., 2004 WL 1570261  (W.D.N.Y. May 25, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Tosco Corp. v. Koch Indus., 216 F.3d 886 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . .31

United States v. Bestfoods, 524 U.S. 51 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

United States v. Township of Brighton, 153 F.3d 307 (6th Cir.1998). . . . . . . . . . . . . . . . 16

United States v. SEPTA, 235 F.3d 817 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States Steel Supply v. ALCO, 1992 WL 229252 (N.D. Ill. Sept. 9, 1992). . . . . . . . . 31

Wm. Passalaqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131 (2d Cir.
        1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Young v. United States, 394 F.3d 858 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

### STATE CASES

City of Wichita v. Trustees of the Apco Oil Corp. Liquidating Trust, 306 F. Supp. 2d
        1040    (D. Kan. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Colin v. Altman, 333 N.Y.S.2d 432 (N.Y. App. Div. 1972). . . . . . . . . . . . . . . . . . . . . . . . .15

Harris v. Stony Clove Lake Acres Inc., 608 N.Y.S.2d 584 (N.Y. App. Div. 1994). . . . . . . . 15

McDonald v. Sun Oil Co., 423 F. Supp. 2d 1114 (D. Or. 2006). . . . . . . . . . . . . . . . . . . . . .34

Morris v. New York State Dept. of Taxation and Finance, 603 N.Y.S.2d 807 (N.Y. 1993). .10

Outokumpu Eng'g v. Kvaerner Enviropower, Inc., 685 A.2d 724 (Del. Super. Ct. 1996). . . 10

### FEDERAL STATUTES

40 C.F.R. § 300.700 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

Comprehensive Environmental Response, Compensation and Liability Act,
        42 U.S.C.A. § 9601, et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Public Utility Holding Comapny Act of 1935.  15 U.S.C. § 79, et seq. . . . . . . . . . . . . . . . .5

### OTHER AUTHORITIES

18 Am. Jur. 2d Corporations § 46 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Decision and Order of Judge Jonathan W. Feldman, dated March 21, 2004. . . . . . . 12, 22, 29

Stephen B. Presser, Piercing the Corporate Veil, 2007 Supp § 322 (2007) . . . . . . . . . . . . . .7

Transcript of Oral Argument, Consolidated Edison Co. v. UGI Utilities, Inc. (S.D.N.Y.
        Nov. 25, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.      INTRODUCTION

        In order for Plaintiff Rochester Gas & Electric Corporation ("RG&E") to prevail on

its sole claim for cost recovery under Section 107 of the Comprehensive Environmental

Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.A. § 9601, et seq.[1], it had

to satisfy its burden of proving, among other things, that:

        1.      Defendant FirstEnergy Corp. ("FirstEnergy") is the successor to Associated

Gas and Electric Company ("AGECO") for purposes of imposing CERCLA liability for

actions that occurred more than seventy years ago.

        2.      AGECO either was the owner or operator of East Station and West Station

between May 23, 1929 and January 10, 1940, even though title to both properties was always

held in the name of RG&E and even though the persons who controlled and directed

operations at the Sites during the period 1929-1940 were RG&E employees, such as

Alexander Beebee, who had no meaningful connection to AGECO.

        3.      The extraordinary equitable remedy of piercing the corporate veil should be

invoked to allow self-piercing by RG&E of the corporate veil of its former parent corporation

for the benefit of RG&E.

        4.      AGECO dominated and controlled RG&E during the period 1929-1940.

---

[1]     Section 107(a)(2) of CERCLA provides, in relevant part:

        [A]ny person who at the time of disposal of any hazardous substance owned
        or operated any facility at which such hazardous substances were disposed
        of . . . shall be liable for . . . (B) any other necessary costs of response
        incurred by any other person consistent with the national contingency plan .
        . . .

5.     AGECO's alleged domination and control of RG&E during 1929-1940 had a direct nexus to the resulting injury of coal tar and other manufactured gas plant ("MGP") contamination.

6.     The work for which RG&E seeks damages was done in a manner substantially consistent with the National Contingency Plan ("NCP"), and the costs incurred or to be incurred were necessary costs of response.

RG&E, however, failed to satisfy its burden of proving each of these required elements.  RG&E's failure to prove any one of these elements is fatal to its claim.

## II.     NOTHING IN RG&E'S CORPORATE HISTORY FORMS A BASIS FOR LIABILITY OF FIRSTENERGY TO RG&E

The proof presented at trial demonstrated that FirstEnergy cannot be found liable as either an owner or operator of the Sites.  Moreover, FirstEnergy cannot be held liable to RG&E, directly or derivatively, for cleanup costs at the Sites because FirstEnergy is not the corporate successor to AGECO for purposes of imposing CERCLA liability, and there is no basis to pierce the corporate veil.

### A.     RG&E Failed To Satisfy its Burden of Proving that FirstEnergy is the Successor to AGECO for Purposes of Imposing CERCLA Liability for Activities That Allegedly Occurred Pre-AGECO Bankruptcy, More Than 70 Years Ago.

#### 1.     FirstEnergy and GPUC Are Not Successors to the Liabilities of AGECO.

RG&E failed to meet its burden of proving that either General Public Utilities Corporation ("GPUC")[2] or FirstEnergy is the successor to the liabilities of AGECO.  Indeed, the proof presented at trial establishes that in 1946, at the end of the six-year bankruptcy of

---

[2]     GPUC later changed its name to GPU, Inc.  FirstEnergy is the successor to GPU, Inc. as a result of a 2000 merger.

AGECO and AGECORP, the United States District Court for the Southern District of New York entered a Final Decree which approved a Plan of Reorganization for AGECO and affirmed the Bar Order prohibiting future claims.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 42.]  The Court-approved Plan of Reorganization established in clear and unequivocal language that:

(a) ***GPUC was receiving only assets and not liabilities of AGECO*** [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 40];

(b) The assets transferred to GPUC were ***"free and clear of all claims"*** [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 41];

(c)  GPUC's Board of Directors was entirely different from any pre-bankruptcy AGECO affiliated people [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 48];

(d)  GPUC's shareholders were the debenture holders of AGECO and did not include any of Hopson's cronies [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 49];

(e)  GPUC was charged with liquidating these remaining assets of AGECO and was referred to as a ***"liquidating vehicle"*** in the Opinion and Order of the SEC approving the Plan of Reorganization [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 46.].

These unrefuted facts compellingly demonstrate that neither GPUC nor FirstEnergy should be treated as a successor to the liabilities of AGECO.  It was precisely this set of facts that convinced GPU to defy a CERCLA Section 106 Unilateral Order of United States Environmental Protection Agency ("USEPA") related to the Dover Gas Light Superfund

3

Site.[3]  As Mr. James Wendelgass (former manager of corporate and investigative auditing for GPU, Inc.) stated in his testimony at trial, GPU decided to not comply with USEPA's Section 106 Order even though that decision exposed GPU to potential treble damages and fines of $25,000 per day because:

> [T]he company reviewed documents relating to Dover Gas Light and determined that [AGECO] did not control the day-to-day operations of the gas light company.  In addition to that, it looked at the series of documents and orders that related to the wind up of the [A]ssociated [S]ystem and the creation of GPU, and made a determination that GPU was, pursuant to SEC orders, a liquidating vehicle for the assets of the AGECO AGECORP system, and that the liabilities that were associated with that system did not flow to General Public Utilities.

(Trial Transcript, Oct. 29, 2007, at 181).  Moreover, "the whole intent [of the creation of GPU] was to take the remaining assets in bankruptcy, get the assets into this liquidating vehicle, and liquidate them for the benefit of the former bond holders, now the current shareholders of General Public Utilities."  (Trial Transcript, Oct. 30, 2007, at 6).

Here, in considering the same set of documents and the compelling facts set forth in the Reorganization Plan and the Final Decree, this Court should conclude that FirstEnergy is not the successor to AGECO's liabilities.[4]

---

[3]      Chesapeake Utilities Corp. v. General Public Utilities, Corp., No.96-338 (JJF) (D.Del.).

[4]      In New York State Gas & Elec. v. FirstEnergy Corp., 3:03-CV-0438 (N.D.N.Y.), the Court denied NYSEG's motion for summary judgment on the issue of successor liability because there were disputed issues of material fact.  In contrast, here, RG&E has had an opportunity to present any facts supportive of its theory, yet has utterly failed to adduce credible proof to contradict the compelling facts set forth in the Final Decree and Plan of Reorganization approved by the Bankruptcy Court and the SEC.  These documents unequivocally demonstrate that GPUC and  FirstEnergy are not the successors to AGECO's liabilities.

2.      **Where CERCLA and PUHCA Intersect, Liability Does Not Attach.**

Around 1940, the SEC initiated divestiture proceedings against the Associated System, under Section 11 of the Public Utility Holding Company Act of 1935, 15 U.S.C.A., section 79 et seq. ("PUHCA"), which ultimately resulted in the liquidation of AGECO assets through the creation of GPUC.  The United States District Court for the Northern District of Iowa has already held that an alleged successor to a public utility holding company that was divested under PUHCA is not the successor to that divested company's CERCLA liability. See Interstate Power Co. v. Kansas City Power & Light, 909 F. Supp. 1241, 1272, 1282 (N.D. Iowa 1993).  Moreover, "while successor liability is permitted under CERCLA, it is not required unless justified by the facts of each case." Id. at 1275 (internal quotation marks and citation omitted).

Interstate Power is both factually and legally on point to this case.  Similar to the AGECO situation, in 1941, the SEC ordered the liquidation and dissolution of United Light & Power Company ("Power"), the top holding company in a large utility system, pursuant to Section 11 of PUHCA. Id. at ¶ 118.

In or around 1945-46,  pursuant to the liquidation process required by the SEC and a plan of liquidation approved by the District Court for the District of Delaware, Power was dissolved and its stock exchanged for that of a new company, "Railways-Delaware," which assumed Power's position at the top of the pyramid of the holding company system. Id. at ¶ 127.  Railways-Delaware subsequently became the corporate parent of KPCL and indirect parent of Peoples Gas & Electric of Mason City, Iowa ("Peoples"), which had operated the MGP.  In 1949, Railways-Delaware submitted a plan for liquidation of its assets to the SEC. Id. at ¶ 132.  In 1951 or 1952, Railways-Delaware transferred all of its remaining assets to

Iowa-Illinois.  Id. at ¶ 146.  In 1957, Interstate Power Company ("IPC") purchased the

former Peoples MGP site from KPCL.  IPC later sued KCPL and Iowa-Illinois under

CERCLA for contribution arising from the cleanup of the site.

The Court in Interstate Power squarely addressed the issue whether Iowa-Illinois was

the corporate successor to Railways-Delaware, the liquidation vehicle for the former parent

(Power) of a utility holding company system, for purposes of CERCLA liability, just as this

Court must determine whether FirstEnergy is the corporate successor to GPUC which was

the liquidation vehicle for AGECO.  The Court in Interstate Power unequivocally concluded

that where the objectives of PUHCA and CERCLA clashed, the alleged successor could not

be held responsible for the CERCLA liabilities of a system of companies divested by

mandate of Congress pursuant to PUHCA:

> [T]he dissolution of Railways (Delaware) was designed to
> achieve compliance with PUHCA.  Under the circumstances,
> the Court would not be justified in imposing CERCLA liability
> on Iowa-Illinois.

Id. at 1277-78.

In reaching this conclusion, the Court weighed "the principles behind CERCLA . . .

against the principles behind PUHCA."  Id. at 1282.  There, as here, it "**would be ironic for a

congressionally mandated breakup of the utility holding system to result in CERCLA

liability years later** . . . ."  Id.  (emphasis added).  Thus, where the policy objectives of

PUHCA and CERCLA intersect in the context of the breakup of a public utility holding

company mandated by the United States and approved by the SEC, bankruptcy trustees and

bankruptcy court, CERCLA liability is not properly imposed upon the alleged corporate

successor to the public utility holding company.

For these same reasons, it is inappropriate to impose CERCLA liability upon FirstEnergy as a successor to AGECO.[5]  Here, in or about 1940, the United States, under the auspices of the SEC, appointed Trustees with the specific mandate to divest AGECO of most of its assets just as Power was required to divest itself of its assets.  This governmental action resulted in protracted SEC divestiture proceedings and similarly protracted bankruptcy proceedings spanning six years and a large-scale liquidation of AGECO assets.  GPUC was created and capitalized as the surviving corporation with the then-unsold assets of AGECO as a "liquidation vehicle" through which the remaining assets of AGECO would be liquidated.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 42.]  In Interstate

---

[5]     But see North Shore Gas Co. v. Salomon Inc., 152 F.3d 642 (7th Cir. 1998).  This case has been sharply criticized as failing to apply traditional common law principles when determining successor liability issues in the context of CERCLA because the Court essentially applied the widely-rejected "substantial continuity test."  See Stephen B. Presser, Piercing the Corporate Veil, 2007 Supp. § 3.22.  The Second Circuit has rejected the "substantial continuity test," rendering the Court's analysis in North Shore irrelevant.  See New York v. Nat'l Servs. Indus. Inc., 352 F.3d 682, 687 (2d Cir. 2003) (holding that substantial continuity test "should not be used to determine whether a corporation takes on CERCLA liability as a result of an asset purchase").

In North Shore, the court held that if the former parent company (a non-utility) of a pollution-causing entity were to be found directly liable for contaminating caused by its subsidiary, the sister utility company of the former parent could likewise be held directly liable under CERCLA.  The former parent company was dissolved in 1942 in accord with a plan of reorganization developed, in part, to comply with PUHCA's prohibition on non-utility investments within the utility system.  Under that plan, the former parent distributed some of its assets to its sister company but passed its non-utility assets, including the pollution-causing entity, on to its parent (also the parent of the sister utility company).  Many years later, the pollution-causing entity was sold out of the system and the parent was also dissolved.  Thus, the only remaining company of the original three was the sister utility company.  The court concluded that the 1941-42 reorganization did not actually change the control of the assets of the three companies, even though the former parent ceased to exist, because the reorganization amounted to a "hybrid" between a de facto merger and a mere continuation merger between the former parent company and its sister.  The court explained that, prior to the "merger," the former parent and sister companies were so closely related as to be considered a single business enterprise.  Under this analysis, the sister company was equally liable for the actions of the pollution-causing entity and the sister company remained liable for the contamination.

The North Shore case is distinguishable from the present dispute.  In North Shore, there was no dismantling of a multi-layer holding company system through the use of a liquidation vehicle like GPUC, nor does the present case involve a transfer of assets similar to that which occurred in North Shore.  Therefore, the North Shore court's unorthodox reliance on a "hybrid" form of merger between the former parent and sister companies is irrelevant to the present analysis.  Moreover, the court in Interstate Power engaged in a much more thoughtful analysis of the conflict between the policies underlying PUHCA and CERCLA than did the court in North Shore -- and did so in a much more analogous context. Thus, Interstate Power provides better guidance to this Court, both on the law and facts, than does the decision in North Shore.

Power, Railways-Delaware served a substantially similar role as a liquidation vehicle.  Here, it is critical to recognize that GPUC was created by the Trustees not to succeed to liabilities of AGECO, but rather to assist the Bankruptcy Court and the SEC in winding up the liquidation of the AGECO holding company system.  It was only after the vast bulk of AGECO's holdings had been sold and/or liquidated that the SEC decided, in 1946, to assign to GPUC a few of the remaining AGECO assets.  Under the facts of this case, and consistent with the Interstate Power decision, there is no justification for the imposition of CERCLA liability upon FirstEnergy as the corporate successor to AGECO.

### 3.    The Bankruptcy Bar was Intended to Protect Any Remaining AGECO Assets from Future Claims.

The bankruptcy trustees, the bankruptcy court, and the SEC all expressly intended that GPUC not succeed to the liabilities of AGECO, and that GPUC be given a clean slate for finally compensating those creditors whose debts had not been satisfied during the six years of bankruptcy.  This conclusion is consistent with the factual complexities and documentation of this case and with the "fresh start" policy underlying the bankruptcy statute.

Although the Second Circuit has held that post-petition claims arising from a statute enacted after a final bankruptcy decree has been entered are not discharged by the bankruptcy, that holding was limited to post-bankruptcy statutes that impose affirmative obligations on the debtor.  In re Chateaugay, 53 F.3d 478, 497 (2d Cir. 1995).  In that case, the claims against the debtor arose from the Coal Industry Retiree Health Benefit Act of 1992, which imposed *affirmative obligations* on mining companies to pay health benefits of retired coal miners.  Unlike the claims at issue in Chateaugay, which arose from affirmative statutory payment obligations imposed on the debtor by the federal government, the claim at

issue in this case arises because of the alleged status of AGECO as an owner and operator of
the Sites during the period 1929 to 1940, prior to the bankruptcy discharge.  Moreover, this
claim arises because RG&E *voluntarily elected* to incur the "obligation" by way of the
Voluntary Cleanup Agreement, which further distinguishes the instant situation from that in
Chateaugay.

Moreover, in contrast to the Coal Act where Congress imposed the payment
obligation on *any* entity that had employed miners, even reorganized companies,
Chateaugay, 53 F.3d at 485 (citing the Coal Act), CERCLA is devoid of any indication that
Congress intended the policies underlying CERCLA Section 107 to override or erode the
"fresh start" policy of the bankruptcy laws,[6] particularly when coupled with the corporate
restructuring goals of PUHCA.

The equities in this case support a traditional application of bankruptcy law and
policy.  There is no basis in law or public policy for allowing RG&E an exception to the
rules of bankruptcy to deprive GPUC of its right to a "fresh start."  Thus, RG&E is barred by
the Final Decree in the AGECO bankruptcy proceedings from bringing its claim for
contribution under CERCLA.

**B.      AGECO Cannot be Held Derivatively Liable Under CERCLA as an
Owner or Operator of the Sites.**

At all relevant times, RG&E was a fourth- or fifth-tier subsidiary of AGECO, and
was a separately incorporated entity.  As such, the imposition of derivative CERCLA liability
upon AGECO as an owner or operator of the Sites is inappropriate as a matter of law.  See
United States v. Bestfoods, 524 U.S. 51, 63-64 (1998).  Recognizing that it would be
impossible to establish that AGECO was an operator of the Sites under the Bestfoods test,

---

[6]      But see In the Matter of Penn Central Transportation Co., 944 F.2d 164 (3d Cir. 1991).

RG&E asserts that the corporate veils between AGECO and RG&E should be pierced. Under the circumstances presented here, however, piercing of the corporate veil to impose CERCLA liability upon AGECO is not warranted.

        **1.**       **Piercing the Corporate Veil is Only Appropriate in the Most Exceptional Circumstances, None of Which Exist Here.**

Corporate veil piercing is an extraordinary remedy applied by courts on the rare occasion when the demanding burden of proof is met.[7]  Disregard of the distinctions between corporate entities is only appropriate in the most exceptional of circumstances.  Indeed, mere domination, and even total ownership of one corporation by another, does not necessarily warrant a piercing of the corporate veil.  See Outokumpu Eng'g v. Kvaerner Enviropower, Inc., 685 A.2d 724, 729 (Del. Super. Ct. 1996) (citing Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 271, n.15 (D.Del. 1989)).  RG&E failed to prove the facts necessary to satisfy its burden of proof and demonstrate that it is entitled to the extraordinary remedy of corporate veil piercing.

        **2.**       **RG&E has Failed to  Prove the Required Elements of a Veil-Piercing Argument.**

The standard for piercing the corporate veil under New York law requires RG&E to prove that: "(1) the [parent] exercised *complete domination* of the [subsidiary] in respect to the transaction attacked; and (2) that such domination was used to *commit a fraud or wrong* against the plaintiff which *resulted in plaintiff's injury*."  Morris v. New York State Dept. of Taxation and Finance, 603 N.Y.S.2d 807 (N.Y. 1993).  In Freeman v. Complex Computing Co., 119 F.3d 1044, 1052-53 (2d Cir. 1997), the Second Circuit Court of Appeals reversed a district court order piercing the corporate veil where there was a finding of domination and

---

[7]      Plaintiff has the burden of establishing a basis for piercing the corporate veil.  Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 140 (2d Cir. 1991).

control because there had been no showing of the requried nexus between the control and the wrongful conduct and injury.  [Trial Transcript, Oct. 31, 2007, at 130-131.]

The second prong of <u>Morris</u> requires a showing of both fraud or other wrongful conduct by the parent and causation between the injury complained of and the parent's fraud or wrong.  <u>Morris</u>, 603 N.Y.S.2d at 810-11; <u>Electronic Switching Ind., Inc. v. Faradyne Electronics Corp.</u>, 833 F.2d 418, 424 (2d Cir. 1987) (even if domination is shown, there must also be a showing that the domination "was used to commit wrong, fraud, or the breach of a legal duty . . . *and that the control and breach of duty proximately caused the injury complained of*") (emphasis added); <u>American Fuel Corp. v. Utah Energy Dev. Co.</u>, 122 F.3d 130, 134-35 (2d Cir. 1997) (no veil piercing because no nexus existed between wrongful conduct and plaintiff's injury).

In the CERCLA context, there is no basis to pierce the corporate veil where the wrongful conduct of the alleged dominating company did not cause the contamination that is the subject of the cause of action.  In <u>Bedford Affiliates v. Sills</u>, 156 F.3d 416, 431-32 (2d Cir. 1998), the Second Circuit Court of Appeals ruled that "a finding that Sills' corporate domination caused the contamination at the Site must be made . . . before veil-piercing can occur."

Here, RG&E has failed to even suggest a nexus between AGECO's alleged domination and control and the "resulting injury" – contamination by tar and other MGP wastes – because no such nexus exists.  For this reason alone, RG&E's veil piercing claim must fail under the directly applicable standards enumnerated by the Second Circuit Court of Appeals in <u>Freeman</u> and <u>Bedford Affiliates</u>.

Not only did RG&E fail to meet its burden of proving a nexus between the alleged AGECO control and the wrongful conduct resulting in injury, but RG&E also failed to meet its burden of proving AGECO domination and control of RG&E during 1929-1940.  Under the ten factors set forth by this Court,[8] it is clear that RG&E failed to meet its burden of proving AGECO domination and control:

(1)     Observance of Corporate Formalities:  RG&E at all times maintained corporate formalities, including maintenance of regular minutes of the RG&E Board and Executive Committee, making routine business filings with the New York Public Service Commission [cite to Joint Exhibits], and holding annual shareholders meetings.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 80-81, 83-87.]

(2)     Capitalization:  RG&E was at all times adequately capitalized.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 68-79.]

(3)     Use of Corporate Funds:  There is no evidence that AGECO used corporate funds of RG&E for its use or use by AGECO's owners for personal rather than corporate purposes.  Indeed, RG&E's corporate financial records prove that any money set aside for the so-called "Corporate Surplus Account" was not taken out of RG&E.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 90, 96.]

(4)     Overlapping Officers/Directors:  While there was overlap in officers and directors between AGECO and RG&E, RG&E has presented no evidence to establish that such overlap was improper or that the AGECO officers/directors that sat on the Board of RG&E acted for the benefit of AGECO and not for the benefit of RG&E.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 91-92.]

(5)     Common Office Space:  The evidence shows that RG&E at all times maintained its head office in Rochester and kept its books in Rochester.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 88.]

(6)     Independent Business Discretion:  The testimony establishes that RG&E exercised business discretion independent of AGECO.  During the 1929 – 1932 period, *RG&E decided to not issue dividends on its common stock, which was owned by AGECO affiliates*.  [Trial Transcript, Oct. 30, 2007, at 70-71, 73-76, 81-82; Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 95-96.]

---

[8]     Decision and Order of Judge Jonathan W. Feldman, dated March 31, 2004 ("Feldman Opinion"), at 7 (citing  Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 140 (2d Cir. 1991)).

(7)    Arm's Length Dealings:  RG&E and AGECO dealt with each other at arms length. RG&E failed to prove that contracts between RG&E and AGECO-affiliated service companies were at unfair prices.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 99.]  Based on comparisons of RG&E financials of 1929 and 1931, any such contracts did not negatively impact RG&E's financial performance.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 100.]

(8)    Profit Centers:  RG&E and AGECO were independent profit centers, each of them maintaining separate books.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 105.]

(9)    Payment of Debts:  RG&E failed to prove that RG&E had paid or guaranteed any debts of AGECO-affiliated companies.

(10)   Use of Property:  RG&E also failed to present any evidence that AGECO used RG&E property as it were its own.  [Defendant's Post-Trial Proposed Findings of Fact, at ¶ 106.]

Lacking such direct evidence on any of these issues, RG&E's corporate governance expert, Professor Macey, relied solely on "inferences" drawn from seventy-year-old testimony from individuals whose credibility and reliability admittedly is unknown.  [Trial Transcript, Oct. 23, 2007, at 89-90.]  This imprecise inference-drawing is simply not enough to satisfy RG&E's heavy burden of proving the required elements for invoking the extraordinary remedy of piercing the corporate veil.

### 3.    The 1932 Voting Trust Eliminated Any *Potential* Ability of AGECO to Control RG&E.

In 1932, RG&E needed to refinance bonds that were maturing on July 15, 1932. Based on the significant financial strength of RG&E at that time, a consortium of lenders agreed to loan RG&E the money to refinance the debt.  The loan was subject to numerous financial and non-financial covenants designed to minimize the banks' *future* risk and to ensure that RG&E would maintain its strong financial position.  [Trial Transcript, Oct. 30, 2007, at 102-104, 106-108.]  One of those conditions was a Voting Trust Agreement among the banks, RG&E, its immediate corporate parent, and AGECO, which Agreement would

prevent AGECO from controlling the financial and corporate affairs of RG&E on a going-

forward basis.  [Trial Transcript, Oct. 30, 2007, at 61-64, 106-107.]

Several provisions of the Voting Trust Agreement ensured that AGECO would have

no ability to control RG&E through the following key provisions (among others):

- Control of Voting Rights:  AGECO transferred its rights to vote its RG&E common stock shares to four Voting Trustees.  The Agreement required that three of the four Voting Trustees be persons with no affiliation to AGECO.  The four Voting Trustees had the exclusive right to vote the common stock deposited under the Agreement.  The Voting Trustees were prohibited from transferring Voting Trust Certificates to AGECO.  [Joint Ex. 009 at Art. 1, 2, 5, 8, 9, 11.]

- Control of the RG&E Board of Directors:  Two-thirds of the RG&E Board of Directors had to consist of local Rochester businessmen with no AGECO affiliation.  The unanimous consent of the Voting Trustees was required to remove any of the members of the RG&E Board.  [Joint Ex. 009 at Art. 9.]

- Termination of Service Contracts with AGECO-affiliated Companies:  The loan was conditioned on AGECO's agreement to terminate or revise service contracts that its affiliates had with RG&E.  [Joint Ex. 317 at RGE 11497-501.]

From July 15, 1932 to 1940, RG&E operated under the terms of the Voting Trust

Agreement without interference from AGECO.  [Joint Ex. 027].

### 4.    RG&E Cannot Pierce the Corporate Veil of its Parent Corporation.

In Consolidated Edison Co. v. UGI Utilities, Inc., 310 F. Supp. 2d 592 (S.D.N.Y.

2004), the defendant was granted summary judgment on the issue of veil-piercing, and the

Court declared:

> …[T]he defendant's self-piercing theory is correct.  We are talking about misuse of the corporate [form] that causes harm to third parties.  We are not talking about a situation where a company itself argues piercing to sue a shareholder.  That just doesn't make sense.  There are cases that say that the harm has to be to a third party, and here, because it is the company itself arguing that its former shareholder is liable under a piercing veil, I reject the claim.

Transcript of Oral Argument, <u>Consolidated Edison Co. v. UGI Utilities, Inc.</u> (S.D.N.Y. Nov. 25, 2003), at p. 48.  In short, the veil piercing remedy might be available to protect any injured third-parties who relied on RG&E's corporate distinctness, but this remedy is not available for the benefit of the corporation or its shareholders.  <u>See also</u> <u>Colin</u>, supra, 333 N.Y.S.2d at 433; <u>Coast Manufacturing Co. v. Keylon</u>, 600 F. Supp. 696, 698 (S.D.N.Y. 1985) ("[a] corporation may not pierce its corporate veil, nor cause its parent or subsidiary to do so").

Other New York courts have held that a corporation may not pierce its own corporate veil.  <u>See</u> <u>Harris v. Stony Clove Lake Acres Inc.</u>, 608 N.Y.S.2d 584, 586 (N.Y. App. Div. 1994) (stating in a "reverse piercing" case that "[a] corporation, even when wholly owned by a single individual has a separate legal existence from its shareholders, and courts are loathe to disregard the corporate form for the benefit of those who have chosen that form to conduct business"); <u>Colin v. Altman</u>, 333 N.Y.S.2d 432, 433 (N.Y. App. Div. 1972) ("[T]he corporate veil is never pierced for the benefit of the corporation or its stockholders."); <u>Coast Mfg. Co. v. Keylon</u>, 600 F. Supp. 696, 698 (S.D.N.Y. 1985); <u>see</u> <u>also</u> 18 Am. Jur. 2d <u>Corporations</u> § 46 (1985) (stating that "[g]enerally, the corporate veil is never pierced for the benefit of the corporation or its stockholders").

Moreover, New York courts specifically require a showing of some fraud or other wrong resulting in injury to the party seeking to pierce the corporate veil.  Since "it is axiomatic that one cannot commit a fraud or wrong against oneself," it follows for this additional reason that RG&E cannot satisfy the requirements for piercing the corporate veil under New York law.  <u>See</u> <u>In re RCS Engineered Products Co., Inc.</u>, 102 F.3d 223, 226 (6th Cir. 1996).

In short, RG&E's argument that it is entitled to pierce the corporate veil between itself and its former corporate parent has no basis in New York law.[9]

### C.    AGECO Cannot be Held Directly Liable Under CERCLA as an Operator of the Sites.

In conformity with the United States Supreme Court's decision in United States v. Bestfoods, 524 U.S. 51 (1998), AGECO, the fourth- or fifth-tier corporate parent of RG&E, cannot be held directly liable under CERCLA as an operator of the Sites unless RG&E met its burden of proving that AGECO "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with leakage or disposal of hazardous waste or decisions about compliance with environmental regulations." Id. at 66-67; Feldman Opinion at 3 (recognizing that RG&E must show some "direct and personal participation in the act of pollution" to maintain an operator claim against AGECO); see also United States v. Township of Brighton, 153 F.3d 307, 314 (6th Cir.1998) (stating that operator liability under Bestfoods requires showing of "affirmative acts").  Under this standard, the focus of the inquiry is not on the relationship between the parent and its subsidiary but on the relationship between the parent and the *facility*.  See Bestfoods 524 U.S. at 67 (holding that "[t]he District Court was therefore mistaken to rest its analysis on [the parent's] relationship with [the subsidiary], premising liability on little more than "[the parent's] 100-percent ownership of [the subsidiary]" and "[the parent's] active participation in, and at times majority control over, [the subsidiary's] board of directors" because "[t]he analysis should instead have rested on the relationship between [the parent] and the [subsidiary's] facility itself.").

---

[9]    See Defendant's Reply to Plaintiff's Supplemental Brief to its Pre-Trial Brief, filed electronically on Oct. 31, 2007.

Thus, evidence that a parent company exercised some degree of control over its subsidiary is not enough to give rise to direct liability, nor will evidence that the directors of the parent company simultaneously served as directors of the subsidiary, even if they "made policy decisions and supervised activities at the facility." Id. at 69-70.

Here, RG&E has not demonstrated that AGECO participated in the day-to-day waste management or gas manufacturing decisions at the Sites. RG&E offered no evidence that AGECO managed, directed or controlled the waste disposal, waste handling, and/or waste management decisions of RG&E, as required under the standard articulated in Bestfoods. [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 23-25, 27-30.] Moreover, RG&E failed to prove that AGECO managed, directed or controlled RG&E through "service companies," as alleged by RG&E. Indeed, RG&E *admitted* that it has *no evidence* that AGECO controlled the management of tar and wastes at the Sites or was in any way involved in any of the pollution-causing activities at the Sites during the entire relevant time period. [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 23-32.] For example, RG&E's corporate designee testified:

> Q: Can you point me to any document, photograph, piece of information that indicates that GPU controlled the generation of gas at the East and West Station during the period 1929 to the late 1940s?
>
> A: I can't point to a particular document, no.

[Rule 30(b)(6) Deposition of Kevin Hylton, Aug. 14, 2002, ("Rule 30(b)(6) Dep. Via Hylton") at 75.] Further, in its second Rule 30(b)(6) deposition, RG&E's corporate designee made the following admissions on behalf of RG&E:

> Q: Are you aware of any facts that demonstrate that an AGECO officer or director played a role in decisions about

disposal of waste generated at East and West Station during the
period May 1929 through July 15th, 1932?

A: No.

Q:  Do you have any facts or information that any
representative, officer or director of AGECO dictated or
mandated the tar production and tar handling procedures at
East Station and West Station during the period May 13th,
1929, through July 15th, 1932?

A:  No.

[Rule 30(b)(6) Deposition of David Heiligman, oct. 18, 2002, ("Rule 30(b)(6) Dep. Via

Heiligman") at 34-35.]  RG&E's corporate designee further admitted that there were no facts

to support the conclusion that AGECO ever operated the MGP Sites.  [See Defendant's Post-

Trial Proposed Findings of Fact, at ¶ 24.]

Moreover, RG&E has admitted that it, not AGECO, controlled the day-to-day

activities at the Sites.  [See Rule 30(b)(6) Dep. via Hylton at 74.]  RG&E also admitted that

its employees, who lacked any affiliation with AGECO, were in key Site management

positions.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 29, 31-32.]  Finally,

RG&E admitted that it has no facts that AGECO ever operated the Sites or was in any way

involved in the pollution of the Sites.  [See Rule 30(b)(6) Dep. via Heiligman at 34-35.]

The evidence thus compels the conclusion that RG&E has not and cannot established

facts sufficient to support its allegation that AGECO operated the RG&E Sites.

### III.    RG&E IS NOT ENTITLED TO ANY RECOVERABLE DAMAGES UNDER CERCLA

#### A.    RG&E has Not Incurred and Will Not Incur Any Damages Because It has Fully Recovered Its Cleanup Costs Through Its Rate Base.

RG&E is seeking to recover as damages under CERCLA § 107 all costs incurred and

to be incurred by it in cleaning up the sites.  RG&E, however, has not yet suffered any

damages and will never incur any such damages.  RG&E has fully recovered its cleanup

costs through rate provisions approved by the New York State Public Service Commission

("PSC").  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 171-172.]  "RG&E

has full rate recovery for the MGP Sites, [and] any increase in the liability estimate will be

offset by an increase in the regulatory asset and not have an effect on the bottom line."  [Joint

Ex. 469.]

 Because RG&E has recovered all costs incurred through inclusion of such costs in its

rate base, it has suffered no damages.  To the extent such monies have not yet been recouped,

RG&E has admitted that it expects to recover all expenditures through future rate-making

procedures.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 171-172.]

**B.**     **RG&E's Response Costs are Not "Necessary" Costs of Response Pursuant to CERCLA.**

 Only those costs that are "necessary" and consistent with the NCP may be recovered

in CERCLA cost recovery actions.  CERCLA § 107(a)(4)(B).  "Necessary" costs are those

costs "incurred in response to a threat to human health or the environment" and "necessary to

address that threat."  Foster v. United States, 922 F. Supp. 642, 652 (D.D.C. 1996) (quoting

G.J. Leasing Co., Inc. v. Union Electric Co., 854 F. Supp 539, 562 (S.D. Ill. 1994) aff'd, 54

F.3d 379 (7th Cir. 1995)).  RG&E has not demonstrated that its costs – none of which were

incurred in response to a state or federal government order – were "necessary."  Indeed, all of

RG&E's costs for which it seeks recovery were incurred pursuant to a Voluntary Clean-Up

Agreement.

 RG&E has yet to perform a quantitative risk assessment at East Station, and

therefore, has not demonstrated that its work at that Site has been "necessary."  [Trial

Transcript, Oct. 26, 2007, at 150-151.]  A quantitative risk assessment is a quantitative

analysis of risks at a site in order to characterize the risk to human health and the environment posed by site conditions and the presence of site-related contaminants.

Additionally, in the early 1980s, the USEPA retained the contractor, NUS Corporation ("NUS"), to assess potential hazardous waste sites under CERCLA.  NUS performed preliminary site assessments at both East and West Stations and determined no further action was necessary.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 132.]  The USEPA has taken no action subsequent to those determinations.

C.    **RG&E Costs were Not Incurred in a Manner Substantially Consistent with the National Contingency Plan.**

RG&E has failed to meet its burden of proving that, "when evaluated as a whole", the investigation and remedial work performed at the Sites was substantially consistent with the NCP and resulted in a "CERCLA-quality clean-up".  42 U.S.C. § 9607(a)(4); 40 C.F.R. § 300.700(c)(3)(1); and See Young v. United States, 394 F.3d 858, 863 (10th Cir. 2005) (holding that "plaintiff bears the burden of proving any response costs were necessary and consistent with the NCP") (internal quotations omitted) (citing United States v. Hardage, 982 F.2d 1436, 1477 (10th Cir. 1992).

RG&E started investigating environmental conditions at East Station in 1992, but has not yet performed several studies required by the NCP -- a comprehensive site-wide remedial investigation, a comprehensive site-wide quantitative risk analysis, and a comprehensive site-wide feasibility study of remedial alternatives.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 136-37, 139.]  Instead, RG&E is implementing piecemeal removal actions based on incomplete information.  Significantly, RG&E has been implementing these piecemeal, interim removal actions even though RG&E and its expert concede that there is no imminent or immediate threat to the environment.  [See Defendant's Post-Trial Proposed

Findings of Fact, at ¶ 147.]  As this Court earlier recognized, "one common denominator of any removal action is that it be done for the prevention of immediate harm."[10]  [Feldman Opinion at 17.]  RG&E's site investigation and cleanup work at the East Station fails to meet CERCLA's "substantial compliance" requirement in several regards.

### 1.    The Tar Well

RG&E's 2004-2005 Tar Well remedy was technically-flawed cleanup project.  The Tar Well remedy was performed as an IRM, prior to the completion of an RI/FS for the East Station site.  According to the NCP, an IRM is characterized as a response action that is fast, simple, an obvious solution to an obvious problem and consistent with the final site-wide remedy.  [40 C.F.R. Section 300.415; Trial Transcript, Oct. 26, 2007, at 106-114; Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 152-57.]  The Tar Well remedy does not meet these requirements.

RG&E has failed to prove that the Tar Well presented an obvious problem.  RG&E's own expert testified that the Tar Well was not leaking at the time of its removal [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 145-46.][11], that it did not present an imminent threat to human health or the environment [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 147], that the only contaminants emanating from the Tar Well at the time of its removal were in the dissolved phase in the groundwater ("leachate" according to Mr. Karls), and that the groundwater did not present an imminent threat to human health or

---

[10]    This Court held:  "RG&E has not produced any evidence that the work done in 1992 was in response to any immediate harm or any threat of release of hazardous substances into the environment.  The exact definition of a 'removal' action may not be precise or even always consistent, but the one common denominator of any removal action is that it be done for the prevention of immediate harm." [Feldman Opinion, at 17.]

[11]    RG&E itself is still guessing as to the source of the tar outside the Tar Well.  [Feldman Opinion, at 17; Trial Transcript, Oct. 24, 2007, at 120:19-121:7.]

the environment.  [Trial Transcript, Oct. 25, 2007, at 57:12-16.]  Further, to the extent that the purpose of the Tar Well remedy was to prevent tar from migrating to the Genesee River, RG&E has concluded that the contaminated groundwater at the site was not presenting any threat to the Genesee River.  [Trial Transcript, Oct. 24, 2007, at 123:23-124:6.]  In short, RG&E embarked on a $4.4 million remedy in the absence of any scientifically established threat.

To the extent that the Tar Well presented any issues of concern, the Tar Well did not lend itself to obvious solutions and the remedy selected was not simple.  The Tar Well remedy was a complex response action that involved removal of 19,986 tons of contaminated media, excavation down to 25-29 feet below grade to the bedrock surface, pumping and disposal of 978,359 gallons of contaminated groundwater, and installation of a slurry wall to prevent water from entering the excavation area.[12]  [Joint Ex. 375 at RGE 347444-347455.] The Tar Well remedy cost $4.4 million.  [Trial Transcript, Oct. 24, 2007, at 80:6-10.]  The fact that RG&E encountered significant unanticipated groundwater infiltration problems during implementation of the Tar Well remedy demonstrates that the remedy was too complex to have been performed as an IRM.

The Tar Well also was not substantially consistent with the NCP because it was neither simple nor fast.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 153, 154.]

---

[12]     The Tar Well remedy was comparable in magnitude to the Beebee Park cleanup that the Court ruled was a "remedial action."  Like the Tar Well remedy here, the work at Beebee Park was "extensive, costly, complex, and extended over a number of years," thereby "support[ing] the finding that the project was intended to be a permanent remedial action, rather than a removal project commenced in response to an *immediate harm*."  [Feldman Opinion, at 17-18 (emphasis added).]

RG&E argues that despite these obvious deviations from the NCP, the Tar Well remedy complied with the NCP because it was consistent with the State's IRM program. The State's requirements for an IRM dictate the opposite conclusion. New York defines an IRM as a response action that does not require "extensive investigation". [Joint Exhibit 95.] RG&E has performed nine (9) investigations at East Station, seven (7) of which have focused on the Tar Well. [13] Thus, the Tar Well was studied "extensively" prior to its removal. [Trial Transcript, Oct. 26, 2007, at 165:16-166:13.]

RG&E also contends that the Tar Well remedy was consistent with the NCP because the State required the Tar Well remedy and because NYSDEC guidance requires IRMs. This argument is without merit because it presumes that IRMs for former MGP structures containing tar are consistent with the NCP, yet ignores the fact that the NCP itself requires an evaluation of whether the environmental issue is appropriate for an IRM or whether it requires a remedial action. [40 C.F.R. 300:415(b)(4); Trial Transcript, Oct. 29, 2007, at 165-173.]

RG&E concedes that the Tar Well did not present any imminent threat, but contends that the Tar Well remedy was appropriate and consistent with the NCP as a non-time critical IRM. 40 C.F.R. 300.415(b)(4). RG&E's explanation is nothing but an after-the-fact attempt to dress up its NCP-noncompliant remedy as some sort of activity that comports with the

---

[13]    (i) 1992 Site Investigation [Joint Ex. 034]; (ii) 1998 Focused Remedial Investigation [Joint Ex. 035]; (iii) Addendum to the 1998 Focused Remedial Investigation [Joint Ex. 036]; (iv) 1999 geophysical investigation of the subsurface [Joint Ex. 309]; (v) 2001 Focused Feasibility Study [Joint Ex. 037]; (vi) 2003 "Executive Summary for the Site Investigation and Focused Feasibility Study for Remediation of Impacts at the East Station" [Joint Ex. 365]; (vii) 2004 Preliminary Summary Report on Remedial Design Investigation for IRM to Mitigate NAPL Seeps" [Joint Ex. 361]; (viii) 2004 "Report on IRM Phase I Remedial Design Investigation to Mitigate NAPL Seeps" [Joint Ex. 357]; and (ix) 2004 "Draft Report on Pre-Remediation Characterization of the Tar Well/Gas Holder Area" [Joint Ex. 366].

NCP.  RG&E's attempt to back itself into the definition of a non-time critical IRM falls apart.

A critical factor in the decision whether contamination requires a non-time critical removal action or a remedial action is whether the threat presented by the contamination is "sufficiently serious that the added time needed to comply with remedial requirements (e.g. completion of an RI/FS and ROD) would be unacceptable."  [Deft. Ex. 643 at 5, n.6.] RG&E's expert conceded that the threat presented at the Tar Well did not meet the "sufficiently serious" test articulated by USEPA:.

> THE COURT:  . . . I am saying in your professional opinion, with your experience, is removal of this tar well, did tar well present a threat to human health or the environment, that although non-time critical is sufficiently serious, the added time needed to comply with remedial requirements that is completion of the final RI/FS would be unacceptable?
>
> MR. KARLS:  I don't know that an additional three or four years of waiting would have necessarily created an additional environmental impact beyond what's already experienced at the site.  I don't know that there would be additional deterioration of the environment beyond what's there now.  The sooner it comes out, the sooner the groundwater underneath it will improve.  So, from that perspective it's an incremental improvement.  –

[Trial Transcript, Oct. 25, 2007, at 145:20-146:11 (emphasis added).]  The environmental issues arising from the Tar Well simply did not require the swiftness of an IRM or justify deferral of an RI/FS for the Site.

The Tar Well remedy not only failed to meet the requirements of an IRM under Section 300.415(b) of the NCP, it failed to meet this requirement for a non-time critical removal action.

Even if the Court concludes that the Tar Well remedy fits the definition of a non-time critical removal action, the Court still should find that the work was inconsistent with the NCP because the Tar Well remedy failed to comply with the procedural requirements for such a removal action.  Neither NYSDEC nor RG&E issued an Approval Memorandum or an Action Memorandum as required by the NCP.  [Joint Ex. 234; Trial Transcript, Oct. 25, 2007 at 122:8-123:2 (NYSDEC only issued two approvals for the Tar Well remedy); Joint Ex. 130; Joint Ex. 185 at RGE 347429.]

RG&E's contention that the NYSDEC required performance of the Tar Well remedy is not supported by the evidence.  RG&E had a choice between performing a remedy that was inconsistent with the NCP (the Tar Well remedy) or performing a site-wide RI/FS consistent with the NCP:

> Q.  And there was some discussion back and forth about whether it would be cheaper to do it in 2004 with respect to the tar well remediation versus 2010, I believe, or 2012.  Was the DEC going to allow you to wait that long to do the tar well remediation?
>
> A.  If we wanted to do any remedial action, removal action at the site now in the short term, they told us we had to do the tar well first.  So, the answer would be just go right to the site wide investigation, forget about doing any inter remedial action, because they weren't going to approve anything if we didn't do the tar well first.

[Trial Transcript, Oct. 25, 2007, at 157:13-23 (emphasis added).]  RG&E made the wrong choice by electing to defer a site-wide RI/FS and instead jumping to the Tar Well remedy.  The fact that RG&E was under the oversight of NYSDEC does not somehow morph RG&E's Tar Well remedy into an NCP-compliant activity.

2.      **The ISS Remedy**

RG&E intends to install an in situ stabilization wall along the bank of the Genesee River, with a NAPL recovery system, as an interim remedial measure to address the tar seeps at East Station ("River Seep Remedy").  [Joint Ex. 357, at RGE 27442.].  The River Seep Remedy is not substantially consistent with the NCP because RG&E intends to perform the River Seep Remedy without first performing a comprehensive site-wide remedial investigation or a comprehensive feasibility study, and because RG&E has not evaluated the cost-effectiveness of the proposed River Seep Remedy or any alternatives for the proposed remedy.  [Rule 30(b)(6) Deposition of Joseph Simone, July 27, 2002, ("Rule 30(b)(6) Dep. via Simone") at 31:2-4; Joint Ex. 275, at 9; Joint Ex. 275, at 10.]

The proposed River Seep Remedy is also inconsistent with the NCP because it is intended to address the tar seeps, yet RG&E has failed to identify the sources of the tar seeps, failed to perform a comprehensive site-wide remedial investigation or a comprehensive feasibility study at East Station (and does not intend to do so until after the tar seep remedy is complete), failed to identify tar migration pathways at East Station, and failed to identify sources of tar in the bedrock at East Station.  [Trial Transcript, Oct. 24, 2007, at 85:9-11.] These are significant deviations from the NCP, and thus, none of RG&E's costs associated with the proposed remedy are recoverable.

3.      **Experimental Methods**

RG&E analyzed environmental media at the Sites using an experimental method (the micro-scale solvent extraction ("MSE") technique) that was not approved by the DEC at the time RG&E used it during investigations at the Sites.  [Joint Ex. 309, at 45;  Trial Transcript, Oct. 26, 2007, at 184-85.]  RG&E's use of the MSE technique is inconsistent with the NCP.

4.        **West Station**

Very little is known about the nature, extent and causes of contamination at West Station because RG&E has yet to perform a remedial investigation of the West Station. [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 165, 167.]  Lacking any meaningful investigation at West Station, it is not known at this time whether and to what extent RG&E's Beebee Generating Station contributed hazardous substances to the West Station.  [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 165.]  In addition to not having performed a remedial investigation at West Station, RG&E has also yet to perform a quantitative risk assessment at the West Station.  [Rule 30(b)(6) Dep. via Simone at 113:2-8.]

In 2006, RG&E investigated subsurface conditions in the vicinity of the former oil-tar separator to determine if that area is the source of tar-like contaminants in the Genesee River. [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 168.]  Prior to conducting the 2006 investigation of the area of the former tar-oil separator, there was no evidence indicating that that area was the only potential source of contamination at the West Station. [See Defendant's Post-Trial Proposed Findings of Fact, at ¶ 169.]  Lacking any basis to focus exclusively on the oil-tar separator, RG&E's oil-tar separator investigation was not consistent with the NCP.

D.        **RG&E is Not Entitled to Recover Oversight Costs Incurred Pursuant to the Voluntary Cleanup Agreement.**

The Voluntary Cleanup Agreement between RG&E and the New York State Department of Environmental Conservation ("NYSDEC") provides that:

> Volunteer [RG&E] shall pay to the Department in order to pay for State expenses (including but not limited to direct labor and fringe benefits, overhead, travel, analytical costs and contractor costs).

[Joint Ex. 40 at RGE 25972.]

RG&E seeks to recover a portion of these oversight costs from FirstEnergy along with other claimed necessary costs of response. However, there is no Second Circuit precedent to support RG&E's contention that it is allowed to recover from another private party the government's oversight costs associated with a voluntary site cleanup agreement. RG&E's claim for oversight costs also lacks merit because RG&E *contracted* to reimburse the NYSDEC for the government's oversight costs. In no other circumstance would this Court consider allocating to an outside party a portion of another party's contractual obligation to make a payment, and this Court should not do so here.

FirstEnergy had no opportunity to negotiate the terms of the contract between RG&E and NYSDEC, nor did it have any knowledge of the agreement being developed. RG&E made a calculated decision to negotiate and sign the Voluntary Cleanup Agreement for its own benefit, including the increased value of the remediated land. FirstEnergy had no such similar motivation to agree to pay for extraneous costs associated with the cleanup and should not be bound by the terms RG&E negotiated.

### E.   Even if FirstEnergy is Held Liable, FirstEnergy has a Viable Counterclaim Against RG&E and FirstEnergy's Equitable Share of Response Costs Must be De Minimis

In allocating liability among RG&E and FirstEnergy, the Court is entitled to apply any equitable factors that it deems appropriate. 42 U.S.C. § 9613(f)(1). The Court has broad discretion in selecting which allocations factors to apply. Seneca Meadows v. ECI Liquidating, 427 F.Supp.2d 279, 292-294 (W.D.N.Y. 2006) (citing the so-called "Gore Factors" as well as other equitable factors). To determine FirstEnergy's allocable share of liability this Court first needs to determine what costs are subject to allocation. Then, this Court should (1) compute FirstEnergy's share based on the years that the Court determines the Sites were "owned" by FirstEnergy or based on the volume of gas produced during the

period for which the Court finds FirstEnergy has liability, and then (2) *reduce* that share by applying the following equitable factors to the parties:  degree of care exercised by the parties and the relative knowledge and awareness of the parties of the environmental contamination of the Sites.

### 1.     Costs Not Subject to Allocation

If the Court finds that FirstEnergy has any liability in this case, it must exclude from allocation any costs associated with contamination caused by activities of RG&E prior to and after the period for which FirstEnergy has liability.  The parties agree that AGECO (or its affiliates) did not acquire RG&E stock until May 1929, and this Court has ruled that FirstEnergy has no liability after January 1940.  [See Feldman Opinion at 12.]  Thus, any past or future cleanup costs incurred or to be incurred by RG&E that relate to activities prior to May 1929 and after January 10, 1940, are not subject to allocation.  For example, the tar well at East Station was not used for the storage and disposal of gas or tar during the period 1929 to 1940.  The facts demonstrate that:

- Starting in 1894, RG&E used the Tar Well structure at East Station for the storage of gas and later as a vessel for containing tar, and discontinued its use of the Tar Well prior to 1911, well before any alleged involvement by AGECO.  [Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 173-174.]

- The tar well does not appear on Sanborn Fire Insurance Maps after 1910.  [Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 178.]

- RG&E manufactured gas at the West Station from 1917 through 1952, and following the construction of West Station, the East Station plant operated only in peak shaving mode.  [Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 180-181.]

- Site maps dated 1928 demonstrate that following the construction of West Station, tar was conveyed from East Station to West Station through pipes heated by steam.  [Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 182.]

Costs associated with work that is not consistent with the NCP also are not subject to allocation (i.e., costs incurred and to be incurred relating to the in-situ stabilization wall at East Station, the aborted "IRM" at West Station).

Finally, any costs associated with the cleanup of hazardous substances contributed to the West Station site by RG&E's operation of its electric generating plant (Beebee Generating Station) adjacent to and on the former West Station site also are not subject to allocation.  RG&E has not yet performed a remedial investigation of the West Station, and it is not known at this time whether RG&E's Beebee Generating Station contributed hazardous substances to the West Station, and if so, where.  [Trial Testimony, Oct. 26, 2007, at 94, 190-91.]

> **2.      The Ability of the Parties to Demonstrate that Their Contribution to a Release of Hazardous Substances Can Be Distinguished: Volume of Gas Produced**

The ability of the parties to demonstrate that their contribution to a discharge release or disposal of hazardous wastes can be distinguished is an equitable allocation factor that is considered by the Courts in CERCLA allocations.   State of New York v.  Westwood-Squibb Pharmaceutical Co., 2004 WL 1570261, *21 (W.D.N.Y. May 25, 2004).

In this case, it is appropriate to allocate 20% of the total liability to the owner of the Sites and 80% to the operators because the operator of the Sites (RG&E) had a superior level of knowledge and awareness of the leaks and spills occurring during operation of the Sites.  [Trial Testimony, Oct. 29, 2007, at 35-36.]  During the period that AGECO indirectly owned RG&E stock, RG&E reported in its annual filings with the State regulatory agencies that it was either recycling or selling all of the tar that was generated during the gas manufacture process. [See Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 20-21]  Based on

RG&E's data reported to the State, AGECO could not have known that tar was being discharged to the environment at the Sites.  [Trial Transcript, Oct. 29, 2007, at 27:23 – 28:22, 29:5-10, and 128:24-25.]  Therefore, the Court should assign a greater allocable share to the operator of the Sites, RG&E.

With respect to each party's share, either as owner or operator, the Court reasonably may apply a percentage based on years owned.  [Trial Transcript, Oct. 29, 2007, at 14-15.]  See United States v. SEPTA, 235 F.3d 817 (3d Cir. 2000) (allocation based on years of ownership was fair), Tosco Corp. v. Koch Industries, 216 F.3d 886 (10th Cir. 2000) (years of ownership determined to be a helpful allocation factor), and U.S. Steel Supply v. ALCO, 1992 WL 229252 (N.D. Ill. Sept. 9, 1992) (owner's allocation based on years of ownership as well as other equitable factors).  For example, using percentage of years owned, the Court would  apply 3.9%[14] to FirstEnergy's share of necessary and NCP-compliant costs incurred as a result of operations during the period May 23, 1929 and July 15, 1932 at East Station.

Alternatively, the Court could look to the volume of gas produced as an appropriate basis for allocating liability.  [Trial Transcript, Oct. 29, 2007, at 16:3-16:23; and 29:15-30:2.]  According to RG&E's expert, the period May 1929 – July 15, 1932 represents 6.2% of the total gas produced by the Sites over their operating life (1872 – 1955).  [Deft. Ex. 654.]  The 6.2 % of total gas produced (derived from Plaintiff's expert's chart) is a more reliable figure because it factors in the precise time period between when AGECO acquired interest in RG&E, May 23, 1929, and the entry of the Voting Trust Agreement on July 15, 1932.  This accounts for the seven twelfths of the year 1929 and one half of the year 1932 during that period.  There was no testimony at trial regarding whether or not Dr. Shifrin's figure of 8%

---

[14]     May 1929 through July 15, 1932 equals 38.5 months, or 3.2 years.
         East Station years "owned":  [3.2 years/(1955 – 1872)] X 100 = 3.9%
         West Station years "owned":  [3.2 years/(1955-1917)] X 100 = 9.1%

was simply a full year by year calculation, or one reduced to reflect the partial years of 1929 and 1932.

> **3.      Any Share of Liability Attributed to FirstEnergy Should be Reduced to Reflect Other Equitable Allocation Factors**

Any share of liability for FirstEnergy for necessary costs of response incurred consistent with the NCP should be further reduced due to the following equitable considerations:

- **RG&E's low degree of care with respect to the Sites and the hazardous substances released there**.[15]   RG&E exercised a low degree of care with respect to the handling of wastes in four regards:

    **(1)      Improper Decommissioning of Tar Well**:  When the Tar Well was decommissioned in 1910, RG&E inappropriately left the Tar Well contents and its walls and foundation in place.  [Joint Ex. 235, at RGE 344040.]  RG&E's failure to properly close the Tar Well in 1910 is a factor that should increase RG&E's allocable share of future costs associated with contamination that leaked from the Tar Well.

    **(2)      Dumping of Tar**:  When RG&E removed tar in the course of decommissioning activities after the Sites were shut down, RG&E showed reckless disregard for the environment by merely disposing of the tar on property owned by RG&E after the Sites stopped producing gas.  [Trial Transcript, Oct. 30, 2007, at 175-180.][16]

    **(3)      Failure to Act**:  RG&E knew of the contamination at the Sites as early as the 1970s, and yet took no action to address the contamination until the early 1990s when RG&E started investigating Site conditions.  RG&E learned of tar contamination at the West Station at least as early as 1978 when RG&E was making preparations to

---

[15]   Bedford Affiliates v. Sills, 156 F.3d 416 (2d Cir. 1998) (upholding allocation of 95% to operator who was in possession of site at all relevant times and who exercised low degree of care with respect to the site); Seneca Meadows, 427 F. Supp. 2d at 292.

[16]   An additional aggravating factor is that RG&E did nothing to stop tar-dumping activities when such activities were brought to the attention of RG&E management.  [Trial Testimony, Oct. 30, 2007, at 178.]

In addition to dumping tar, the deposition designation from former RG&E employees acknowledge disposal of "oily water waste streams" and "C&D" (construction and demolition) waste at East Station in the 1980's.  [See Deposition of Jeffrey Williams, Aug. 1, 2002, at 60-62, 146-148.]

construct a wastewater treatment facility for its Beebee Generating Station within the footprint of the former West Station.  [Deft. Ex. 610, at 4-5.]  RG&E also learned of oily contamination at East Station in the 1970s, but took no action to address it.  [Deposition of Robert DeSeyn, Aug. 9, 2002, at 35:15-39:2.]

**(4)     Delay:**  Even after RG&E started to address environmental issues at the Sites, RG&E engaged in further delay by performing one needless and incomplete investigation after another to defer performance of any meaningful remediation.  RG&E waited six (6) years after the 1986 Morrison-Knudsen study to start collecting groundwater and soil data at the Sites.  [Joint Ex. 092, at RGE 01318-01325; Joint Ex. 034, at RGE 01873-75.]  In the following fifteen (15) years, RG&E has performed a handful of additional investigations of East Station that were focused on one site issue (the Tar Well) and two cursory investigations at West Station.  There has been only one actual cleanup activity at either Site – the Tar Well remedy.  RG&E's allocable share should be increased.

- **RG&E's economic benefit**:  After the Sites are remediated, they will increase in value and become more marketable for any future site use even if the ultimate remedies require institutional controls.  [Seneca Meadows, 427 F. Supp. 2d at 305.]  If FirstEnergy is found to have any liability, RG&E's entire cleanup costs will have been covered by persons other than RG&E (i.e., rate payers, FirstEnergy and RG&E's insurers).  The Court's equitable allocation should recognize that these Sites (RG&E assets) will increase in value, and that it would be inherently unfair to allow RG&E to realize such a gain from a cleanup.

## IV.     A DECLARATORY JUDGMENT AS TO FUTURE COSTS IS PREMATURE WHEN IT IS UNKNOWN WHETHER ANY FUTURE CLAIMS FOR RELIEF WILL BE MADE, AND, IF SUCH CLAIMS ARE MADE, WHETHER THE FUTURE COSTS WILL BE RELATED TO ACTIVITIES THAT OCCURRED DURING A TIME PERIOD FOR WHICH FIRSTENERGY IS LIABLE

As required by the "case or controversy" provision of Article III of the United States Constitution, and consistent with provisions of the Declaratory Judgment Act, 28 U.S.C. § 2201, a declaratory judgment "may be issued only in the case of an 'actual controversy.'"  Malowney v. Federal Collection Deposit Group, 193 F.3d 1342, 1347 (11th Cir. 1999); see also McCormick ex rel McCormick v. School Dist. of Mamaroneck, 370 F.3d 275 (2d Cir. 2004) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future") (quoting Deshawn E. ex rel Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998)).

Therefore, **when any future claims for relief are speculative,** declaratory judgment should not be granted.  See McDonald v. Sun Oil Co., 423 F. Supp. 2d 1114, 1131-32 (D. Or. 2006).[17]

Although CERCLA allows a court to issue a declaratory judgment, most CERCLA cases in which a declaratory judgment is granted as to future costs are cases where at least a RI/FS has been completed.  Here, RG&E should not be granted a declaratory judgment for future costs due to its failure to establish the prima facie elements of CERCLA liability with respect to future response costs of remediation.  See City of Wichita v. Trustees of the Apco Oil Corp. Liquidating Trust, 306 F. Supp. 2d 1040, 1117 (D. Kan. 2003) (granting declaratory judgment *only where* prima facie elements of CERCLA liability were met with respect to the specific remediation).  RG&E has not established a prima facie case of CERCLA liability for *any* future response costs at either East or West Station.

RG&E admittedly has not conducted a comprehensive remedial investigation and feasibility study with respect to either East Station or West Station.  [Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 136-37, 165, 167.]  Also, RG&E admittedly has not conducted a quantitative risk assessment for either site.  [Defendant's Post-Trial Proposed Findings of Fact, at ¶¶ 139, 166.]  Thus, at this point in time, it is unknown whether any remedial action will be required for either site.  Indeed, RG&E has not identified all sources

---

[17]     In McDonald, plaintiffs sought declaratory relief, alleging that although the state had not ordered any remediation at the relevant sites, plaintiffs might still incur remedial costs in the future.  423 F. Supp. 2d at 1131-32.  The court rejected this argument.  Id. at 1132.  According to the court, declaratory relief is permitted only in justifiable controversies based on "present facts rather than on contingent . . . events."  Id. at 1131.  Because the state had not ordered plaintiffs to perform remediation at the site, addressing the merits of the lawsuit had resolved the parties' justifiable disputes; and therefore, any future claims for relief were considered speculative.  Id. at 1132.  As a result, the court granted defendants' motion for summary judgment on the issue of plaintiffs' declaratory judgment.  Similarly, in this case, RG&E has not been ordered by the state or EPA or any governmental entity to perform any remediation at the relevant sites.  Therefore, applying the rationale of the McDonald court, addressing the merits of the lawsuit resolves RG&E's justifiable disputes, but any future claims for relief are speculative.  Id. at 1132.

of coal tar contamination; RG&E has not identified whether the coal tar is migrating in any specific directions; RG&E has not identified whether the coal tar contamination poses a risk to human health and the environment which requires remediation.  [Trial Transcript, Oct. 26, 2007, at 130-131.]  It is possible that no remedial action will be necessary if it is determined that the coal tar contamination is in the bedrock and that the remediation of coal tar DNAPL in bedrock is determined to be technologically impracticable.  [Trial Transcript, Oct. 26, 2007, at 189.]  Thus, it simply is not known if any remedial actions will be required and whether any future claims for relief will be made.

Moreover, because RG&E has not established the prima facie elements of CERCLA liability for *any* future response costs, it is not known whether any contamination that may be the subject of future remedial actions will be linked to an activity or operation that occurred during a time period for which the Court has determined FirstEnergy is liable under a piercing the corporate veil theory.  Thus, future clean ups could relate to removal of items like the East Station Tar Well, which was not used at any time during the period 1929 to 1940.  Costs associated with such activities are not recoverable from FirstEnergy.  Future costs also could involve remediation of non-MGP related activities (such as Beebee Generating Station) which are not recoverable from FirstEnergy.

In short, it is premature to issue a declaratory judgment holding FirstEnergy responsible for a percentage of future costs when it is not known whether any future claims for relief will be made, and, if such claims are made, whether the future costs will be related to activities during any period of liability for FirstEnergy.  Finally, because RG&E is not

under any order to do any such remediation, it is not known whether any future costs

voluntarily incurred by RG&E will be "necessary" and "consistent with the NCP".[18]


## V.   CONCLUSION

For the foregoing reasons, FirstEnergy Corp. respectfully requests that this Court

grant judgment in its favor.


Respectfully submitted,

_/s/_____

John F. Stoviak, Esq.
Jane Kozinski, Esq.
Melissa Hill, Esq.
Christine M. Pickel, Esq.
Saul Ewing LLP
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA  19102
(215) 972-1095

Paul F. Keneally, Esq.
Underberg & Kessler, LLP
300 Bausch & Lomb Place
Rochester, NY 14604
(585) 258-2800
*Attorneys for Defendant*

---

[18]     If, however, the Court chooses to issue a declaratory judgment in this matter, FirstEnergy respectfully submits that any Order issued by the Court should be specifically tailored to include only those future response costs proven to be (a) "necessary costs of response;" (b) "consistent with the NCP;" and (c) incurred in response to an activity directly linked to a definitively proven time period of liability for FirstEnergy, determined by the Court.