# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

ROCHESTER GAS AND ELECTRIC
CORPORATION,

                    Plaintiff,                    **DECISION AND ORDER**
          v.                                      **00-CV-6369**

GPU, INC.,

                    Defendant.

_____

## Preliminary Statement

Plaintiff ("RG&E") commenced this action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") against defendant ("GPU") seeking to recover environmental cleanup costs that it incurred at several of its Rochester area sites. The Court conducted a bench trial from October 22, 2007 through October 31, 2007.[1] Following the trial, the parties submitted further briefing, including supplemental proposed findings of fact and conclusions of law.

Preliminarily, this Court notes that the evidence presented at trial requires resolution of two distinct but factually related liability issues. The first concerns corporate liability. More specifically, the Court must decide whether defendant GPU is legally liable as the corporate successor to Associated Gas and Electric Company ("AGECO") and, if so, whether RG&E should be

_____

[1]   In accordance with the provisions of 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court for all dispositive matters. (Docket #44).

permitted to pierce the corporate veil of its former parent corporation. The second determination concerns CERCLA liability. Assuming GPU can be held liable for environmental claims against AGECO, the Court must then decide whether GPU is liable under CERCLA for past and future cleanup costs associated with tar discharge and pollution at RG&E's East and West Station sites.[2]

It should also be noted that the complexities of litigating this case were compounded by the fact that most of the material events occurred over seventy years ago. Indeed, as to two critical issues in this case, corporate governance and environmental contamination, most of the proof introduced at trial and relied upon by the parties consisted of corporate records and governmental investigations created decades ago. Deciphering this evidence and analyzing it in the context of CERCLA liability was difficult. The legal teams from both sides did a remarkable job of gathering and organizing the historical information and then introducing this evidence in coherent and coordinated presentations.[3] The Court

---

[2] In its complaint, RG&E also sought contribution for cleanup costs associated with its Beebee Park site. In a decision dated March 31, 2004, this Court granted GPU's motion for partial summary judgment and dismissed the Beebee Park claim as barred by the statute of limitations. See Court's Decision and Order dated March 31, 2004 (Docket #126).

[3] The witnesses counsel called at trial referenced hundreds of different documents, only a portion of which were actually used by the witnesses in their testimony. Other documents, including historical documents and environmental records were either mentioned tangentially during testimony or were introduced (usually by stipulation) as part of the record of relevant evidence for the

sincerely appreciated their combined efforts.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following constitute the Court's findings of facts and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## A. FINDINGS OF FACT: CORPORATE LIABILITY.

1.  The corporate liability issues litigated in this case are intertwined not only with the history of Rochester Gas and Electric Corporation ("RG&E") and its relationship with the Associated Gas and Electric Corporation (AGECO) and affiliates, but also with the state of public utility ownership in the United States between 1920 and 1940.

## THE AGECO EMPIRE

2.  In 1906, AGECO was incorporated as a holding company for utility companies in New York, Pennsylvania and Ohio. Between 1922 and 1923 Howard C. Hopson and John I. Mange acquired all outstanding shares of voting stock of AGECO.

3.  A holding company is a term to describe "a corporation whose assets consist predominantly of stock of another

---

Court to consider. Thus, although the presentation of witness testimony was completed in a week, the Court's evaluation of the evidence included consideration of thousands of pages of documents submitted to the Court in dozens of bankers boxes.

corporation." <u>See</u> October 22, 2007 Trial Testimony of Professor Jonathan R. Macey at p. 103 (hereinafter "Macey TT1").[4] The parties do not dispute that AGECO was a substantial multi-jurisdictional holding company that held the stock of other holding companies, service companies, operating companies and various other assets associated with public utilities and other energy related business.

4. While the holding company method of corporate organization and control was legitimately utilized in many business spheres, it was problematic in the ownership of public utilities where the "pyramidal organizational structure" led to various corporate abuses. These abuses included (1) siphoning revenues from the operating subsidiaries for various service companies in the holding company structure, (2) self dealing transactions among the various tiers of the operating companies, and (3) lack of transparency in ownership and control by creating complex organizational structures in order to avoid local regulatory control and accountability. Macey TT1 at p. 123-24.

5. Over time, AGECO became the "poster child" for the abusive practices of certain public utility holding companies. Macey TT1 at p. 124. Indeed, the abuses by AGECO resulted in several public

---

[4] To the extent that certain witnesses testified over the course of more than a single day, references to their testimony will be preceded by "TT1" or "TT2" and a page number to designate in which trial transcript the testimony can be located.

4

agencies conducting comprehensive investigations of the AGECO empire along with Howard C. Hopson and John L. Mange, AGECO's controlling shareholders. Two of the investigatory agencies, the Securities and Exchange Commission ("SEC") and the Federal Power Commission ("FPC") issued detailed reports summarizing their findings and making recommendations for change in limiting the holding company format for ownership of public utilities. A third report was contained in a letter from the Acting Chairman of the Federal Trade Commission ("FTC") to the United States Congress in response to a congressional inquiry about the practices of certain utility companies, including AGECO.[5]

6. The SEC report described the corporate history of AGECO and its manipulation of wholly owned subsidiaries. These findings were referred to and relied upon by Judge Leibell in his opinion confirming AGECO's reorganization under the Bankruptcy Act:

> Ageco was incorporated in New York on March 19, 1906. It was a comparatively small public utility holding company with gross consolidated assets in 1922 of $7,000,000. Between March 14, 1922 and April 1923 Howard

---

[5] All three official government reports were admitted into evidence pursuant to Rule 803(8) of the Federal Rules of Evidence. The reports were also reviewed and relied upon by Professor Macey in rendering his opinions as to whether the relationship between AGECO and RG&E was consistent with the findings and conclusions reached by the SEC, FTC and FPC. The Court has determined that the four legislative hearing transcripts setting forth witness testimony (Exhibits 535, 536, 537 and 538) do not meet the requirements of Rule 803(8) or Rule 901(b)(8) ("Ancient Documents") and these exhibits are therefore are not received in evidence. See October 25, 2007 Trial Transcript at p. 182-83.

C. Hopson and John I. Mange acquired all of
Ageco's outstanding shares of voting stock.
Hopson and Mange held and exercised voting
control of Ageco until January 10, 1940. Mange
was the operating executive. Hopson controlled
the financial and accounting policies of Ageco
and its subsidiaries throughout. He controlled
their Boards of Directors and held their
undated signed resignations. Hopson's
employees kept the minute books; some of the
minutes were spurious. They also kept the
books of account (irregularly maintained).
Entries were changed and reinstated as Hopson
directed; one item was changed 13 times.
Alleged contracts for stock subscriptions of
Ageco in subsidiaries, disappeared and
reappeared as the occasion required. There
were no corporate resolutions authorizing the
transfer of the bulk of Ageco assets to
AUICorp. The officers of Ageco and Agecorp
were selected by Hopson and were paid through
checks of Hopson 'service companies' which
furnished the corporations in the Associated
System with 'auditing, corporate, security,
transfer, tax consultant and other services.
'For these services Hopson's personally-owned
service companies were paid large sums by the
companies in the Associated System, giving him
and his family a profit in excess of
$6,500,000 in the period of 1922 to 1938.

In 1922 Ageco controlled relatively few
subsidiaries. In 1929 it controlled about 200
subsidiaries. The more subsidiaries in the
Associated System, the more work for the
Hopson service companies and the greater his
personal profits. At December 31, 1929, the
gross book value of the consolidated assets of
the corporations in the Associated System had
increased to $900,491,542, largely as a result
of the acquisition of voting stocks and other
securities of other public utility holding
company systems and of various operating
utility companies. Of course, many of the
operating companies had their own debt
structures.

*In re* Assoc. Gas & Elec. Co., 61 F. Supp. 11, 24 (S.D.N.Y. 1944),

aff'd, 149 F.2d 996 (2d Cir. 1945), cert. denied sub nom. Elias v.
Clarke, et al., 326 U.S. 736 (1945).

7.    The FPC report, issued in 1949, was equally critical of
AGECO's control and domination over its subsidiaries. "Our
investigation has developed an extraordinary picture of the
exploitation of an essential public service for which the holding
company device served as a cloak.  Almost every possibility for
plunder was exploited." *In re* Metropolitan Edison Co., et al., FPC
Investigation, No. IT-5015, Sept. 27, 1940), at p. 238 (hereinafter
"FPC Report") (Plaintiff's Exhibit 510).  Although the focus on the
FPC report was AGECO's relationship with several Pennsylvania
utility companies, it detailed "the methods by which Hopson and the
corporations and individuals he controlled drew millions of dollars
from the [Pennsylvania] respondents and other operating companies
of the Associated Gas and Electric Company [AGECO] system." Id.

8.    Both the FPC report and the SEC report were particularly
critical in describing AGECO's and Hopson's practice of using
"service companies" to extract money from wholly owned subsidiaries
by "outsourcing" essential management functions of an operating
utility to Hopson and AGECO controlled service companies.  The FPC
found that "Hopson, using other individuals under this control as
well as his relatives, formed nearly a score of personal service
companies through which unwarranted charges were extracted from
companies in the Associated [AGECO] System." Id. at p. 239 n.1.

In addition to "personal service companies", the FPC found that AGECO and Hopson formed "so called 'system service companies,' which were subsidiaries of Associated Gas and Electric Company." Id. at p. 240 n. 6.   The FPC found these system companies had extracted millions of dollars in  "unjustified profit" from the Pennsylvania public utility companies within the AGECO empire.  Id.

9.  The FPC report concluded that the holding company system in the public utility field presented many "evils."  These included (1) using wholly owned service companies to burden operating utilities with unnecessary charges to their expense accounts, (2) the concealment of real ownership and control of the operating utility and (3) "the manipulation and exploitation of operating properties for the selfish interests of the holding companies and their owners."  Id. at p. 243.

10.  As to AGECO in particular, the FPC found that AGECO and Hopson represented "a somewhat unusual combination of mind and efforts almost exclusively devoted to manipulation and selfish exploitation.  It was legerdemain at its worst.  The ingenuity of Hopson and his associates were indeed worthy of a better cause. They were apparently single-heartedly determined upon extracting currently every dollar they could wring from the operating utilities regardless of the effect upon consumers and investors. The fact that they were unjustly and improperly impairing the efficient and economical operation of such utilities and laying

unlawful burdens upon the rate payers seemed not to concern them at all."[6] Id. at p. 244.

**RG&E AND AGECO**

11.   In 1904 Rochester Gas and Electric Co. and Rochester Railway and Light Company were combined to form Rochester Gas and Electric Corporation ("RG&E"), which was incorporated under the name Rochester Railway and Light Company ("RRLC").  In 1906, the Mohawk Valley Company ("MVC") acquired the common stock of RRLC. The MVC was a subsidiary of the New York Central Railway Company. RRLC changed its name to Rochester Gas and Electric Corporation in 1919.  The RG&E Story (Joint Exhibit 27) at p. 22.

12.   In 1929 AGECO acquired Rochester Central Power Corporation, then the parent corporation of RG&E.   RG&E's acquisition of AGECO occurred at the height of the AGECO era and RG&E's place in AGECO's corporate structure was typical of the holding company ownership format.  In 1929, RG&E's "corporate lineage" was as follows:  RG&E was a direct subsidiary of Mohawk Valley Company, which was a direct subsidiary of Rochester Central Power Corporation, which was a direct subsidiary of Associated Electric Properties, Inc., which was a direct subsidiary of

---

[6] RG&E argued that AGECO was the ENRON of its time. See Plaintiff's Opening Statement, October 22, 2007 Trial Transcript at p. 29.  On December 31, 1940 Hopson was convicted of seventeen counts of mail fraud in the Southern District of New York and sentenced to five years in prison. In re Associated Gas & Elec. Co., No. 1610, 1942 SEC LEXIS 3051, at * 13 (SEC Aug. 14, 1942) (hereinafter "SEC Investigation Report") (Plaintiff's Exhibit 512).

Associated Electric Companies, which was a direct subsidiary of Associated Gas and Electric Properties. RG&E was also the largest operating utility company among the more than 200 companies owned by AGECO. See Federal Trade Commission Report, Sen Doc. No. 92, Pt. 52, 70th Cong. 1st Sess. (1933) (hereinafter "FTC Report No. 52") (Plaintiff's Exhibit 505) at p. 603; Macey TT2 at p. 91.

### EVIDENCE OF CORPORATE DOMINATION OF RG&E BY AGECO

13.   To assist in demonstrating that the domination and control AGECO generally exercised over its operating utilities existed specifically with respect to RG&E, RG&E presented the expert testimony of Jonathan R. Macey, a professor at Yale University Law School and Yale School of Management. After graduating from Harvard College and Yale Law School, Macey clerked for Judge Henry Friendly of the Second Circuit Court of Appeals and subsequently taught at various law schools, including the University of Virginia, the University of Chicago and Cornell University. Professor Macey currently teaches law school courses in the areas of business organizations, corporations, securities regulations, regulated industries, corporate finance and corporate governance. Professor Macey testified that one of his primary areas of expertise is the field of corporate governance and he currently serves as a member of the Board of Directors for the Yale Law School Center for the Study of Corporate Governance. Macey is the author or co-author of a text book and treatise on corporate

law, and has published numerous articles on the topic in law reviews and other scholarly publications. See Joint Exhibit 81.

14. In evaluating the corporate structure of RG&E and the issue of whether there was evidence of dominance by AGECO, Professor Macey testified that he reviewed thousands of pages of historical documents regarding RG&E and AGECO, including corporate records and meeting minutes, annual reports, accounting documents, deposition testimony as well as the testimony, reports and findings of the several public agencies that investigated AGECO and Hopson. While the ultimate determination whether corporate governance norms were violated by AGECO is for the Court, Professor Macey's testimony distilling and summarizing the historical documents, providing historical perspective with respect to the public utility industry during the relevant time period, and placing the historical data in context with well established principles of corporate governance was of assistance to the Court[7].

---

[7]   Macey testified he was not retained by RG&E to offer an opinion on whether AGECO's corporate veil should be pierced, but rather on AGECO's "evolving corporate governance relationship" with RG&E during the relevant time period.   (Macey TT1 at p. 89). Professor Macey's expertise was helpful to the Court in understanding corporate governance issues with respect to the holding company structure generally and specifically with respect to the public utility industry (including the particulars of the relationship between AGECO and RG&E).   Accordingly, the Court admitted his expert testimony. See Proujansky v. Blau, No. 92 CIV. 8700(CSH), 1999 WL 124457, at *4 (S.D.N.Y. Mar. 8, 1999); In re Reliant Energy ERISA Litig., No. H-02-2051, 2005 WL 5989791, at *2 (S.D. Tex. Aug. 19, 2005) (although expert opinions on legal matters are generally inadmissible, a court sitting as the trier of fact "may find expert testimony on complex legal issues . . . very

15.  <u>The Holding Company Structure</u>:  According to Macey, under Hopson and Mange, AGECO was found by various government agencies and courts to have been "one of the more abusive" holding companies of its time.  Indeed, Macey opined that AGECO and Hopson were, in no small part, the impetus for the enactment of the Public Utility Holding Company Act ("PUHCA") in 1940.[8]

16.  Macey testified that during the relevant time period AGECO used a "cookie cutter corporate governance approach" with respect to its relationships with its subsidiaries, including RG&E. Macey TT1 at p. 160.  As a result, it was Macey's opinion that the domination, control and violation of corporate norms that were documented in the public agency investigations and reports about AGECO's business practices applied with equal force to AGECO's corporate relationship with and domination of RG&E.  <u>Id</u>. at p. 126-65.

17.  Macey pointed to a variety of evidence culled from the historical data to support a finding that AGECO exercised corporate

helpful and, therefore, may consider those opinions").

[8] PUHCA was adopted by the federal government in response to "abuses that burdened ratepayers during the Depression."  <u>See</u> <u>Southern Union Co. v. Mo. Pub. Serv. Comm'n</u>, 138 F. Supp. 2d 1201, 1204 (W.D. Mo. 2001).  PUHCA regulated the corporate structure of utility companies by providing that a company must register with the SEC as a holding company at any time such company controlled ten percent or more of the voting stock of a public utility.  <u>Id.</u> A company's registration as a utility holding company then triggered "additional regulation of such company's investments in both utility and non-utility stock."  <u>Id.</u>

dominance and control over RG&E in the same manner as it was found to have controlled and dominated other operational subsidiaries.

18. As stated earlier, the corporate lineage of RG&E in relation to AGECO was typical of the pyramidal holding company structure used by Hopson and AGECO to exercise operational and economic dominance over its various public utility subsidiaries. For example, the FTC investigation of AGECO found that the "Associated System plan appears to have been to have the holding company practically own the entire [operating] property through the holding company owning all the security issues of the underlying corporations." FTC Report No. 52 (Plaintiff's Exhibit 505) at p. 603. The FTC report cited RG&E as one example of Hopson and Mange using this holding company structure to control the operating utility, finding that RG&E was "the operating link in a control ring which embraces at least nine named corporations which are more or less superimposed holding companies heading up in Associated Gas and Electric Properties (Massachusetts). The beneficial interest in the latter association lies with two men only, H.C. Hopson and J. I. Mange, who are the chief executives of the more important companies making up the Associated System." Id.

19. By utilizing this holding company structure, each of the subsidiaries was able to make claim to the earnings of the operational utility company (RG&E) sitting at the base of the corporate structure. Standing between RG&E and AGECO was a series

13

of non-operational "upstream" corporations with no real or "hard" assets except the stock of other companies within the holding company structure. Macey testified that this structure permitted AGECO to siphon revenues from the operating subsidiary (RG&E) to various service companies and upstream holding companies. (Macey TT1 at p. 123).

20. <u>Overlapping Officers and Directors</u>: The existence of overlapping directors and officers within the holding company structure utilized by Hopson and AGECO provided AGECO the ability to exercise dominance and control over financial and operating matters of subsidiaries like RG&E. While "there is nothing <u>per se</u> illegal about having overlapping directors between parents and subsidiaries," (Macey TT1 at p. 145-46), it is a relevant consideration in evaluating corporate dominance because it raises "conflict of interest" concerns. There is no question that these conflict issues are heightened when there are operational contracts or financial transactions negotiated between the parent and the subsidiaries.

21. AGECO clearly used the holding company structure to "cross-pollinate" directors and officers among its many subsidiaries. The FTC investigation found: "More than 250 individuals were connected with the 196 companies in the Associated Gas & Electric System that reported the names of their officers and directors as of December 31, 1931. One hundred and forty of these

14

officers and directors were connected with two or more of these reporting companies." Federal Trade Commission Report, Sen Doc. No. 92, Pt. 70, 70th Cong. 1st Sess. (1934) (hereinafter "FTC Report No. 70") (Plaintiff's Exhibit 507) at p. 765.

22.  RG&E typified AGECO's practice of deliberately populating corporate boards and officers within its holding company empire with individuals clearly aligned with AGECO, Hopson and Mange. Indeed, the affiliation of RG&E directors with "upstream" AGECO controlled holding companies was pervasive. Of the nine members of RG&E's Board of Directors in 1931, five (including Hopson and Mange) were also on the Board of Directors of both AGECO and all of the other upstream holding companies (Mohawk, Rochester Central, AGECORP) standing between RG&E and AGECO. See Plaintiff's Diagram entitled "RG&E Directors Affiliated with AGECO Holding Companies — 1931" (hereinafter "Exhibit 562"). The same nine members of the RG&E Board in 1931 were also either officers or directors of a combined 472 AGECO affiliated companies. See Plaintiff's Diagram entitled "RG&E's Officers and Directors — 1931" (hereinafter "Exhibit 563").

23.  Service Companies: While the presence of overlapping directors and officers afforded AGECO the opportunity for corporate dominance of its operational subsidiaries, including RG&E, the host of service company contracts outsourcing fundamental operational and financial responsibilities from the operational utility to

AGECO affiliated (and Hopson controlled) "service companies" provided direct proof of control and dominance.

24.  As stated earlier, Hopson and Mange's use of service companies to improperly extract revenues from operational utilities within the AGECO system was well documented in the governmental investigations of AGECO.  The FTC report found that "the most intimate and daily influences exerted on the several operating utility organizations of the [AGECO] system arise through the activities" of the AGECO controlled service companies.  See FTC Report No. 52 (Plaintiff's Exhibit 505) at p. 608.  AGECO used these service companies to exert direct control over the management and operation of all facets of its operational utilities.

25.  The SEC found that once Hopson and Mange acquired control of AGECO in 1922, "they divided the general supervision of the system.  Mange exercised general supervision over the physical operations of the system through Utility Management Corporation (UMC), which he describes as a mutual service company. The services performed through this corporation related to physical operations the manufacture or production, transmission and distribution of gas and electricity, construction and consumer relationships."  SEC Investigation Report (Plaintiff's Exhibit 512) at * 17-18.  The FTC found UMC functions included "the supervision and direct management of all the operating utility properties in the Associated System. Its relations to the operating companies are set forth in service

16

contracts with the operating companies. It operates under the fee system, charging a flat 2.5 percent of all gross operating revenues for its services." See FTC Report No. 52 (Plaintiff's Exhibit 505) at p. 608.

26. From 1922 through 1931, Hopson controlled the "legal, financial, accounting and tax matters" of the AGECO system through H.C. Hopson and Co., a service company owned by Hopson. The headquarters of the service company was located at 61 Broadway in New York City, the same address used by AGECO. See FTC Report No. 52 (Plaintiff's Exhibit 505) at p. 608. Daniel Starch, Hopson's brother-in-law (and a Director of RG&E) operated a service company which acted as "advertising advisor and agent for all general and financial advertising of the [AGECO] system." Id.

27. The relationship between AGECO and the various service companies Hopson and Mange created and operated was incestuous. The threat to corporate independence posed by overlapping officers and directors within the holding company structure paled in comparison to corporate relationships in which the directors of the operating utility were also directors, officers or paid employees of the service company with whom the utility entered into multi-million dollar contracts that outsourced virtually all of the utility's operating responsibilities. Indeed, the Federal Power Commission's investigation found that "[f]rom 1929 through 1938, the Hopson Service Companies siphoned approximately $20,000,000,

principally from the Associated System's operating companies . . .
of which at least $7,000,000 was unjustified profit." FPC Report
(Plaintiff's Exhibit 510) at p. 239. The FPC Report sets forth in
detail the various ways in which Hopson and Mange manipulated the
corporate relationships of AGECO and the service companies to
plunder the assets of subsidiary operating utilities like RG&E.[9]

28. The historical evidence corroborates Professor Macey's
testimony that AGECO's "modus operandi" as to the utilization of
service companies was uniform among AGECO's downstream operating
companies, including RG&E. Macey TT1 at p. 126; Macey TT2 at p. 9-
10. Indeed, between 1929 and 1930 corporate records confirm that
RG&E entered into contracts with the same service companies that
governmental investigations found to have been dominated by Hopson
and Mange and used to improperly extract revenues for the benefit
of Hopson and his associates. These service companies included (1)
W.S. Barstow & Co (later known as E. M. Gilbert & CO.), (2) J.G.
White Management Company (later known as UMC), (3) Utility
Accountants and Tax Consultants, and (4) Mid-State Fuel
Corporation. See Minutes from September 19, 1934 RG&E Board of
Directors Meeting (hereinafter "9/19/34 Minutes") (Joint Exhibit
12) at Bates # 65748.

---

[9] The FPC determined that personal expenses of Hopson and his
family, "such as liquor, photographs, theater tickets, golf and
yacht club dues, personal automobiles, vacation trips to Florida,
and the like, were saddled upon the system by the service company
device." FPC Report (Plaintiff's Exhibit 510) at p. 239.

29.  As set forth earlier, Utility Management Company was the Service Company controlled by John Mange which exercised general supervision over operating utilities within the AGECO empire.  On August 2, 1929, RG&E's Executive Committee officially authorized RG&E to enter into a contract with J.G. White Management Company for "managerial services" for RG&E.  The Executive Committee authorized RG&E to pay J.G. White a flat 2.5% of RG&E's gross receipts from August 2, 1929 forward.  J.G. White soon changed its corporate name to Utility Management Company ("UMC").  Four members of the RG&E's executive committee were present and voted in favor of the UMC service contract.  One was Mange, who was not only President and Chairman of AGECO but also controlled UMC.  The August 2, 1929 meeting of the Executive Committee of RG&E was convened at 61 Broadway in New York City, which was the corporate headquarters of AGECO.  See Minutes from August 2, 1929 Meeting of RG&E's Executive Committee (hereinafter "8/2/29 Minutes") (Joint Exhibit 2); Macey TT1 at p. 134.  By the end of 1931, RG&E's annual report listed UMC with offices located in New York City as the "Operating Manager" of RG&E.  See RG&E 12/31/31 Annual Report (Joint Exhibit 7) at p. 2.  Between 1929 and the fall of 1932, almost all meetings of RG&E's Board of Directors and Executive Committee were conducted at AGECO's New York City office location. See 8/2/29 Minutes (Joint Exhibit 2); Minutes from December 6, 1929 Meeting of RG&E's Executive Committee (hereinafter "12/6/29

Minutes") (Joint Exhibit 3); Minutes from March 25, 1930 Meeting of RG&E's Board of Directors (hereinafter "3/25/30 Minutes") (Joint Exhibit 5); Minutes from July 14-July 15, 1932 Meeting of RG&E's Board of Directors (hereinafter "RG&E Board Minutes of July 14-15, 1932") (Joint Exhibit 8). In 1931, the Annual Meeting of the stockholders of RG&E was convened and reconvened three times at AGECO's New York City office location. See Minutes from March 18, 1931, April 24, 1931 and April 27, 1931 Meetings of RG&E's Annual Stockholders (Joint Exhibit 343).

30. On August 2, 1929, RG&E's "Executive Committee" authorized RG&E to enter into a service with the W.S. Barstow and Company "for construction services." See 8/2/29 Minutes (Joint Exhibit 2) at p. 127. Barstow was authorized to be paid a flat 7.5 percent "of the gross amount chargeable to the plant and property accounts" of RG&E from August 2, 1929 forward. See id. at p. 128. According to the FTC report, Barstow was an AGECO controlled construction company and was one of the service companies used by AGECO to exert daily operational control over its operating utilities. See FTC Report No. 52 (Plaintiff's Exhibit 505) at p. 610-11.

31. On December 29, 1930, RG&E entered into a service contract with Mid-State Fuel Corporation, an AGECO controlled service company. Based on his review of the available historical records, Professor Macey opined that RG&E was obligated to provide

payments to Mid-State Fuel Corporation despite the fact that Mid-State Fuel rendered no services to RG&E.  See Macey TT1 at p. 125-27; Macey TT2 at p. 19-20.[10]

32.  On March 1, 1932, RG&E entered into a service contract with Utility Accountants and Tax Consultants.  See 9/19/34 Minutes (Joint Exhibit 12) at Bates # 65748.  Utility Accountants and Tax Consultants was a service company organized by Hopson and was one of several service companies that was owned by Hopson's sisters. SEC Investigation Report (Plaintiff's Exhibit 512) at p. *19-20. The SEC determined that "[t]his organization appears to have been used merely as a billing and collection medium" with respect to services performed by the other Hopson controlled service companies and "had no staff of its own." Id. at *19.  The SEC found that Hopson's sisters played no role in the service companies and Hopson himself "personally exercised control over the work" of the service company.  Id. at *21.

33.  Even with respect to service companies not mentioned in the governmental reports, there was evidence of self-dealing and

_____

[10] The fact that records Macey relied on may have contained hearsay is of no consequence.  See Fed. R. Evid. 703 (expert's opinion may be admitted even if it relies on facts that are otherwise inadmissable, so long as it is of a type reasonably relied upon by experts in the particular field); see also United States v. Daly, 842 F.2d 1380, 1387-88 (2d Cir. 1988); Marcel v. Placid Oil Co., 11 F.3d 563, 567 n.6 (5th Cir. 1994) ("Experts generally may rely on hearsay...if the data is reliable and qualifies under Rule 703."); Peteet v. Dow Chem. Co., 868 F.2d 1428, 1432 (5th Cir. 1989) (Trial courts "should defer to the expert's opinion of what data they find reasonably reliable").

corporate over-reaching that was consistent with the governmental findings. For example, beginning in June 1929, RG&E began using an AGECO controlled service company known as Utility Purchasing and Supply Corporation ("UPSC") as its "general purchasing agent." On December 6, 1929, RG&E's "Executive Committee" officially authorized RG&E to enter into a contract with UPSC which effectively outsourced all purchasing decisions and policies to UPSC. Three members of the executive committee were present and voted in favor of the contract. Two of them were Hopson and Mange. The third was John M. Daly, who like Hopson and Mange, was on the Board of Directors of every upstream holding company between RG&E and AGECO. Daly was also a director and officer of 41 AGECO affiliated companies. The December 6, 1929 meeting of the Executive Committee of RG&E was convened at 61 Broadway in New York City, which was the corporate headquarters of AGECO. See 12/6/29 Minutes (Joint Exhibit 3); Exhibit 562; Exhibit 563; Macey TT1 at p. 134.

34. As to all of the aforementioned Service Contracts, there was no evidence in either the minutes of the Executive Committee or the Board of Directors' that, despite the obvious conflict of interest, any effort or suggestion was made to recuse Mange or Hopson from voting to approve a contract with a service company that either one of them owned, operated or controlled. Nor was there any evidence that any of the service contracts was negotiated

at arms length or was subject to any kind of independent or competitive process. Indeed, it appears that the only service contracts that RG&E entered were with service companies owned, controlled, operated or managed by Hopson, Mange or AGECO. This conclusion is consistent with SEC's determination:

> [W]e find, in view of Hopson's control both of the system and of the service companies, that there was in effect an arrangement under which the [AGECO] system companies were bound to utilize the services of Hopson's service companies; and we consider it immaterial that this arrangement, which bound the system companies as effectually as any contract was not reduced to writing.

SEC Investigation Report (Plaintiff's Exhibit 512) at *49.

35. Between 1929 and 1932, RG&E filed reports with the Public Service Commission ("PSC") reflecting payments exceeding $1.7 million to three service companies controlled by AGECO, Hopson or Mange: J.G White Management Corp. (later known as UMC); Utilities Purchasing and Supply Corporation; and W.G. Barstow and Company. See Excerpts from RG&E Corporate 1929 PSC Report (Joint Exhibit 401); Excerpts from RG&E Corporate 1930 PSC Report (Joint Exhibit 402); Excerpts from RG&E Corporate 1931 PSC Report (Joint Exhibit 403); Excerpts from RG&E Corporate 1932 PSC Report (Joint Exhibit 404). For the years 1929 and 1930, RG&E did not disclose on the face of the report that any of the three service companies was "affiliated" with AGECO.

36. Professor Macey identified other evidence in the

historical records to support a finding of corporate control of RG&E by AGECO. For example, RG&E's 1931 Annual Report asserts that the "Financial Office" of RG&E was now located at 61 Broadway in New York City, AGECO's corporate headquarters. As a matter of corporate governance, Professor Macey opined that RG&E's decision to "outsource" all of its financial affairs to its parent corporation AGECO "suggests a lack of local control over a pretty important part of a company's business" and was, therefore, consistent with AGECO's control and domination over its operating subsidiary. See Macey TT1 at p. 158.

37.    Professor Macey testified about corporate behavior emblematic of AGECO's inappropriate domination of RG&E. On January 30, 1930, RG&E's Executive Committee again met at AGECO's New York City headquarters. Present at the meeting were Hopson, Mange, Daly and Herman Russell, the newly elected[11] President of RG&E. At the meeting, the Executive Committee voted to create an "account known as the 'Surplus Appropriated for Common Stockholders'" account. See Minutes of January 30, 1930 Executive Committee Meeting

---

[11] On November 13, 1929, RG&E President Robert M. Searle died. A meeting of RG&E's Executive Committee was convened on December 6, 1929. The meeting was held at AGECO's headquarters in New York City. The Executive Committee members then present (Mange, Hopson and Daly) appointed Herman Russell to the Executive Committee. Mange then nominated Russell for President of the Corporation. The committee minutes state "there being no other nominations," the Chairman (Mange) "declared Mr. Russell to have been duly elected President of the Corporation." See 12/6/29 Minutes (Joint Exhibit 3) at Bates # 64891-64892.

(hereinafter "1/30/30 Minutes") (Joint Exhibit 50) at p. 176.  The
Executive Committee directed RG&E to transfer into the account "all
net income" of RG&E in excess of declared dividends for the year
1929.  See id.  Macey explained that "[o]ne would expect dividends
to be paid, but sending all of the net income upstream" to AGECO
was "very unusual" from a corporate governance perspective because
some of the net income not paid as a dividend should be retained as
earnings of RG&E and used for legitimate corporate purposes.  See
Macey TT1 at p. 152.  Thus, not only were the Service Companies
extracting money from RG&E, but any remaining net income was being
siphoned to AGECO through the actions of RG&E's Executive Committee
and Board of Directors, most of whom stood to benefit as either a
controlling common shareholder of AGECO or as an owner/operator of
a service company or both.

    38.  The SEC Report aptly summarized the role of the Service
Companies and those who controlled them:

> The role of the service companies was not
> limited to mere performance of technical
> services for AGECO and its subsidiaries.
> During the years 1934 to 1937 AGECO maintained
> no payroll of its own and during the first 3
> of these years, it reported no operating
> expenses for itself. . . . During this period,
> Mange, the president, and Magee, a
> vice-president of AGECO, received their
> salaries from Utility Clearing Corporation,
> which in turn prorated the salaries among the
> subsidiary companies in proportion to their
> gross income. During each of these years, a
> large number of the directors of AGECO in
> addition to Mange and Magee were employees of
> the Hopson-controlled service companies, and

> were compensated by them. In 1934, the
> following persons served as directors for all
> or part of the year: Hopson, Starch (Hopson's
> brother-in-law), Mange, Magee, Wasser (also
> employed by Utility Management Corporation),
> and five employees of Hopson's service
> companies - namely, Burroughs, Dougherty,
> Daly, Rice and Sears.

SEC Investigation Report (Plaintiff's Exhibit 512) at *23-24.

In 1931, John Mange, Sanford Magee, Daniel Starch, Howard Hopson

and Charles Dougherty were either Officers or Directors of RG&E.

At the same time, Mange was Chairman and President of AGECO,

Hopson was Vice-President and Treasurer of AGECO, and Magee was

Vice President and General Manager of AGECO. See RG&E 12/31/31

Annual Report (Joint Exhibit 7); AGECO 1930 Annual Report (Joint

Exhibit 6). As to the "independence" of these individuals, the

SEC Report determined:

> The amounts of compensation received by
> Hopson, Burroughs, Dougherty, and other
> directors and officers of [AGECO] who were
> paid by the Hopson service companies were not
> passed upon by Mange or by the [AGECO's] board
> of directors. Mange characterized this
> situation as follows: "They were not paid as
> officers of the company. It was part of the
> duties of the servicing company to furnish
> officers and directors to the Associated Gas
> and Electric Company and the servicing
> companies paid whatever they saw fit or
> thought they were worth."
>
> The result of this situation was that a
> substantial group of [AGECO's] board of
> directors were placed in a position where they
> were expected to scrutinize, on behalf of
> [AGECO's] security holders, payments by
> [AGECO] for services rendered by the service
> companies by which they were employed and

> paid.  Mange testified that he knew that those
> directors of [AGECO] who were employed and
> paid by the Hopson service companies would
> consider that their paramount duty was to the
> service companies and not to [AGECO].

SEC Investigation Report (Plaintiff's Exhibit 512) at *25.

39.  Likewise, the FTC investigation, which included an

examination of RG&E, described the AGECO relationship with its

operating "assets":

> One of the policies of the system is to
> consider all operating property and employees
> as assets of the system, subject to transfer
> temporarily or permanently from one locality
> to another, or from one corporation to another
> within the system as needs arise,
> corresponding changes being made in company
> pay rolls and in fixed capital accounts.  Thus
> a local corporation often was practically a
> set of books, kept to conform to legal
> requirements, while its property was managed
> as a part of the great system.

See FTC Report No. 52 (Plaintiff's Exhibit 505) at p. 605.  And the

Federal Power Commission similarly concluded:

> The unjust burdening of operating utilities
> with improper and unnecessary charges to their
> expense and property accounts, the concealment
> of real ownership and control, the efforts by
> one means or another to confuse and obstruct
> investigation and regulation, and generally,
> the manipulation and exploitation of operating
> properties for the selfish interests of the
> holding companies and their owners, have all
> been inherent tendencies of the holding
> company method of organization as it has grown
> up in the inadequately controlled public
> utility industry especially during the past
> two decades.

See FPC Report (Plaintiff's Exhibit 510) at p. 243.

40. While the defendant objected to the admission of the FPC, FTC and SEC reports as unreliable, the defendant introduced and relied on a separate government report that set forth an equally compelling account of Hopson's and AGECO's total domination of the operating subsidiaries in the AGECO system. In its Findings and Opinion regarding AGECO's Plan of Reorganization issued pursuant to the Holding Company Act of 1935, the SEC made several relevant findings. With respect to Hopson's use of AGECO to dominate and control its operating subsidiaries, the SEC found:

> [T]he financial, corporate and accounting policies and practices of AGECO and its subsidiaries were directed and controlled by Hopson. . . . Under his domination were all the important officials of AGECO and its subsidiary holding companies, most of whom received their salaries not from those companies but from so-called "service companies" owned by Hopson and his family.

As to the use of service companies, the SEC found:

> These companies, organized and staffed by Hopson, furnished personnel to the system companies, including most of the officers and many of the directors (at a charge as high as two or more times the salary they received), and purported to render financial, accounting, corporate, secretarial, tax consulting and legal services to the various companies in the system and to various (sic) of their affiliates. By these means Hopson retained the closest control over the accounts, operations and personnel of the entire system - - at a handsome profit to himself.

See Findings and Opinions of the Securities and Exchange Commission on the Plan of Reorganization (hereinafter "SEC Findings on

Reorganization") (Defendant's Exhibit 631) at p. 3352.

41. Based on the historical evidence presented, I find the findings and conclusions reached by the various governmental agencies who investigated AGECO to be entirely consistent with the evidence of AGECO's control of and domination over RG&E between 1929 and 1932. The Court finds the governmental reports to be reliable and accurate and corroborate Professor Macey's opinion that AGECO followed a "cookie cutter" approach in its relations with its operating subsidiaries.

## THE VOTING TRUST PERIOD

42. The "RG&E Story" (Joint Exhibit 27) aptly describes the voting trust period as RG&E's "fight for operating independence":

> One of the most dramatic as well as far-reaching events in the history of the RG&E was the series of happenings that made it possible for the company to regain its operating independence. This resulted from the setting up of a Voting Trust which took control of the company from the Associated Gas and Electric System for a period of 10 years and turned it over to a group of civil minded local business men.

Id. at p. 29.

43. By 1932, RG&E was in financial distress and was experiencing liquidity problems. While one of the causes of RG&E's distress was the general state of the national economy in 1932, it was also evident that AGECO's extraction of operating revenue from

RG&E contributed to RG&E's liquidity problems.  By May 1932, AGECO "faced a serious financial obstacle" with respect to its operation of RG&E.  Bankers "did not approve of some of the financial maneuvers" of AGECO and "its credit had been  impaired." The RG&E Story (Joint Exhibit 27) at p. 33.  RG&E urgently needed an infusion of cash because 9.7 million dollars of notes were due on July 15, 1932.  New York City banks had turned down loan applications and Hopson appealed to RG&E President Herman Russell to obtain financing from local banks.  Financial institutions, however, were only willing to loan additional funds to RG&E if company operations were taken out of the hands of AGECO and placed into local control.  See The RG&E Story (Joint Exhibit 27) at p. 33-34.

44.  AGECO's objections to relinquishing control of RG&E were withdrawn as the prospect of RG&E being forced into receivership loomed.  Id at p. 36.  A Voting Trust Agreement was executed on July 15, 1932. See Voting Trust Agreement (Joint Exhibit 9).  A Voting trust Agreement is an agreement between shareholders of a company and Voting Trustees where the shareholder gives to the Voting Trustee the actual shares of the stock and in return receives from the Voting Trustee a voting trust certificate.  The purpose and effect of the voting trust is to separate the voting rights of the stock from all the other emoluments of ownership, including the right to receive dividends.  Once the agreement is

30

executed, the voting trustees become the registered owners of the stock.  As the registered owners, the right to vote and choose the Board of Directors of the company is now vested with the Voting Trustees.  See Macey TT2 at p. 26-27.

45.  There is no legitimate dispute that the Voting Trust Agreement was intended to divest control of RG&E from AGECO (and its controlling shareholders Hopson and Mange) and place the utility under independent local control.   To that end, the Agreement required the Voting Trustees to cast their votes in a manner that would require two-thirds of RG&E's Board of Directors to be both residents of and engaged in a business within the City of Rochester or the County of Monroe.  In return for divesting control of RG&E from AGECO, RG&E obtained the financing it needed to continue operations and meet its obligations with regard to the maturing notes.  See The RG&E Story (Joint Exhibit 27) at p. 36-37.

46.  The minutes of the Board Meetings and Executive Committee Meetings confirm that the new Board of Directors immediately began asserting corporate independence from the AGECO regime.   On the day the Voting Trust Agreement was effective, RG&E's Board of Directors met and accepted the resignations of AGECO-controlled Directors, including John Mange as Chairman of the Board and Chairman of the Executive Committee and Howard Hopson as a member of the Board and the Executive Committee.  In addition, AGECO-controlled Directors Greenridge, Dougherty, Starch, McKenna, Daly

31

and Pardee also resigned from RG&E's Board and were replaced with a majority of independent local businessmen from the Rochester, New York area.  <u>See</u> RG&E Board Minutes of July 14-July 15, 1932 (Joint Exhibit 8) at p. 138.

47.  It is significant that the first order of business taken by the Board on July 15, 1932 was the "recission of any and all resolutions of the Board of Directors of this Corporation creating an account known as 'Surplus Appropriated for Common St[oc]kholders' and the transfer of any and all sums now in such account to the account 'Corporate Surplus' of this Corporation" and directed RG&E's Officers to immediately make such transfer.  <u>See</u> RG&E Board Minutes of July 14-July 15, 1932 (Joint Exhibit 8) at p. 136.  The "Surplus Appropriated for Common Shareholders" was the account created on January 30, 1930 by RG&E's then Executive Committee (Hopson, Mange, Daly and Russell) to allow RG&E's net income to be "appropriated" for the benefit of AGECO.  <u>See</u> Finding of Fact Number 37, <u>infra</u>.

48.  On July 15, 1932, the day the Voting Trust was implemented, RG&E and AGECO and others entered into a written agreement regarding AGECO's service contracts with RG&E.  The agreement authorized the Board of Directors of RG&E to take "any action ... desired by the Board of Directors [of RG&E] for the purpose of terminating or revising any or all the said [service] contracts in such manner ... as [RG&E] may request, upon direction

32

by said Board." See RG&E's Executive Committee Meeting of October 5, 1932 (Joint Exhibit 323); see also RG&E Board Minutes of September 19, 1934 (Joint Exhibit 12).[12]

49.    One of the most obvious and important changes in the corporate conduct of RG&E after the Voting Trust Agreement was signed was that RG&E's Executive Committee and Board of Directors no longer held their meeting at AGECO's corporate headquarters in New York City, but instead convened their meetings at RG&E's offices in Rochester, New York.

50.    On October 5, 1932, RG&E's Executive Committee met in Rochester, New York and discussed cancellation or revision of the service contracts with four AGECO operated service companies: (1) UMC, (2) W.S. Barstow & Company, (3) Utilities Purchasing and Supply Corporation and (4) Mid-State Fuel Corporation.    The Committee agreed to enter into a "moratorium agreement" with AGECO intended to give RG&E time to study the service contracts "before we determine what, if any, contracts we wish to terminate and what, if any, modifications we may wish in those not terminated." See RG&E's Executive Committee Meeting of October 5, 1932 (Joint

---

[12] Although the July 15, 1932 Agreement was not introduced in evidence, it was, in relevant part, described in the minutes of RG&E's Executive Committee Meeting of October 5, 1932 (Joint Exhibit 323) and RG&E's Board of Directors meeting minutes of September 19, 1934 (Joint Exhibit 12).    It appears this was an agreement separate from the Voting Trust Agreement since the provisions referred to in the meeting minutes are not contained in the Voting Trust Agreement.

Exhibit 323).

51.  RG&E's Executive Committee met on December 7, 1932 and again on December 21, 1932 in Rochester, New York.  During the December 7th meeting, the Executive Committee was informed that the management contract with UMC "contains elements which are undesirable both from the standpoint of the Public Service Commission and the management."  See December 7, 1932 Executive Committee Meeting Minutes (Joint Exhibit 325) at p. 43.  The Committee circulated a proposed agreement that asked UMC to furnish management services "on the basis of the actual time and materials consumed on the work, plus a reasonable percentage to cover overhead and profit."  Id. at p. 44.  The Committee also discussed cancelling the service contract with Mid-State Fuel Corporation. Id.  At the December 21, 1932 meeting, the Executive Committee discussed "[t]he various service contracts for management, construction, [and] purchasing ... with the Mid-State Fuel Corporation."  See December 21, 1932 Executive Committee Meeting Minutes (Joint Exhibit 10) at p. 51.  The Committee decided to submit any continuation of these contracts to the "Public Service Commission before execution[.]"  Id. at p. 52.

52.  RG&E's Board of Directors met in Rochester, New York on the afternoon of December 21, 1932.  The Board directed that the Mid-State Fuel contract immediately be cancelled.  As to the service contracts with Utility Management Company, Utilities

Purchasing and Supply Corporation, and W.S. Barstow & Company, all AGECO dominated service companies, the Board stated that these service contracts "are now under review" in order to establish the "proper percentage of overhead" to be paid. The Board was informed that no service contract would be executed until the terms of the contract were reviewed by the Public Service Commission "before execution." See Minutes of December 21, 1932 RG&E Board of Directors Meeting (hereinafter "12/21/32 Minutes") (Joint Exhibit 326).

53.   The review of the service contracts with AGECO service companies continued.  The minutes of the Executive Committee meeting of January 9, 1933 (held in Rochester, New York) reflect that Mr. Russell was continuing to review the service contracts and confirmed that the service contract with Mid-State Fuel Corporation was terminated effective August 1, 1932.   See January 9, 1933 Executive Committee Meeting Minutes (Joint Exhibit 327) at p. 58. The service contract with Utility Accountants and Tax Consultants, the service company formed by Hopson's sisters and controlled by Hopson, was also terminated by RG&E.  See 9/19/34 Minutes (Joint Exhibit 12).

54.   On March 22, 1933, RG&E's Board of Directors met in Rochester, New York.  During the meeting, the Board voiced its concern over an AGECO advertisement appearing in Rochester's morning newspaper purporting to offer for sale shares of stock of

35

RG&E. One member of the Board stated that the advertisement "brings up for decision the attitude of the present management in relation to the Associated Gas and Electric System[.]" See March 22, 1933 Board of Directors Meeting Minutes (Joint Exhibit 328) at p. 97. The Board member noted "that the plan of refinancing largely through the local banks and by the establishment of a local Board of Directors had been predicated on the idea of disassociating this Corporation from the management and influence of the Associated Gas and Electric System[.]" Id. The Board discussed a proposed statement to be furnished to local newspapers "disavowing any connection of the Corporation's Board of Directors with the printing of the advertisement." Id.

55. RG&E's Executive Committee met in Rochester, New York on July 13, 1934 and unanimously agreed to recommend to the Board of Directors the cancellation of the August 2, 1929 service contracts between RG&E and UMC, E.M. Gilbert Engineering Corporation and the Utility Purchasing & Supply Company. See July 11, 1934 Executive Committee Meeting Minutes (Joint Exhibit 335) at p. 95. Thereafter, on September 19, 1934, RG&E's Board of Directors unanimously voted to cancel the "existing service contracts with The Utility Management Corporation, E.M. Gilbert Engineering Corporation and the Utility Purchasing and Supply Company[.]" See 9/19/34 Minutes (Joint Exhibit 12).

56. A full review of all of the minutes of the meetings of

36

RG&E's Executive Committee and Board of Directors (admitted in evidence as joint exhibits) during the post Voting Trust Agreement period pays tribute to the efforts of the Board to bring to an end AGECO domination and instead assert its independence as a self-governing corporation.    The minutes reveal a corporate identity starkly different than the 1929 to 1932 time period and document numerous actions by the new Executive Committee and Board of Directors to exercise corporate independence not only from AGECO-controlled service companies, but from AGECO itself.    Given this historical evidence, including the clear and unequivocal determinations by the SEC, FTC and FPC as to AGECO's use of service companies to control the managerial and financial operations of its various operating utilities (including RG&E), RG&E's post Voting Trust Agreement actions evidenced a definitive break from AGECO domination and control.

## SUCCESSOR TO AGECO

57.    On January 10, 1940, AGECO and its wholly owned subsidiary Associated Gas and Electric Corporation (AGECORP) filed for bankruptcy under Chapter X of the then bankruptcy law.    See Joint Stipulation dated October 21, 2007 at ¶ 8 (Docket #224).    At the time of filing, AGECO and AGECORP were registered public utilities under the Public Utilities Holding Company Act (PUHCA).    AGECO's assets consisted entirely of the stock of AGECORP.    SEC Findings on Reorganization (Defendant's Exhibit 631) at p. 3348-49.

37

AGECORP's assets included the stocks of the various operating subsidiaries, including RG&E. See Testimony of James Wendelgass at p. 28-30 (hereinafter "Wendelgass October 30, 2007 Trial TT2"). During the lengthy reorganization proceedings, AGECO and AGECORP were operated by the Bankruptcy Trustees. See Annual Report of Trustees dated December 31, 1945 (hereinafter "12/31/45 Annual Report") (Joint Exhibit 65).

58.    AGECO and AGECORP's Plan of Reorganization was confirmed by the United States District Court Judge Vincent L. Leibell on August 9, 1945.    Pursuant to Section 11 of PUHCA, the SEC was also required to approve the reorganization plan.    By Order dated January 10, 1946, Judge Leibell ordered that the Plan be consummated. See Final Decree dated August 12, 1946 (Joint Exhibit 24) at p. 4520.

59.    On January 10, 1946, and pursuant to the plan of reorganization, AGECORP (a Delaware Corporation) merged into AGECO (a New York corporation) and immediately changed its name to General Public Utilities Corporation.    A "Certificate of Consolidation and Agreement of Merger" setting forth the terms of the merger was publicly filed on January 12, 1946. See Certificate of Consolidation and Agreement of Merger (hereinafter "Certificate of Consolidation") (Joint Exhibit 295).

60.    The Certificate of Consolidation and Agreement of Merger explicitly confirmed the following structure of the transaction:

A.  The merger and consolidation was intended to comply with and be in accordance with Section 91 of the Stock Corporation Law of the State of New York.

B.  The "constituent corporations included in the consolidation" were AGECO and AGECORP.

C.  "The consolidated corporation is one of the constituent corporations, namely AGECO, and not a new corporation.  The existence of AGECO shall continue for all purposes whatsoever after the consolidation and merger with and into itself of AGECORP, and the separate existence of AGECORP shall cease."

D.  Upon the consolidation becoming effective upon the filing of the Certificate with the office of the Secretary of State in New York and Delaware, "the name of the consolidated corporation is to be General Public Utilities Corporation."

See Certificate of Consolidation (Joint Exhibit 295) at p. 1-2 (emphasis added); see also Joint Exhibit 22, 23.

61.  Upon emerging from bankruptcy, General Public Utilities Corporation conducted its operations from AGECO's corporate headquarters located at 61 Broadway in New York City.  In its 1946 Annual Report to shareholders, General Public Utilities Corporation represented itself to be a public utility holding company registered with the SEC and the successor in interest to AGECO and AGECORP.  See 12/31/45 Annual Report (Joint Exhibit 65). In its Annual Reports for the years 1946, 1947 and 1948, General Public Utilities Corporation claimed RG&E as a wholly owned subsidiary of General Public Utilities Corporation.  See Joint Exhibit 65, 68, 71.

62.  Pursuant to the consolidation and merger, General Public Utilities Corporation owned and operated RG&E along with AGECO's other operating subsidiaries in New York, New Jersey and Pennsylvania.    See General Public Utilities Corporate Chart of December 31, 1946 (Joint Exhibit 63) at p. 55.

63.  In 1948, General Public Utilities Corporation "announced that it has developed a program for compliance with the [Public Utility Holding] Act which contemplates that approval of the [Securities and Exchange] Commission will be requested for the sale or distribution of the investments in subsidiaries located in the State of New York and the Philippines and for the retention of all other subsidiaries."    See 1948 Annual Report of General Public Utilities (Joint Exhibit 71) at p. 16.

64.  In September 1949, General Public Utilities Corporation disposed of all of the common stock of RG&E.  See 1949 RG&E Annual Report (Joint Exhibit 376) at p. 12.  Consistent with its announced program, General Public Utilities Corporation did not itself liquidate.  Instead, General Public Utilities Corporation retained and continued to operate other AGECO assets including Metropolitan Edison and Pennsylvania Electric Company. See Wendelgass TT2 at p. 32-33.   RG&E thereafter referred to General Public Utilities Corporation as its "former parent."   See 1949 RG&E Annual Report (Joint Exhibit 72) at p. 12.

65.  General Public Utilities Corporation later changed its

40

name to GPU, Inc.   In 2001, GPU, Inc. merged with defendant FirstEnergy Corporation.

## B.  FINDINGS OF FACT: ENVIRONMENTAL CONTAMINATION

### MANUFACTURED GAS PLANTS

66.  Essential to determining the environmental contamination issues in this case was a basic understanding of (1) the history of natural gas production in the United States and (2) the environmental problems caused by the discharge of coal tar, the primary liquid byproduct of Manufactured Gas Plants ("MGPs") that were operated by RG&E during the time periods relevant to this dispute.  Both plaintiff and defendant retained experts[13] who, _inter_

---

[13] Plaintiffs called Robert M. Karls, a hydrogeologist and the CEO of Delta Environmental Consultants, a national consulting firm. After graduating with a Master's degree in hydrology and water resources, Karls worked for the U.S. Geological Survey and for the Minnesota Pollution Control Agency, the state's environmental regulatory agency.  Karls was offered for his expertise in the nature, causes and timing of contamination from MGP sites, as well as to opine about RG&E's compliance with the National Contingency Plan ("NCP"), as set forth in CERCLA.  See October 24, 2007 Trial Testimony of Robert M. Karls (hereinafter "Karls TT1") at p. 158-73.  Defendant's expert, Neal S. Shifrin, is CEO and a principle of Gradient Corporation, an environmental consulting firm he created in 1985.  Shifrin has a Bachelor of Science degree in chemical engineering and earned a Ph.D in environmental and civil engineering from the Massachusetts Institute of Technology ("MIT") in 1980.  Shifrin is a licensed site professional in the State of Massachusetts and over the course of his professional career has been involved in assessing work on 120-150 contaminated MGPs, including 30 in New York State.  Defendant offered Dr. Shifrin as an expert on environmental engineering and compliance with the NCP as it related to MGP contamination and cost allocation.  See October 26, 2007 Trial Testimony of Neal S. Shifrin (hereinafter "Shifrin TT1") at p. 46-48.

alia, provided helpful evidence on the history and operation MGPs in the United States as well as the processes used to clean up contaminants MGPs naturally generate.

67.  While the expert testimony greatly assisted the Court in understanding the MGPs process, for purposes of this Opinion it is sufficient to utilize a useful and succinct summary of MGPs gas production that was set forth in a recent First Circuit opinion:

> Before natural gas became widely available, utilities produced gas fuel for heating, lighting and cooking at facilities called manufactured gas plants (known in the industry as "MGPs"). . . MGPs came into service in the 1800s. They became outmoded and were abandoned when natural gas pipelines reached the state in the 1950s. Generally, MGPs created gas by heating coal in a large oven. As the coal reached high temperatures, gas evaporated and was drawn into holding tanks, processed, purified (cleansed of tar and other contaminants), and piped out for use.
>
> Along with gas, the MGP process produced a variety of solid and liquid byproducts, including ash, clinker, coal slag, cyanides, drip oils, and tar. Some of these byproducts are long-lasting and now contaminate the ground and water around the sites once occupied by MGPs, either because they were discharged as unwanted waste or because they seeped accidentally from the plants. Several components of MGP waste, including tar, are considered carcinogenic, and MGP sites have become significant environmental and public health concerns.
>
> At issue here is the contamination caused by

tar[14] at the [] MGP site. A heavier-than-water
liquid with approximately the consistency of
vegetable oil, tar was the chief liquid
byproduct of MGP gas production. It condensed
and was extracted from MGP gas as it cooled.
MPG producers separated tar from gas in order
to make the gas suitable for consumer use.
Normally, tar was either re-burned for fuel or
sold as an industrial product. At nearly all
MGP sites, however, at least some tar escaped
confinement or was dumped into the
environment. Once tar enters the environment,
it tends to migrate, or flow, and to
contaminate soils well beyond the original
sites of MGPs.

EnergyNorth Natural Gas, Inc. v. Century Indem. Co., 452 F.3d 44,

46-47 (1st Cir. 2006) (footnote omitted).[15]

## RG&E's EAST AND WEST STATION MGP SITES

68.  Even before it was purchased by AGECO, RG&E was a utility

─────────────

[14]  Throughout the trial, tar or coal tar was frequently
referred to as "NAPL," an acronym for non-aqueous phase liquid,
which are liquids that are not completely soluble in water. See
October 24, 2007 Trial Testimony of Joseph M. Simone at p. 46-47
(hereinafter "Simone TT").

[15]  The above quoted historical MGP summary from EnergyNorth
Natural Gas, Inc. v. Century Indem. Co. was fully consistent with
the detailed expert testimony and documentary evidence adduced at
trial, although here there was no intentional "dumping" per se,
(see October 25, 2007 Trial Testimony of Robert M. Karls
(hereinafter "Karls TT2") at p. 3-4, 148-49), just the deliberate
storage of coal tar in subsurface concave tar wells. See Karls TT1
at p. 191, 193, 196; Simone TT at p. 15-21, 38-40; see also October
2003 Executive Summary for the Site Investigations and Focused
Feasibility Study for Remediation of Impacts at the East Station
Former MGP sites in Rochester, New York (hereinafter "2003
Executive Summary") (Joint Exhibit 110). As adduced at trial,
information on the health hazards and clean-up efforts associated
with New York's MGPs can be found on the New York State Department
of Environmental Conservation website at
http://www.dec.ny.gov/chemical/24911.html (last visited August 6,
2008). See Karls TT2 at p. 32-33; Joint Exhibit 233.

provider that operated MGPs throughout Western New York. The two MGPs relevant to this litigation are the East and West Station sites owned by RG&E. The East Station MGP site was constructed in approximately 1871 and encompasses approximately thirteen acres of property located north of downtown Rochester. RG&E later constructed another MGP at the West Station site, located across the Genesee River from the East Station MGP. <u>See</u> 2003 Executive Summary (Joint Exhibit 110). Gas production at West Station "started around 1913" and "[b]y 1917 it was in full production." <u>See</u> Simone TT at p. 18. Once the West Station MGP became fully operational, RG&E no longer needed to generate gas on a year round basis at the East Station MGP.[16] Nevertheless, even after the West Station MGP became fully operational, the East Station continued to produce gas during peak cold weather demand periods, perhaps even operating continuously during the winter months.[17] <u>See</u> October 26, 2007 Trial Testimony of Neal S. Shifrin (hereinafter "Shifrin TT1") at p. 92. Both East and West station continued producing gas until the early 1950's. Simone TT at p. 18; Karls TT1 at p. 182.

69. As stated earlier, coal tar is the primary liquid

---

[16] "Historical Documents indicate that most of the gas production [at the East Station MGP] was subsequently moved to the West Station site and discontinued at the East Station around this time [after 1917]." <u>See</u> Final Engineering Report for Interim Remedial Measure RG&E East Station Former Manufactured Gas Plant, March 2006 (Joint Exhibit 185) at p. 1-2.

[17] After 1917, the East Station facility was also used to purify gas generated at the West Station. Karls TT1 at p. 192.

byproduct of MGP gas production. After the tar is extracted during the production process, it is captured and stored before being either re-used or sold for various industrial purposes. The gas produced by the MGP is eventually stored in a large collapsible gas holder structure which is able to expand and contract depending on the volume of gas being held and the needs of the customer. See Karls TT1 at p. 186-92. However, as the gas cools during the manufacturing process, tar begins to separate from the gas stream at multiple points in the production process. Where, as here, the volume of gas produced created enough tar to have independent value, the tar was captured and stored for later use or re-sale. The captured tar was placed into brick lined tar wells on the East Station site.[18] Because of the higher viscosity inherent in heated tar, the brick lined well was not "sealed" and thus warm tar could migrate into the ground, be dissolved in groundwater and contribute to the contamination of the surrounding areas. See Karls TT1 at p. 193-95.

70. Much testimony at trial concerned a former East Station gas holder that was converted to a tar well prior to West Station construction. The parties disputed whether this East Station tar well was in active use after the West Station MGP was fully

---

[18] Tar was also stored in an above ground tank at the West Station. See Karls TT1 at p. 196.

operational in 1917.[19]   The evidence suggests that it was not. At
the very least, plaintiff has not met its burden of proving that it
was.[20]    Indeed, in his expert report plaintiff's own expert
hydrologist Robert Karls concluded: "The [East Station] tar well is
believed to have been actively used from approximately 1880 through
at least 1910." See Karls TT2 at p. 111-12; Expert Report of
Robert Karls (Joint Exhibit 107) at p. 10.

71.    Although not in his written expert report, Karls
testified that he believed any tar generated at East Station after
1929 would have been stored in the East Station tar well because
otherwise it would have to be pumped or transported across the
river to the West Station for storage and Karls saw "no evidence
that that was done." See Karls TT2 at p. 150. Mr. Karls's opinion
on the continued use of the East Station tar well was effectively
rebutted by Dr. Neal S. Shifrin. See Shifrin TT1 at p. 83-92.
Shifrin testified that he agreed with what he believed to be
Karls's original opinion – that the East Station tar well was taken
out of use around the same time that the West Station was being

---

[19] The cost of removing the East Station tar well was
significant. Given the dispute over corporate liability,
establishing whether the East Station tar well was in active use
during a period of time when AGECO legally dominated RG&E was
important to the parties.

[20] Based on the proof at trial, plaintiff anticipated the
possibility of an adverse finding as to whether the East Station
tar well was in use after 1928. See Plaintiff's Post-Trial
Proposed Findings of Fact #95. (Docket #247).

built, around 1911. Shifrin pointed out that a "Sanborn map"[21] of
the site published in 1911 no longer depicted the East Station tar
well. See Shifrin TT1 at p. 84-85. In addition, the historical
documents indicated "very clearly" that West Station had a "huge
operation for byproducts resale" which included a tar distillation
plant with a very large tar storage tank. See Shifrin TT1 at p.
84. Finally, Shifrin relied on a 1928 engineering diagram of the
West Station that depicted a steam pipe used for moving tar across
the Genesee River from the East Station to the West Station. Since
the tar would have to be heated in order to flow efficiently over
the river, the use of a steam heated pipe was consistent with tar
transportation. Indeed, the notation on the map's steam pipe
reference states: "Tar from East Station." See Shifrin TT1 at p.
134-36, 149; Defendant's Exhibit 645, 646; see also Karls TT1 at p.
197.

72. The primary contaminants at both the East Station and
West Station sites are tar and chemicals derived from the tar.
These contaminants were not deliberately dumped in the soil, but
rather inadvertently spilled or deposited as a result of the
routine operation of the MGPs during the relevant operational time

---

[21] Sanborn Maps were maps that depicted structures on a
particular site and were used primarily by insurance companies to
locate and insure business structures. Reviewing Sanborn maps over
a particular time period are useful for environmental
investigations as they depict historical changes to the location
under investigation. See Karls TT1 at p. 65-66.

period.  The fact that the East Station tar well was no longer used to store tar once the West Station became fully operational did not eliminate tar leakage at East Station.  So long as the East Station MGP was producing gas, tar leakage was occurring.  As hydrologist Robert Karls, credibly testified:

> The leaks of tar at the site principally came from the piping, the joints, the flanges, things like that on a lot of the pieces of equipment.  And we have to remember the time period of construction [of the MGPs] started in the 1800s [and] continued to be rebuilt and things into the 1900s.  So, the types of materials and methods they used weren't necessarily as tight, if you will, as methods we have today.  So, leaks and spills from underground piping going to the tar holders, going to various pieces of processing equipment would be expected or could have occurred.

See Karls TT2 at p. 4.  Even as to the soil surrounding the East Station tar well, Karls opined that the tar well alone was not the only cause of contamination.  Operations within buildings near the tar well (e.g., the water gas plant, the coal carbonization retort house, the purifier house) were producing tar and tar byproducts. In fact, according to Dr. Shifrin, most of the tar outside of the tar well came from sources other than the tar well itself.  See Shifrin TT1 at p. 132-33.  Thus, releases of tar and resultant soil contamination from sources other than the tar well occurred during routine gas production operations throughout the operating life of East Station.  See Karls TT2 at p. 79-80; Shifrin TT1 at p.

48

134.

73.    While the actual tar leakage at both East and West stations occurred during the period when the plants were operational, the effects of the leakage continued for decades.  The contaminants within the tar continued to dissolve, seeping into the subsurface and, eventually, the ground water.  A tar leak does not have to be large to create hazardous contamination.  Indeed, the actual leakage was minuscule in relation to the total amount of tar produced in the gas production process by these two MGPs.  Many contaminants associated with coal tar are measured in parts per billion and hence a very low concentration of contaminants can cause environmental damage sufficiently serious as to require evaluation and remediation.  See Karls TT2 at p. 10-11.  Dr. Shifrin testified that while the gallons of tar that leaked during normal plant operations was small in relation to the gallons of tar produced, the leaked tar at East and West Stations nevertheless created "a big environmental problem."  See Shifrin TT2 at p. 12.

### The Voluntary Cleanup Agreement

74.    RG&E's efforts to remedy the contamination at the MGP East and West station sites were described in detail by Joseph Simone, the Environmental Compliance Manager for New York State Electric and Gas Corporation (NYSEG)[22].  Simone has worked at NYSEG

---

[22]    In early 2002, RG&E was acquired by Energy East Corporation, NYSEG's parent corporation.

for over 25 years and since early 2004 has been in charge of site investigation and remediation at all RG&E's MGP sites, including East and West Station. See Simone TT at p. 11-13.

75.   In 1992, RG&E hired Atlantic Environmental Services Company to conduct a preliminary field investigation of the East Station MGP site. The preliminary study indicated the presence of hazardous substances in subsurface soils which presented unacceptable risks to human health or the environment. See Simone TT at p. 37-38. Further investigation of East Station was conducted. In April 2000, a Focused Remedial Investigation (hereinafter "FRI") was prepared by Ish, Inc. and META Environmental Inc. See Joint Exhibit 36. The study focused on the source NAPL observed along the Genesee River and determined the East Station tar well to be a "significant source." The FRI found that DEC safe water standards were exceeded in sampling locations on the site. In June 2001, Ish, Inc. and META Environmental Inc. issued a Focused Feasibility Study (hereinafter "FFS") for select areas of East Station. See Joint Exhibit 37. The FFS proposed a list of alternative remedies for the soil and water contamination the FRI identified in the riverbank and tar well areas of the East Station. The proposed remedies were evaluated in terms of being consistent with existing DEC regulations and guidance documents regarding MGP contamination. With respect to the tar well, the FFS recommended controlling further contamination by a technology known

as in-situ stabilization ("ISS").[23]   It was in this time frame that RG&E approached the DEC to discuss cleaning up its MGP sites.

76.   On April 10, 2003, RG&E entered into a Voluntary Cleanup Agreement (hereinafter "VCA") (Joint Exhibit 40) with the DEC to address, *inter alia*, the contamination at the East and West Station sites.  See Joint Exhibit 40.  Simone testified that the incentive for RG&E to enter into the VCA and complete the clean-up under the supervision of the DEC was both practical and monetary.  The DEC was engaged in an active effort to identify and require clean-up of MGP sites across New York State.  Conducting the clean-up of the MGP sites without DEC oversight was, according to Simone "extremely risky" because "they might require you to redo all the work" if they did not approve your remedy or watch the work being done.  See Simone TT at p. 53-54.  While cost effectiveness is not a factor the DEC will consider in ranking proposed remedies in approving a clean up plan, cost may be considered in choosing between equally effective remedies.  See Simone TT at p. 34-35.

77.   RG&E also believed that cooperating with the DEC gave the company some limited ability to have input into the specifics of the site remediation process which could advance RG&E's interest in

_____

[23] In-situ stabilization involves mixing the tar laden soil with a cement material and other binding agents in an effort to form a large mass or block incapable of further migration or leaching.

51

controlling the costs.[24]    The VCA provided that the DEC would not take any enforcement action under CERCLA or New York's Environmental Conservation Law (ECL) with respect to MGP contamination addressed under the VCA so long as RG&E remained in compliance with the terms of the VCA. See VCA (Joint Exhibit 40) p. 12.  The VCA also provided that so long as RG&E complied with the terms of the VCA contract, it will "be deemed to have resolved its liability to the State for purposes of contribution provided by CERCLA." Id. at p. 19.

78.  In October 2003, Ish, Inc. and META Environmental Inc. issued an Executive Summary for the Site Investigations and Focused Feasibility Study for Remediation of Impact at the East Station former MGP Site. See 2003 Executive Summary (Joint Exhibit 110). The report, completed at DEC's request, summarized the previous environmental investigations that had been done at East Station, listed the alternative remedies and proposed "next steps" to manage the contaminated soil and groundwater.  The report noted that before any remedies were implemented, DEC guidance and concurrence approval would be obtained.  Id. at 60.

79.  Based on the FSS, RG&E sought to address the riverbank contamination first, but DEC rejected their request and directed

---

[24]  The VCA is drafted by the DEC and, although it contains a dispute resolution procedure, the DEC must ultimately review and approve any work plan proposed by the "volunteer." See Shifrin TT2 at p. 63 (the DEC is "the judge, jury and executioner").

that source materials in the tar well be removed by excavation first. See Simone TT at p. 57-60; see also October 30, 2007 Trial Transcript at p. 161-62;[25] Joint Exhibit 113 at p. 2. According to Simone, removal of "source material" (coal tar) from storage vessels as an Interim Remedial Measure ("IRM") was DEC policy for MGP clean-ups. The DEC website provided public access to documents describing the agency's procedures with respect to MGP clean-ups. The DEC website supports Simone's testimony that DEC's MGP remediation strategy was to implement IRMs (either through VCA or direct state superfund clean-ups) requiring the initial removal of MGP structures and impacted soils so long as "technically feasible." Under the strategy, IRMs approved by DEC "will attempt to achieve final remedial criteria." See Joint Exhibit 233.

80. Based on DEC's direction that RG&E address the East Station tar well first, RG&E adjusted their remediation sequence and proposed removing the contaminated source material from the tar well while leaving the walls and the floor of the tar well intact. In August 2004, DEC informed RG&E that their proposal was unacceptable and that, consistent with DEC's statewide MGP strategy, RG&E would be required to remove the entire tar well structure, associated piping and all contaminated soil surrounding

---

[25] This cite references excerpts from the deposition testimony of Steven Mullin, who RG&E designated as its corporate representative pursuant to Fed. R. Civ. P. 30(b)(6). The deposition excerpts were read into the record on October 30, 2007.

the structure. See Simone TT at p. 68-69; see also August 10, 2004 DEC Letter with attached Comments on RG&E's Draft IRM Work Plan (Joint Exhibit 126). Simone believed that to comply with the DEC order RG&E would have to excavate soil at least to the river bank and perhaps even the entire site.

Simone contacted RG&E and negotiated a compromise in which DEC would approve complete removal of the structure and removal of contaminated soil within 20 feet of the tar well. See Simone TT at p. 68-69; see also November 4, 2004 RG&E Letter with attached Monthly Progress Reports (Joint Exhibit 135). The revised IRM work plan was submitted to DEC in October 2004 and approved. The work plan was implemented by RG&E and in March 2006 RG&E submitted a revised Final Engineering Report (hereinafter "FER") (Joint Exhibit 185) detailing the implementation of the tar well and surrounding soil removal IRM work plan. RG&E's final report on the tar well remediation was accepted and approved by the DEC. See Joint Exhibit 185.

81. RG&E is also actively engaged with the DEC in designing and implementing the ISS remedy for the tar seeps to the river. The DEC approved the ISS as an IRM. At the time of trial, the river seep ISS work plan had been submitted to the DEC for approval. RG&E plans to implement the ISS project immediately upon approval from the DEC. See Simone TT at p. 87-88. Once the ISS system is installed, RG&E will commence a comprehensive site-wide

investigation to develop and propose a remedy for the rest of the East Station MGP site.    It is anticipated that the remedial selection process will take two to three years and several years thereafter to implement the approved remedy.    The remedial investigations and feasibility studies already completed by RG&E will be useful in the investigation of the East Station site and assist RG&E in choosing an appropriate site remedy.    See Simone TT at p. 92-93.

82.    Once the VCA was entered into with the DEC, RG&E also began the remediation process at the West Station MGP site. Pursuant to a request by DEC, Ish, Inc. and META Environmental Inc. were hired by RG&E to perform a river seep survey looking for evidence of tar and other contaminants on the West Station side of the river.    The survey results were provided to the DEC.    Based on the results, DEC told RG&E it wanted a structure called the tar oil separator removed because it was a potential source of ongoing release of tar into the river.    See Simone TT at p. 97-98.    RG&E was not as convinced as DEC that the separator was, in fact, a source of river contaminants and proposed doing an investigation to confirm whether or not the separator was an environmental problem. The DEC approved the work plan for the separator investigation. The investigation revealed the tar oil separator was not an active source of contamination (Joint Exhibit 44) and the DEC agreed that an IRM removal of the separator was no longer required.    See Simone

TT at p. 98-100. At present, RG&E is in the process of developing a work plan for a comprehensive site investigation for West Station. Once the investigation is complete and reviewed by DEC under the VCA, RG&E will develop a remedial action work plan for DEC review and approval.

83. It was abundantly clear from the trial testimony and exhibits that once the VCA was signed, RG&E engaged the DEC in overseeing and approving their entire MGP tar remediation efforts, including the East and West station sites. The DEC approved the work plans, had an on-site representative observing remediation activities, reviewed all progress reports, has regularly met with RG&E representatives to discuss the status of the remediation activities and reviewed and approved the final engineering reports. Under the VCA, RG&E is obligated to reimburse the DEC for all oversight costs incurred by the DEC. See VCA (Joint Exhibit 40); see also Exhibit 108 at p. 4.

84. As of the time of trial, the actual costs that had been incurred by RG&E for East and West Station evaluation and clean-up at the time of trial were summarized in Joint Exhibit 82. The total was $5,143,763.76. Of the total, costs associated with the tar well and contaminated soil removal IRM amounted to $4,396,028.29. While FirstEnergy certainly contests RG&E's claim that is it liable for any portion of the costs, defendants do not dispute the accuracy of the totals set forth in Joint Exhibit 82.

85. Based on RG&E records, the total amount of contaminated soil removed from the tar well and surrounding areas was 19,987 tons of soil. Sixty-five percent (65%) of the soil removed (13,000 tons) was removed from the area <u>outside</u> of the tar well. Thus, the costs associated with removing contaminated soil from areas outside of the tar well itself can be reasonably derived by multiplying the total costs associated with the tar well ($4,396,028.29) by 65%. The result is $2,857,418.39, which sum represents the costs to remove contaminated soils outside of the tar well.

86. Defendant's expert Dr. Shifrin testified that because reliable historical records are available, there is "very good data for gas production" volume during the operating lives of East and West Station. Shifrin TT2 at p. 16. Accordingly, Shifrin opined that gas production would be "a useful metric for allocating" MGP owner/operator liability under CERCLA. <u>Id</u>. According to Shifrin, how much gas was made correlates to how much tar was made. <u>Id</u>. Indeed, both RG&E and FirstEnergy agreed that tar releases are directly proportional to the amount of gas being manufactured during a particular time period.[26]

87. The Court also finds allocable gas production to be the

_____

[26] Dr. Shifrin's opinion that the methodology used to allocate responsibility for tar contamination should assign a smaller percentage of responsibility for the owner of the MGP in comparison to the operator of the MGP (<u>see</u> Shifrin TT2 at p. 25-27) was not persuasive given my findings as to AGECO's domination and control of RG&E as set forth earlier in this Decision and Order.

most logical way to assign responsibility for contamination caused by coal tar leakage. Thus, comparing the volume of gas produced for a relevant time period to the total volume of gas produced during the operating life of the MGP is the appropriate methodology to measure an owner/operator's fair share of liability for environmental contamination damage caused by the release of coal tar. Based on reliable historical records (see Shifrin TT2 at p. 16), eight percent of all gas that was produced at the East and West Station MGPs was produced during the period commencing May 1, 1929 (when AGECO acquired RG&E) and ending July 14, 1932 (when the Voting Trust was enacted). See Gas Production Chart (Plaintiff's Exhibit 571).[27]

### CONCLUSIONS OF LAW

### A. CONCLUSIONS OF LAW: CORPORATE VEIL PIERCING

1.  FirstEnergy's liability for any proven CERCLA claim depends, in the first instance, on whether (1) AGECO is liable under corporate veil piercing principles for environmental contamination caused by RG&E, its wholly owned subsidiary and (2) if so, whether GPU and FirstEnergy are corporate successors to AGECO's liability for any proven contamination.

---

[27] Plaintiff's Exhibit 571 is a color enlargement of a bar graph prepared by defendant's expert Dr. Shifrin. The graph was part of Shifrin's expert report (Joint Exhibit 309). In his expert report, Dr. Shifrin concluded that "8% of the total gas from East and West Stations, combined, was produced during the Pre-Voting Trust Period." Joint Exhibit 309 at p. 12.

2.  Both parties agree that to pierce a corporate veil and reach the assets of its parent corporation, RG&E must demonstrate: (1) that AGECO exercised complete domination over RG&E with respect to the transaction at issue; and (2) that such domination was used to commit a fraud or wrong that injured RG&E. <u>American Fuel Corp.</u> <u>v. Utah Energy Dev. Co.</u>, 122 F.3d 130, 134 (2d Cir. 1997) (applying New York law).[28]

3.  Whether a parent corporate entity completely dominates a subsidiary corporate entity depends on several factors, no one of which controls.   The factors include:

> (1) the absence of corporate formalities and paraphernalia that are part and parcel of the corporate existence (*i.e.*, issuance of stock, election of directors, keeping of corporate records);
>
> (2) inadequate capitalization;
>
> (3) use of corporate funds for personal rather than corporate purposes;
>
> (4) overlap in ownership, officers, directors, and other personnel;
>
> (5) common office space, address and telephone numbers of corporate entities;
>
> (6) the amount of business discretion maintained by the allegedly dominated corporation;
>
> (7) whether related corporations dealt with

---

[28] As set forth in this Court's previous opinion, for purposes of piercing the corporate veil, New York law and federal common law are so substantively similar that a choice of law is not required.

the dominated corporation at arms length;

(8) whether the corporations are each treated as independent profit centers;

(9) the payment or guarantee of debts of the dominated corporation by the other corporations in the group; and

(10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991).

4.    Both New York courts and the Second Circuit have emphasized that any veil piercing analyses must look to the totality of circumstances.  "Because a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised."  Morris v. New York State Dep't of Taxation & Finance, 82 N.Y.2d 135, 143 (1993) (citation omitted); see also MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 64 (2d Cir. 2001)("[O]ur case law teaches determining whether to pierce the corporate veil is a very fact specific inquiry involving a multitude of factors.").  Nevertheless, "[c]ontrol is the key."  American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988).

5.    Pre-Voting Trust Period: Based on the totality of evidence adduced at trial, the court concludes that AGECO's abuse of the

corporate form during the pre-voting trust period (1929-1932) justifies the intervention of equity in order to pierce AGECO's corporate veil. This determination is based on a preponderance of the credible evidence.

6. I conclude that AGECO's control and domination of RG&E in the pre-voting trust period was systemic and pervasive. It was systemic because it was part of a methodical plan by Hopson and Mange to dominate and manipulate operating utilities through non-operational "upstream" corporations with no real assets or organizational purpose other than to dictate the operational, management, financial and corporate behavior of operating utilities within RG&E.

7. To be sure, the holding company structure utilized by the public utility industry in the 1920's and 30's engendered opportunities for non-operational parent corporations to control their operating subsidiaries. But, as the findings and conclusions of the various governmental investigations confirm, Hopson, Mange and their corporate agent (AGECO) took the opportunity and used it to engage in abusive corporate practices and a myriad of self-dealing transactions.

8. These abusive practices and improper transactions are set forth in detail in governmental investigation reports prepared separately by the SEC, the Federal Power Commission and the Federal Trade Commission. These detailed and comprehensive reports

document abusive corporate practices sufficiently serious to justify piercing the corporate veil that ostensibly separated AGECO from RG&E.  These practices included a plethora of overlapping officers, directors and other personnel, the use of common office space to conduct high level corporate meetings, the lack of business discretion exercised by operating subsidiaries in corporate and financial decision-making, the routine outsourcing of virtually all operational, financial, legal and managerial functions to either AGECO-controlled service companies or service companies controlled by Hopson, Mange or their immediate families, the conflict of interests which resulted in a lack of arms-length negotiations between operating subsidiaries and AGECO-controlled service companies, and the improper extraction of funds from AGECO-controlled utilities through service company contracts in which no services were actually rendered.

9.    Defendant's argument that the findings of the various governmental agencies should not be afforded much weight because RG&E was not the primary focus of the investigations might be persuasive had the historical evidence as to RG&E not corresponded so completely with the broader governmental findings.  The blueprint of how Hopson and Mange used AGECO to control, dominate and personally profit from operating utilities within the AGECO system was undeniably consistent among the operating utilities within the AGECO empire, including RG&E.  The evidence as to RG&E—

including holding virtually all high level corporate meetings at AGECO's New York City headquarters; designating AGECO's New York City office as the official financial office of RG&E; outsourcing management responsibilities, financial and accounting functions, construction and purchasing duties to service companies controlled by AGECO, Hopson or Mange; the breadth of overlapping officers, directors and executive committee members; the creation of corporate accounts within RG&E to "appropriate" income for the benefit of common stockholders (Hopson and Mange); the self dealing inherent in RG&E's Executive Committee approving service contracts yielding payments of over $1.7 million with companies owned or controlled by the members of the Executive Committee—are all examples of the "cookie cutter" approach to corporate governance described by Professor Macey.

10. In contesting the evidence of AGECO's domination of RG&E, the defendant relied on the testimony of Frank C. Torchio, a forensic economist. After obtaining an M.B.A. degree from the University of Rochester's Simon Graduate School of Business, Torchio worked as a financial analyst at RG&E before opening his own consulting business in 1989. Torchio's expert testimony involved conducting a financial analysis of RG&E during the relevant time periods with particular emphasis on the issue of whether RG&E was adequately capitalized as a public utility during the time period of 1929-1940. See October 30, 2007 Trial Testimony

of Frank C. Torchio (hereinafter "Torchio TT") at p. 56.   The adequacy of capitalization is one of the ten factors identified by the Second Circuit as being relevant to the veil piercing analysis. See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d at 139.

11.   Torchio opined that after examining a variety of financial and statistical metrics commonly used to evaluate the capitalization of a company, he determined that RG&E was "not inadequately capitalized" during the 1929-1932 time period particularly when compared to other public utilities during the same periods. See Torchio TT at p. 67-69; Defendant's Exhibit 653.

12.   While the Court found Torchio's testimony helpful on evaluating the adequacy of capitalization of public utilities during the relevant time period, his opinion on RG&E's capitalization was not sufficient to overcome other evidence supporting a finding that AGECO's control of RG&E justifies a piercing of AGECO's corporate veil.

13.   Torchio did not dispute that within three years after AGECO purchased RG&E, the utility was on the verge of receivership because it was unable to obtain financing to pay off over nine million dollars of notes due in July 1932.   Torchio agreed that "the inability of a company to pay its debt [would] reflect adversely on its capitalization."   See Torchio TT at p. 101. Torchio, however, tried to minimize RG&E's insolvency predicament

64

and opined that because the utility was ultimately able to obtain bank financing and pay its debt demonstrates adequate capitalization and a "healthy" public utility. Id. at p. 105. But the proof at trial clearly documents that bank financing for RG&E was contingent on one condition--AGECO's promise to execute a voting trust agreement that ended the parent corporation's domination of its subsidiary and restored local corporate control. Indeed, when pressed at trial, Torchio agreed that the banks "were quite concerned about the AGECO empire" and were "not going to lend any money until [they] know what AGECO is going to do." See Torchio TT at p. 103. Torchio's attempt to depreciate the impetus for the voting trust agreement was not persuasive. Put simply, RG&E might have been "healthy" as a self-governing public utility, but it was sufficiently ill when controlled by AGECO to cause the banks to require AGECO to end its ability to  dominate RG&E as a condition of survival.

14. Defendant next argues that even if RG&E has demonstrated by a preponderance of the evidence that AGECO controlled and dominated its wholly owned operating subsidiary, RG&E still failed to prove that such domination was used to commit a fraud or wrong that injured RG&E. See American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d at 134. FirstEnergy has long argued that the second element of the veil piercing test can only be satisfied if RG&E can demonstrate a precise and direct nexus between specific actions and

conduct of employees of AGECO and the alleged contamination of RG&E's sites.   In other words, defendant claims that unless RG&E has proven that employees of AGECO were directing the day-to-day waste management operations which resulted in soil contamination, AGECO's corporate veil cannot be pierced.

    15.   This argument was first raised by defendant in the context of imposing owner liability under CERCLA.   In rejecting FirstEnergy's argument, this Court held:

> On this issue, the Court agrees with RG&E that plaintiff is not required to prove that employees of AGECO were directing the day to day waste management operations of RG&E in order for RG&E to meet the second prong of the veil piercing test and impose owner liability on AGECO under CERCLA.   While the harm committed by AGECO must generally be attributable to or linked with the complete domination and control exercised by the parent in order to pierce AGECO's veil, that link need not be direct and actual participation by employees of AGECO in managing, directing or conducting the offending operations. FirstEnergy's interpretation of the second prong unjustifiably imports the elements of CERCLA's operator liability into the test for piercing AGECO's corporate veil.   Indeed, if such direct and personal participation in the act of pollution were required, there would never be a need to pierce the corporate veil because the actions of the employees of the parent would, in and of themselves, be conduct sufficient to impose "operator" liability under CERCLA.   See Bestfoods, 524 U.S. at 66-67 (to be liable under CERCLA "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.") (emphasis added).

66

> During oral argument, counsel for FirstEnergy
> conceded that the "direct participation"
> condition he believed was required for
> <u>derivative</u> CERCLA liability pursuant to New
> York's veil-piercing test was not required
> when seeking to impose CERCLA liability
> directly on an owner like RG&E. The
> incongruity inherent in creating differing
> standards for direct and derivative CERCLA
> liability is contrary to the very purpose of
> veil piercing, that is, to acknowledge that
> for legal purposes the subsidiary is the
> "alter ego" of the parent. In sum, so long as
> AGECO's control over the corporate operations
> of RG&E contributed to the environmental
> damage and liabilities alleged in the
> complaint, actual and direct participation by
> AGECO employees in the day to day operation of
> the offending plants is not required to
> satisfy the second prong of the veil piercing
> test.

<u>See</u> March 31, 2004 Decision and Order granting in part and denying in part defendant's Motion for Summary Judgment on liability grounds (Docket #126) at p. 5-7 (footnote omitted). All of the conclusions of law set forth in my earlier opinion are hereby incorporated by reference.

16. The Court declines to reverse its previous determination at to what level of proof is required to meet the second prong of the veil piercing test. That being said, the proof adduced at trial also convinces the Court that during the pre-voting trust period there was, in fact, a direct nexus between the actions and conduct of AGECO and the alleged contamination of RG&E's sites.

17. This conclusion is supported by RG&Es undeniable use of service contracts to out-source all of the management, finance

purchasing and construction responsibilities to various service companies owned and operated by AGECO and/or AGECO's two controlling shareholders. The pollution at issue here was not due to a limited or definitive spill where individual employees can be identified as responsible for the contamination. To the contrary, it is abundantly clear from the evidence that all manufactured gas plants operating during the relevant time period produced gas and, as gas was produced, tar was created. Inherent in the tar storage methods used during this time period was leakage and soil contamination. If AGECO, through its domination and control of RG&E, controlled virtually every aspect of an operating utility directly involved in the gas manufacturing business, then AGECO is sufficiently involved in the environmental harm inherently caused by that business to meet the nexus prong of the veil piercing test. Here, AGECO's total domination of RG&E meant control over the daily operations of its subsidiary. Under these unique set of facts, the actions of RG&E were the actions of AGECO. In sum, the Court concludes that the proof at trial satisfied not only the standard set forth in my March 31, 2004 Decision and Order, but also met the level of proof the defendant contends was necessary to meet the second prong of the veil piercing test.

18. Finally, FirstEnergy argues that as a matter of law RG&E cannot pierce the corporate veil of its parent corporation. Given the unique historical circumstances upon which this litigation is

68

based, and notwithstanding Professor Macey's unequivocal opinion that self piercing is permitted under the law, the Court requested additional briefing on this issue. Unfortunately, none of the cases cited by either party (nor located by the Court in its own research) appear controlling as to defendant's "self-piercing" argument.

19. Despite the lack of direct authority on the concept of "self-piercing," the Second Circuit has suggested that the veil piercing doctrine is not intended to be pigeonholed and that there are an "infinite variety of situations" that might justify disregarding a corporate veil. Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d at 139. "Broadly speaking, the courts will disregard the corporate form, or, to use accepted terminology, 'pierce the corporate veil', whenever necessary 'to prevent fraud or to achieve equity.'" Morris v. New York State Dep't. of Taxation, 82 N.Y.2d at 140 (quoting Walkovszky v. Carlton, 18 N.Y.2d 414 (1966)) (citations omitted).

20. Given the totality of circumstances present here, I find piercing the corporate veil of AGECO for the period of time that AGECO dominated and controlled RG&E is appropriate to achieve equity. This is not a situation where the piercing doctrine is being invoked by the subsidiary to somehow protect or assist its parent. Indeed here, the "parental relationship" ended over fifty years ago and RG&E's current posture is more akin to an injured

third party than a subsidiary of a parent. If RG&E is able to
establish that contamination liability under CERCLA occurred during
a specific period of time when it was controlled and dominated by
AGECO, then equity demands that AGECO assume its fair share of the
total costs of cleaning up that contamination.

21.  <u>Voting Trust Period</u>: The evidence does not support
piercing AGECO's corporate veil during the voting trust period.
Just as the need for the voting trust agreement confirmed AGECO's
control of RG&E, the implementation of the voting trust agreement
signaled the end of that domination.

22.  As set forth in the Court's findings of fact, once the
voting trust agreement was signed, RG&E's corporate governance
changed dramatically. AGECO affiliated officers and directors were
removed, including Hopson and Mange who resigned from the Board and
were removed as controlling members of RG&E's executive committee.
Independent Rochester based individuals were installed as new
directors and thereafter controlled two-thirds of all RG&E director
seats.

23.  The new Board moved swiftly to assert its independence
from AGECO control. The new Board immediately terminated the
"Surplus Appropriated for Common Shareholders Account" and
rescinded all transfers the former Board had made to that account.
Instead of holding its Board meetings and Executive Committee
meetings at AGECO's New York City offices, RG&E corporate meetings

were now conducted at RG&E's corporate headquarters in Rochester, New York.

24. As to the service contracts with the AGECO controlled service companies, the new Board immediately began reviewing the terms of the contracts and determined that they contained "elements which are undesirable" to the management of RG&E. A process was implemented to review each service contract to determine what contracts should be terminated and what contracts needed to be materially modified. The significance of the independence of the Board and Executive Committee from AGECO and the AGECO-controlled service companies cannot be understated. Arms-length negotiations as to service agreements were now possible and it was the interests of RG&E instead of Hopson, Mange and AGECO that would control. The fact that review of the service contracts led to cancellation or substantial modification of the contracts pays tribute to new corporate independence of RG&E.

25. Professor Macey conceded that "things changed with the Voting Trust. I am not suggesting everything stayed the same, and they were definitely moving in the direction of independence. That was one of the business purposes for the voting trust." See Macey TT2 at p. 105. In RG&E's closing argument, counsel agreed that "the evidence [as to AGECO domination and control of RG&E] clearly is not as strong after 1932 — I mean, there is no question about that." See October 31, 2007 Trial Transcript at p. 84.

71

26.    While admitting that the voting trust agreement represented a "sea of change" in RG&E's corporate governance, RG&E argued that the transformation to an independent utility took time to implement and thus AGECO's control over its operating subsidiary diminished gradually:  "It's obvious both in the evidence and common sense, the ship didn't turn around overnight in the middle of the ocean."    See October 26, 2007 Trial Transcript at p. 34.

27.    In this Court's view, however, the critical issue as to domination and control is not how long it took to turn RG&E's "vessel" around, but who was navigating the ship.  I conclude that after the voting trust was implemented, AGECO's domination and control over RG&E ended.  From that point forward, RG&E was capable of and did, in fact, assert its corporate independence from AGECO, Hopson and Mange.  Accordingly, RG&E did not prove facts sufficient to pierce AGECO's corporate veil after the voting trust was signed in July 1932.

28.    Successor Liability: Finally, defendant argues that RG&E cannot prove that FirstEnergy is the successor to the environmental liabilities of AGECO.[29]    Defendant's successor liability argument

---

[29] If FirstEnergy is not the successor to the environmental liabilities of AGECO, then the last seven years the parties have spent discovering and litigating complicated historical issues as to the merits of piercing AGECO's corporate veil and AGECO's CERCLA liability for contamination of various MGP sites were unnecessary. While FirstEnergy is not precluded from now raising this issue, the Court remains puzzled as to why FirstEnergy waited until trial to affirmatively seek dismissal on the successor liability issue.

hinges on an examination of AGECO's bankruptcy reorganization proceedings and the identity of the company that emerged from those proceedings. This was no easy task. In reviewing the AGECO/AGECORP Plan of Reorganization, the SEC noted: "The record built in this litigation reveals a mass of incredibly complex legal, equitable and factual contentions, defenses and cross claims putting into issue the relative positions of practically every class of securities of both estates against other classes and posing many important and novel questions in the law of corporations, creditors rights, bankruptcy and corporate reorganization." See SEC Findings on Reorganization (Defendant's Exhibit 631) at p. 3350.

29. Both the SEC review of the Reorganization Plan and United States District Court Judge Vincent L. Leibell's decision confirming the plan were admitted in evidence. In addition, on October 26, 2007, the parties jointly stipulated into evidence a well researched scholarly Master's degree thesis written in 1949 that contained a comprehensive examination "of the history of the inception, growth, and reorganization" of the AGECO empire. See Minnie Yavil, The Reorganization of the Associated Gas and Electric Company and the Associated Gas and Electric Corporation, (Feb. 1949) (M.A. thesis, Geo. Wash. University) (hereinafter the "Yavil article") (Joint Exhibit 73). The Yavil article in particular was helpful in understanding this unusually complex and unique

proceeding involving the intersection of federal bankruptcy law and PUHCA.

30.   As stated earlier, in January 1940, both AGECO and AGECORP filed petitions for reorganization under Chapter X of the then Bankruptcy Act.  Separate Trustees were established for AGECO and AGECORP.  The ultimate plan developed by the Trustees was to substitute for claims against AGECO and AGECORP "securities in a solvent reorganized company" which would emerge as the surviving company from the bankruptcy proceedings.  The surviving company was to "take over the assets of the two estates, other than the assets distributed pursuant to the Plan."    See SEC Findings on Reorganization (Defendant's Exhibit 631) at p. 3376.

31.   In order to be viable the reorganization plan had to comply with PUHCA.  As of 1938 the AGECO empire included 170 subsidiary operating companies operating in 29 states and the Philippine Islands.  In 1941, the SEC initiated proceedings against AGECORP trustees alleging that the AGECORP system violated the "single integrated utility" requirements of PUHCA.  In response, the trustees proposed that the surviving company emerging from bankruptcy would consist of a limited number of operating subsidiaries within four existing AGECO systems.  See SEC Findings on Reorganization (Defendant's Exhibit 631) at p. 3415.  In 1942, the SEC issued a divestment order requiring the trustees to liquidate from the system "properties lying outside the four

systems proposed by the trustees." Yavil article (Joint Exhibit 73) at p. 78. Within a year of the initiation of the SEC proceedings, the trustees had disposed of their interest in sixty AGECO/AGECORP companies. By 1945, the "trustees retained an interest in only 16 of the original 116 companies listed in the Commission's order of divestment of 1942." Id. at p. 78-81.

32. Clearly, the reorganization plan proposed by the trustees did not contemplate liquidation of AGECO and AGECORP. Instead, the surviving company that emerged from reorganization consisted of 26 subsidiaries operating primarily in New York, Pennsylvania and New Jersey. The company emerging from bankruptcy included RG&E.

33. While the bankruptcy proceedings were complex and unique, contrary to the arguments of FirstEnergy, the historical facts do not support a finding that General Public Utilities was created to simply be a liquidating vehicle for AGECO assets that had not yet been disposed of during the bankruptcy proceedings. Thus, I decline to adopt the views of James Wendelgass who was designated by the defendant as the Rule 30(b)(6) corporate representative of General Public Utilities. Wendelgass testified that his review of the relevant documents revealed that General Public Utilities was only the "repository of the assets of the AGECO/AGECORP system" and it was under an obligation "pursuant to the bankruptcy plan and the SEC orders to liquidate those assets." See Wendelgass TT1 at p. 196. According to Wendelgass, "the whole intent was to take the

remaining assets in bankruptcy, get the assets in this liquidating vehicle and liquidate them." See Wendelgass TT2 at p. 6.

34.   The Reorganization Plan being reviewed by the SEC was proposed by the Trustees in 1943.  The SEC Findings approving the Reorganization Plan were issued in 1944.  In January 1946, Judge Leibell ordered the approved plan to be consummated and the Merger and Consolidation Agreement was executed on January 12, 1946. Between the time the Plan was proposed and ordered implemented by Judge Leibell, the trustees disposed of almost all of AGECO/AGECORP assets in order to comply with PUHCA.  As noted above, the trustees retained the New York, New Jersey and Pennsylvania subsidiary operating companies, which included RG&E.   The trustees contemplated that these assets would remain in the surviving company and earnings generated by these operating subsidiaries would be used to pay the surviving company's debt.  In fact, the SEC deferred ruling on whether the remaining assets in the surviving company complied with PUHCA, noting that disposition of that issue "will be made in due course."  See SEC Findings on Reorganization (Defendant's Exhibit 631) at p. 3415; see also Yavil article (Joint Exhibit 73) at p. 81.

35.  The "surviving company" that emerged from bankruptcy was the successor to AGECO.  The Certificate of Consolidation and Agreement of Merger confirms that the Reorganization Plan involved the merger and consolidation of the assets of AGECORP and AGECO

into a single viable company which held all of the remaining assets of the AGECO empire in New York, New Jersey and Pennsylvania, including RG&E.

36. The merger agreement provided that once the merger and consolidation was complete, the surviving company was AGECO "and not a new corporation." See Certificate of Consolidation and Agreement of Merger (Joint Exhibit 295) at p. 1 (emphasis added). Indeed, the agreement provided that "the existence of AGECO shall continue for all purposes whatsoever after the consolidation and merger." Id. (emphasis added). The merger and consolidation agreement was explicitly intended to be pursuant to and in compliance with Section 91 of New York's then existing Stock Corporation Law. Section 91(10) of the Stock Corporation Law provides that "if the consolidated corporation is one of the constituent corporations, the consolidation of two or more corporations pursuant to this section shall be equivalent in legal effect to a merger of such corporations." See N.Y. Stock Corporation Law § 91(10) (Consol.) (repealed 1966). AGECO was listed on the Certificate of Consolidation and Agreement of Merger as a constituent corporation. Given the foregoing, the Court concludes that the transaction should be given the "legal effect" of a merger and hence General Public Utilities is the legal successor to AGECO.

37. Once the merger was consummated, AGECO immediately changed its name to General Public Utilities Corporation. Its corporate

headquarters was AGECO's offices in New York City. General Public Utilities continued to own and operate RG&E from January 1946 until September 1949. During that period, General Public Utilities affirmatively represented itself to be a public utility holding company registered with the SEC and the successor in interest to AGECO and AGECORP. See December 31, 1945 Annual Report (Joint Exhibit 65). In its Annual Reports for the years 1946, 1947 and 1948, General Public Utilities claimed RG&E as a wholly owned subsidiary of General Public Utilities. Id.; see also Exhibits 68, 71.

38. While it is true that in 1948 General Public Utilities announced to its shareholders that it had decided to request SEC approval to sell its New York subsidiaries (including RG&E) as part of a program to assure future compliance with PUHCA, the fact remains that liquidation of the stock of RG&E was not a requirement of either the Reorganization Plan or any SEC divestment order existing when AGECO/General Public Utilities emerged from bankruptcy. AGECO emerged from bankruptcy as it entered bankruptcy— as an ongoing public utility holding company with RG&E as an operating subsidiary.

39. Assuming that General Public Utilities was eventually required by PUHCA to divest RG&E, PUHCA did not, as a matter of law, extinguish potential CERCLA liability of AGECO/General Public Utilities. North Shore Gas Co. v. Salomon Inc., 152 F.3d 642 (7th

Cir. 1998).    Nor did AGECO's emergence from bankruptcy reorganization discharge RG&E's potential CERCLA liabilities.  *In re Chateaugay*, 53 F.3d 478, 497 (2d Cir 1995).

40.  In summary then, as to corporate liability issues, this Court determines that  plaintiff has met its burden of proof and demonstrated that (a) AGECO is liable under corporate veil piercing principles for environmental contamination caused by RG&E, its wholly owned subsidiary, during the pre-voting trust period but not the voting trust period or thereafter, and (b) GPU and FirstEnergy are corporate successors to AGECO and hence legally liable for any proven contamination during the pre-voting trust period.


## B.  CONCLUSIONS OF LAW: CERCLA LIABILITY

41.  Plaintiff RG&E seeks relief under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). See 42 U.S.C. § 9601 *et seq*.  Specifically, RG&E seeks to recover as damages under CERCLA § 107(a)(4)(B) all response costs incurred and to be incurred in cleaning up MGP related contamination at the East and West Station sites.  Assuming the defendant is found to be liable, it has asserted a counterclaim for contribution pursuant to CERCLA § 113(f).

42.  In evaluating RG&E's claims, this Court is cognizant that "CERCLA is a broad remedial statute, enacted to assure that those responsible for any damage, environmental harm, or injury from

chemical poisons bear the costs of their actions. As a remedial statute, CERCLA should be construed liberally to give effect to its purposes." Prisco v. A & D Carting Corp., 168 F.3d 593, 602 (2d Cir. 1999)(internal quotations and citations omitted).

43.  To establish liability under CERCLA, RG&E must prove that (1) the defendant is a "covered person" under the Act; (2) the East and West Station sites are "facilities" as defined by CERCLA; (3) there was a release or threatened release of hazardous substances at these sites; and (4) as a result of the releases, RG&E incurred response costs that conformed to the National Contingency Plan ("NCP") as administered by the EPA. See United States v. Alcan Aluminum Corp., 990 F.2d 711, 719-20 (2d Cir. 1993); see also Prisco v. A & D Carting Corp., 168 F.3d at 602-03.

44.  Assuming that the corporate veil may be pierced, the defendant does not dispute it is a "covered person" under the Act, that the East and West Station sites are "facilities" as defined by CERCLA or that there was a release or threatened release of hazardous substances at these two MGP sites. See Shifrin TT2 at p. 54; see also Karls TT2 at p. 16.   The focus of its CERCLA defense is the fourth element of RG&E's CERCLA claim—that is, whether RG&E incurred necessary response costs that conformed to the NCP.[30] 40

---

[30]  The National Contingency Plan ("NCP") is a group of regulations promulgated by the EPA which establish standards for responding to releases of hazardous substances. See 40 C.F.R. Part 300. Under the regulations, a private response action is "consistent with the NCP" if the action, evaluated as a whole, is

C.F.R. Part 300. CERCLA permits a private plaintiff like RG&E to recover costs that are necessary response costs consistent with the NCP. See 42 U.S.C. § 9607(a)(4)(B). Defendant argues that RG&E's response costs were both unnecessary and inconsistent with the NCP.[31]

45. The gravamen of defendant's NCP argument is that virtually all of the actual and planned response costs RG&E has incurred and plans to incur are unnecessary and not in substantial compliance with the NCP because they have been implemented without RG&E first performing specific and comprehensive site studies required by the NCP, including a comprehensive site-wide feasibility study of remedial alternatives ("RI/FS"). FirstEnergy claims that, regardless of any DEC direction to the contrary, MGP related clean-up work at East and West stations must await completion of a

---

in "substantial compliance" with certain procedural requirements, and results in a "CERCLA-quality cleanup." See 40 C.F.R. §§ 300.700(c)(3)(i), (c)(4) ("immaterial or insubstantial deviations" will not render a response action inconsistent with the NCP).

[31] The defendant also claims that RG&E has not suffered any actual damage because it either has or will be able to recover its clean-up costs through utility rate increases approved by the New York State Public Service Commission ("PSC"). See Defendant's Post-Trial Brief (Docket #248) at p. 18-19. Defendant offers no legal support or citation for this argument. The Court finds no support in CERCLA that essentially immunizes a polluter of land owned by a public utility because the utility has the ability to try and pass the costs of any environmental clean-up to its ratepayers. Presumably the PSC would consider any CERCLA verdict awarding clean-up costs in deciding whether a rate increase is justified based on the utility having to remediate environmental damage.

comprehensive site wide study demonstrating what contamination actually exists and what specific remedy should be implemented as the most cost-effective way to address the contamination problems found. According to the defendant, RG&E has deliberately skirted the NCP RI/FS site study requirements by deliberately "implementing piecemeal removal actions based on incomplete information." See Defendant's Post-Trial Brief (Docket #248) at p. 20.

46. Both RG&E and GPU agree that whether RG&E's response costs are in substantial compliance with the NCP and thus recoverable under CERCLA hinges on whether the clean-up activities constituted an Interim Remedial Measure ("IRM"). An IRM is the DEC's nomenclature for what CERCLA refers to as a removal action. See Simone TT at p. 71; Shifrin TT2 at p. 63; Karls TT2 at p. 19. RG&E argues that because IRM's are NCP compliant when properly justified, and the lead environmental agency supervising the MGP clean-ups in New York (DEC) determined that certain IRMs were warranted before the RI/FS was completed for the East and West station MGP sites, FirstEnergy's complaint that the absence of an RI/FS disqualifies RG&E from proving substantial compliance with the NCP is groundless.

47. The DEC has issued technical guidance on when an IRM is appropriate:

> An IRM means a discrete set of activities to address both emergency and non-emergency site conditions, which can be undertaken without extensive investigation and evaluation, to prevent, mitigate, or remedy environmental damage or the consequences of environmental

damage attributable to a site, including but
not limited to the examples listed under IRMs.
It addresses one portion of a remedial site and
can usually be addressed independently of other
site issues/problems.    While IRMs may be
temporary solutions to an environmental
problem, they may become the final remedy in
certain cases.    IRMs should not prevent or
significantly hinder permanent remedial
measures that may be required in the Record of
Decision (ROD).    Regardless if temporary or
permanent, they will be discussed as part of
the ROD process.    IRMs can and will proceed
with and without consent orders.

DEC Technical and Administrative Guidance Memorandum (TAGM-4048)

(Joint Exhibit 95).    The DEC's standards for determining the

appropriateness of an IRM mirror the NCP requirements for removal

actions.    See Karls TT2 at p. 38; 40 C.F.R. §§ 300.415(b)(1),

(b)(2).    While removal actions often address emergency site

conditions, both the DEC and the NCP allow "Non-Time Critical"

Removal or IRM actions.    Non-Time Critical Removal actions under

both EPA and DEC regulations are appropriate where at least six

months exist before on-site activities must be initiated.    See 40

C.F.R. § 300.415(b)(4) and TAGM-4048.    While rules regarding

implementation of non-time critical removal actions and IRMs are

more flexible and less involved than the standards for remedial

actions, focused study and evaluation of the site and removal

alternatives are required by both the DEC and the EPA.    Id; see also

Shifrin TT2 at p. 58, 64.    A comprehensive RI/FS is required for

an NCP compliant remedial action, but is not required for a removal

action.    See Karls TT2 at p. 28; see also Carson Harbor Vill., Ltd.

83

v. Unocal Corp., 287 F. Supp. 2d 1118, 1156 (C.D. Cal. 2003).

48.    As stated above, New York State's statutory scheme and implementing regulations regarding hazardous site response requirements substantially parallel CERCLA and EPA's implementing regulations.    See Shifrin TT2 at p. 58.    The EPA has approved certain state agencies as its substitute (lead agencies) in approving, implementing and enforcing CERCLA quality environmental cleanups.    See Shifrin Expert Report (Plaintiff's Exhibit 570) at p. 35-38); Shifrin TT2 at p. 57.    As relevant to this litigation, the DEC is an approved EPA monitoring and enforcement lead agency. FirstEnergy does not dispute that the EPA has delegated primary responsibility for MGP clean-ups in New York State to the DEC (see Shifrin TT2 at p. 58-59, 121-22) and agrees that a clean-up monitored and approved by the DEC (under a VCA) presumptively meets NCP requirements. See Shifrin TT2 at p. 60-61, 165; Karls TT2 at p. 39; see also New York Pub. Interest Research Group, Inc. v. Johnson, 427 F.3d 172, 180 (2d. Cir. 2005); W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc., No. 98-cv-8385(f), 2005 WL 1076117, at *3-5 (W.D.N.Y. May 3, 2005); Pfohl Bros. Landfill Site Steering Comm. v. Browning-Ferris Indus. of N.Y., Inc., No. 95-cv-956A(F), 2004 WL 941816, at *22 (W.D.N.Y. Jan. 30, 2004).

49.    The primary environmental contaminant at both East and West Station is tar and chemicals derived from tar.    See Karls TT2 at p. 2.    Both the tar and the dissolved contaminants are capable

of moving. The tar moves most significantly during the operational phase of the MGP. But the contaminants, as they dissolve in water, continue to be released and move both downward and laterally over time. Id. at p. 8-9. The most expensive response cost incurred to date involves the East Station tar well and accordingly the parties focused most of their efforts in litigating whether the tar well remedy implemented by RG&E was an NCP compliant IRM. The tar well presented a threat to the environment "because it's got tar in an uncontrolled state, and ground water is coming in contact with those tar materials; it's dissolving and creating that plume of dissolved phase contamination that continues to move down [the] gradient. So it's going [to] constitute a continuous ongoing release of contaminated water, if not tar." See Karls TT2 at p. 57. The threat was not limited to the tar well. See Shifrin TT2 at p. 75-76 (conceding that the contamination both inside and outside the tar well presented a potential threat to the environment). Based on the evidence, there is no doubt that tar contamination at the East and West Stations resulting from normal MGP operations at both sites also presented a potential hazard to health and the environment.

50. Based on the totality of evidence presented, I conclude that the response activities of RG&E in studying and remedying the coal tar contamination in and around the East and West Station MGP sites were substantially consistent with the NCP. Contrary to the arguments of the defendant, the actions of RG&E were neither knee

jerked, piecemeal or poorly planned. RG&E well knew that New York's DEC had assumed primary responsibility for the clean-up of hundreds of contaminated MGP sites located throughout New York. Instead of risking conducting a clean-up outside the auspices and approval of the designated state agency, RG&E's decision to be cooperative and proactive was both practical and consistent with the goals of CERCLA. See October 30, 2007 Trial Transcript (Mullin's deposition) at p. 166-67.

51. New York's VCA program was implemented to encourage cooperation from private parties wanting to conduct clean-ups consistent with both New York and CERCLA's standards. By voluntarily engaging DEC and signing the VCA, RG&E was no different than the other private parties who sign a VCA--it intended to obtain regulatory closure on a contaminated site by obtaining a CERCLA quality result that was consistent with the NCP. Id. While the VCA agreement designated RG&E as the "volunteer," there is no dispute that to gain the closure the VCA offered, RG&E had to submit to extensive oversight and control by the DEC. See Joint Exhibit 108 at p. 4. More importantly, while the VCA agreement offered some ability to RG&E to collaborate or even negotiate with the DEC in choosing the direction of the clean-up, the final authority as to what actions were to be taken and what order they were to be implemented was with the DEC.

52. It is against this background that defendant's arguments

about NCP compliance are made. FirstEnergy does not seriously dispute that DEC required the evaluation and removal of tar storage structures and contaminated soil associated with the structure as the "first step" in MGP clean-ups. Nor does FirstEnergy dispute that DEC promoted and utilized IRMs as the preferred mechanism to accomplish this first step. See Shifrin TT1 at p. 104-06; see also October 30, 2007 Trial Transcript (Mullin Deposition) at p. 168-69, 171-72. [32] What FirstEnergy argues is (1) the DEC's reliance on IRMs was wrong; (2) RG&E was wrong in capitulating to DEC's direction, and (3) by needlessly following the orders of the DEC, RG&E's clean-up to date violated the NCP. According to defendant, RG&E should have "stood up" to the DEC and "pushed back" on DEC's direction that the tar well be removed as an IRM. FirstEnergy

---

[32] DEC's Technical Guidance Document DER-10 provides: "As a first priority during investigation and/or remediation, contaminants in all media should be contained and/or stabilized to reduce or eliminate, to the extent possible, receptor exposure to contaminants or to contain movement through any pathway. Actions taken to mitigate environmental or human exposures before the completion of the remedial investigation and appropriate remedial alternative selection, are considered interim remedial measures or IRMs. IRMs may include . . . removals of wastes and contaminated materials." See DER-10 Technical Guidance Document (December 2002) at p. 24 (Joint Exhibit 108)(emphasis added). Essentially the same guidance is contained in the NCP. See 40 C.F.R. § 300.415(b)(3) ("If the lead agency determines that a removal action is appropriate, actions shall, as appropriate, begin as soon as possible to abate, prevent, minimize, stabilize, mitigate, or eliminate the threat" to public health or the environment). Under the NCP, examples of appropriate removal actions include excavation of contaminated soils "where such actions will reduce the spread of, or direct contact with, the contamination"). 40 C.F.R. § 300.415(e)(6).

asserts that the DEC was "not thinking straight" and was "making up data" to justify removal of the tar well and contaminated soils (Shifrin TT2 at p. 98-99), that the DEC was guilty of violating their own policies by not requiring an RI/FS before any site work was done (Shifrin TT1 at p. 122-23) and that RG&E "didn't fight hard enough" with the DEC (Shifrin TT1 at p. 123).

53. FirstEnergy's NCP compliance arguments are not persuasive. I conclude that DEC's policy requiring removal of tar storage structures and contaminated soil associated with the structure as a priority "first step" in MGP clean-ups via a Non-Time Critical IRM was consistent with CERCLA and the requirements of the NCP.[33] Contaminated soil associated with tar storage structures at the East Station MGP site presented an obvious actual or potential environmental threat that could be mitigated on an accelerated basis independent of other any other environmental damage that may also be present at an MGP site. The focused studies RG&E conducted of the structure and surrounding soils justified the use of an IRM and a full scale RI/FS was not required under the NCP for this focused,

_____

[33] See General Elec. Co. v. Litton Indus. Automation Syst., Inc., 920 F.2d 1415, 1419 n.4 (8th Cir. 1990) (an "excavation that totally and permanently cleans up a hazardous waste site" can still be classified as a removal action), cert. denied, 499 U.S. 937 (1991), abrogated on other grounds by Key Tronic Corp. v. U.S., 511 U.S. 809 (1994); see also Stephen Luftig, Director, Office of Emergency and Remedial Response, Use of Non-Time-Critical Removal Authority in Superfund Response Actions (Feb. 14, 2000) (Defendant's Exhibit 643) ("As a practical matter, removal actions are often permanent solutions such as can be the case in a typical soil...removal.").

but Non-Time Critical Removal action. <u>See</u> Joint Exhibit 95; December 1993 EPA Fact Sheet (Joint Exhibit 234); <u>see also</u> 40 C.F.R. § 300.415(b)(4). The evidence developed regarding coal tar contamination (including the Focused Feasibility Study and Focused Remedial Investigation) at the East Station MGP site supported DEC's decision to use the IRM remedy as an NCP compliant clean-up remedy. Contrary to FirstEnergy's argument, I conclude that under the circumstances present here, RG&E was not required to challenge or rebuff DEC's IRM directives. Nor was RG&E somehow obligated to reject DEC's supervision and withdraw from the VCA in order to secure substantial compliance with the NCP. RG&E was entitled to give substantial deference to the directions of the DEC in implementing a remedy that was NCP compliant. <u>See</u> <u>Pfohl Bros.</u> <u>Landfill Site Steering Comm. v. Browning-Ferris Indus. of New York,</u> <u>Inc.</u>, No. 95-cv-956A(F), 2004 WL 941816, at *22 (W.D.N.Y. Jan. 30, 2004) ("Courts have held that where a CERCLA response action involves a state environmental agency charged with approving cleanup plans and monitoring the remediation process, the NCP consistency requirement is satisfied."). Even in the absence of DEC direction, the response actions of RG&E in implementing the East Station IRM remedy substantially complied with NCP Non-Time Critical Removal action requirements. <u>See</u> Simone TT at p. 72-78; 40 C.F.R. § 300.415(b)(4).

54. RG&E's activities at West Station were also consistent

89

with the NCP. FirstEnergy agrees that the tar seep survey submitted to the DEC in 2004 was done in compliance with the NCP and the costs incurred in conducting the survey are recoverable. See Shifrin TT2 at p. 120-22. After examining the survey results DEC informed RG&E that the tar oil separator was a likely source of release of tar contaminants into the river and directed RG&E to remove it. RG&E proposed an additional study involving the taking of soil samples to confirm whether the tar separator needed to be removed because it was a source for coal tar contaminants. The DEC agreed and the study (Joint Exhibit 44) confirmed that the tar oil separator was not an ongoing source of tar contaminants that would justify an IRM. Based on the report, DEC agreed that RG&E would not be required to remove the tar separator as an IRM.

55. While RG&E is currently conducting a comprehensive RI/FS for the East Station, the costs of the site investigation which caused DEC to withdraw its demand that the tar separator be removed as an IRM is recoverable even if the RI/FS ultimately determines no remedial action is needed. "Investigation, study, and assessment of contamination constitute 'response' costs within the meaning of CERCLA." Arawana Mills Co. v. United Technologies Corp., 795 F. Supp. 1238, 1243 (D. Conn. 1992); see also Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 672 (5th Cir. 1989) (holding that site investigation costs are "response costs within the meaning of CERCLA"); Artesian Water Co. v. Gov't of New Castle County, 659 F.

Supp. 1269, 1285-87 (D. Del. 1987)(monitoring and evaluation are response costs within the meaning of CERCLA even if no further response costs have been incurred), aff'd, 851 F.2d 643 (3d Cir. 1988); City of New York v. Chem. Waste Disposal Corp., 836 F. Supp. 968, 980 (E.D.N.Y. 1993) ("The costs of initial investigation and monitoring of a release are recoverable, however, without such a showing [of consistency with the NCP].");  Gache v. Town of Harrison, 813 F. Supp. 1037, 1046 (S.D.N.Y. 1993) ("[I]nitial preliminary investigatory and monitoring costs are recoverable irrespective of the recoverability of the other response costs or compliance with the requirements of the [NCP]."); LeClercq v. Lockformer Co., No. 00 C 7164, 2002 WL 907969, at *3 (N.D. Ill. May 06, 2002)("[I]nitial investigation, site-assessment and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements.").

56.  For the same reason, costs RG&E has incurred with respect to site evaluation and investigation relative to the suitability of an *in situ* stabilization ("ISS") remedy to address the seep of tar contaminants to the Genesee River are also recoverable as response costs necessary for assessing the conditions of the site.  The work plan submitted to DEC by RG&E described four "phases" of the proposed ISS remedy.  According to the Ish Inc.'s January 31, 2004 Report (Joint Exhibit 357), Phase I (preparing the Remedial Design Investigation) was reviewed and approved by the DEC.  Accordingly,

I conclude these investigative costs to be recoverable. However, although RG&E has proposed the ISS remedy as an IRM, the trial testimony did not document DEC approval of the ISS remedy as an IRM under the VCA. Thus, to the extent RG&E has incurred costs relative to actual implementation of the ISS remedy without first obtaining DEC approval that the proposed ISS meets DEC standards for a non-time critical IRM, implementation and construction costs have not been proven to be consistent with the NCP and are not, at least at this juncture, recoverable response costs.[34]

57. Oversight costs incurred by the DEC in its effort to confirm that a site is being adequately investigated and remediated by responsible parties such as RG&E are recoverable under CERCLA.[35] See United States v. E.I. Dupont De Nemours & Co., 432 F.3d 161, 170-74 (3d Cir. 2005)(costs associated with government oversight of removal action are recoverable under CERCLA); see also New York v. Shore Realty Corp., 759 F.2d 1032, 1042-43 (2d Cir. 1985)("The

---

[34] Phase IV of the ISS remedy is contractor selection and remedial implementation. See Joint Exhibit 357 at p. 1-3. Absent DEC approval of Phase IV as an IRM under the VCA (or as a remedial action as recommended as part of an RI/FS), it is premature to find Phase IV costs recoverable under CERCLA. It is unclear from descriptions set forth in Joint Exhibit 82 (and 82E) what particular "Phase" the listed "ISS IRM" costs are attributable to. Only site investigation and evaluation costs are currently recoverable with respect to the proposed ISS IRM remedy at East Station.

[35] The DEC requires oversight cost reimbursement in any environmental investigation (including VCA's) where DEC approval or acceptance is sought. See DER-10 Technical Guidance Document (December 2002) at p. 4 (Joint Exhibit 108).

State's costs in assessing the conditions of the site and supervising the removal of the...hazardous waste squarely fall within CERCLA's definition of response costs, even though the State is not undertaking to do the removal."); United States v. E.I. du Pont de Nemours & Co., 341 F. Supp. 2d 215, 254 (W.D.N.Y. 2004)("[T]he plain language of CERCLA allows for the recovery of governmental oversight costs."). To the extent that DEC has assessed oversight costs against RG&E for monitoring the MGP site clean-up, FirstEnergy is also responsible for its fair share of oversight costs. See Atlantic Richfield Co. v. Am. Airlines, Inc., 98 F.3d 564, 567-69 (10th Cir. 1996)(private party that conducted remedial CERCLA action pursuant to consent decree was entitled to contribution from other responsible parties for costs of EPA monitoring or oversight of action); Action Mfg. Co. v. Simon Wrecking Co., 428 F. Supp. 2d 288, 324 (E.D. Pa. 2006)(oversight costs incurred by EPA in supervising site clean-up pursuant to consent decree are recoverable as necessary response cost under CERCLA).

58. In summary, the Court concludes that the following response costs are substantially consistent with the NCP and hence recoverable under CERCLA:

> A. All East Station Costs set forth on Joint Exhibit 82 except any ISS IRM implementation costs; and

> B. All West Station Costs set forth on Joint Exhibit 82.

## Equitable Allocation under CERCLA

59.    Section 113(f)(1) of CERCLA directs courts to allocate clean-up costs between responsible parties "using such equitable factors as the court determines are appropriate" 42 U.S.C. § 9613 (f)(1).  The statute does not limit courts to any particular list of factors.    Rather, its "expansive language instead affords a district court broad discretion to balance the equities in the interests of justice."  Bedford Affiliates v. Sills, 156 F.3d 416, 429 (2d Cir. 1998); see also Seneca Meadows, Inc. v. ECI Liquidating, Inc., 427 F. Supp. 2d 279, 292 (W.D.N.Y. 2006) ("In a given case, a court may consider several factors or a few, depending on the totality of the circumstances and equitable considerations.") (citation and quotation marks omitted); New York v. Westwood-Squibb Pharm. Co., No. 90-cv-1324C, 2004 WL 1570261, at *21 (W.D.N.Y. May 25, 2004)("Congress did not intend to require meticulous findings of the precise causative contribution that each of the parties made to the site.  Rather, the intent was to have the court deal with each situation by creative means, considering all of the equities and balancing them in the interests of justice.").

60.    This Court need not engage in an extended analysis in choosing the most equitable basis for allocating CERCLA liability as between RG&E and FirstEnergy during the pre-voting trust period. Both RG&E and FirstEnergy agree that under the facts presented here, using the volume of gas produced is an equitable allocation

methodology and I agree. To achieve fairness, FirstEnergy's equitable share should be primarily driven by its contribution of coal tar waste to the MGP sites. Expert testimony adduced at trial convinces me that the volume of gas produced at the East and West Station MGP sites during the relevant time period is the most reliable predictor of waste produced and accordingly will be utilized to determine FirstEnergy's fair share of CERCLA liability.[36]

61. The Court has previously determined that (1) AGECO's dominion and control over RG&E was so pervasive that it was the owner and operator of the East and West Stations during the pre-voting trust period, that is between May 23, 1929 and July 15, 1932, and (2) FirstEnergy is the legal successor to AGECO's proven CERCLA liabilities. Based on the expert testimony at trial, I determine that eight percent of the total gas produced at the East and West

---

[36] Many courts look to the six so-called "Gore factors" in allocating costs between responsible parties. Those factors are: (1) the ability of the parties to demonstrate that their contribution to the site can be distinguished; (2) the amount of hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such waste; and (6) the degree of cooperation by the parties with federal, state or local officials to prevent any harm to the public health or the environment. See 126 Cong. Rec. 26782 (1980) (statement of Rep. Gore). A more elaborate and detailed discussion of the Gore factors would not alter the Court's equitable allocation conclusions in this case.

Station MGPs was produced during the pre-voting trust period of May 1, 1929 to July 14, 1932. See Shifrin TT2 at p. 46; see also Gas Production Chart (Plaintiff's Exhibit 571).

62. The Court concludes that FirstEnergy's fair and equitable share of response costs for environmental contamination caused by MGP operations during the May 1, 1929 to July 14, 1932 period of time is eight percent. See Gas Production Chart (Plaintiff's Exhibit 571).

63. The Court concludes that all of the response costs set forth in paragraph 58(a) and 58(b) above are subject to allocation based on the eight percent equitable share determination set forth above, except a portion of the response costs associated with removal of the tar well. I conclude that plaintiff has failed to meet its burden of proving that the East Station tar well was in active use during the pre-voting trust period. Nevertheless, I also conclude that the tar leakage and resulting environmental contamination in the area outside the East Station tar well occurred from normal East Station MGP plant operations during the pre-voting trust period. Based on the evidence adduced at trial, I conclude that 65 percent of the total costs of removing the tar well are attributable to removal costs relating to contaminated soil outside the tar well and that this 65 percent of the total tar well response costs are subject to the eight percent equitable share determination. Put differently, FirstEnergy shall be liable for

eight percent of the 65 percent of the total response costs relating to the tar well removal.

## DECLARATORY JUDGMENT

64.  CERCLA permits a declaratory judgment allocating future response costs between PRPs. 42 U.S.C. § 9613(g)(2); see also Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 92 (2d Cir. 2000) (holding that "[t]he proper remedy for future response costs is not a present lump-sum payment of anticipated expenses but instead a declaratory judgment award dividing future response costs among responsible parties").

65.  Given the findings and conclusions made herein, a declaratory judgement allocating future response costs as between RG&E and FirstEnergy is appropriate and justified.  Under the VCA, RG&E will continue to incur investigation and remediation costs with respect to MGP contamination at both the East and West Stations.

66.  Accordingly, the Court determines that FirstEnergy is liable for eight percent of all future East and West Station MGP related response costs performed pursuant to the VCA that are not inconsistent with the NCP. In fashioning this declaratory judgment, the Court is cognizant that RG&E is currently conducting RI/FS investigations for both the East and West Station sites, a process that FirstEnergy argues is required for NCP compliance.  Thus, to the extent that future response costs are incurred, they hopefully will await completion of the East and West Station RI/FS reports and

further direction from the DEC pursuant to the VCA.[37]

**ALL OF THE ABOVE IS SO ORDERED.**

                                JONATHAN W. FELDMAN
                                United States Magistrate Judge

Dated:     August 8, 2008
            Rochester, New York

---

[37] At the time of trial, RG&E had convinced the DEC to await the RI/FS before deciding whether any further response was needed with respect to the tar separator and the DEC had not approved the tar seep ISS IRM remedy. Although not a signatory to the VCA, with the issuance of this Decision, the DEC is on notice that FirstEnergy has been held to be liable for a portion of the future response costs relating to MGP contamination at the East and West Station sites. If the DEC approves the tar seep ISS as an IRM, FirstEnergy may, of course, challenge the IRM as being inconsistent with the NCP. Before doing so, the Court encourages the parties and the DEC to try and resolve their disputes before commencing further legal proceedings.